UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :

138-77 QUEENS BLVD LLC,                 :

                         Plaintiff,       :         Case No.: 1:22-cv-5155

                 - against -        :

SCOTT E. SILVER,                  :        <u>JURY TRIAL DEMANDED</u>

                        Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## <u>COMPLAINT</u>


Michael A. Pensabene, Esq.
Harris W. Davidson, Esq.
ROSENBERG & ESTIS, P.C.
733 Third Avenue
New York, New York 10017
(212) 867-6000
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PARTIES ................................................................................................................................4

JURISDICTION AND VENUE ............................................................................................5

FACTS ...................................................................................................................................6

    A.    Background and Litigation History ...........................................................................6

          1.    The Premises........................................................................................................6

          2.    The Subject Lease and Personal Guaranty..........................................................6

          3.    QB Wash's Troubled Operating History ...........................................................7

          4.    The Rent Reset Process, QB Wash's Nonpayment of Rent, Other
              Lease Defaults, and Termination of the Lease....................................................10

          5.    The Eviction Action and QB Wash's Bankruptcy Case .....................................13

    B.    Defendant's Scheme to Coerce a Below-Market Rent or Discounted Sale
        of the Premises, Strip Assets from QB Wash, and Prevent Plaintiff from
        Collecting on the Personal Guaranty .......................................................................15

    C.    Tortious and Illegal Acts in Furtherance of Defendant's Coercion Scheme ..............17

          1.    Defendant's Formation of Wash Funding and Fraudulent Transfers
              to Shield His Son's Assets and Prevent Collection on the Personal
              Guaranty..............................................................................................................18

          2.    Fraudulent Transfers of Cash from QB Wash Benefitting Defendant...............20

          3.    Defendant's Legal Pressure Campaign, Premised on Perjury and
              Frivolous, Sanctionable Legal Arguments........................................................21

          4.    Additional Perjury in the Bankruptcy Court......................................................25

    D.    Breaches of the Lease and Plaintiff's Resulting Damages .........................................25

          1.    Nonpayment of Rent ...........................................................................................26

          2.    Unpaid Water Charges.........................................................................................26

          3.    Damages from the Oil Spill .................................................................................27

          4.    Damages from Municipal Violations....................................................................27

          5.    Lease Termination Damages................................................................................28

          6.    Contractual Damages for Attorneys' Fees..........................................................29

E.  Allegations Concerning Veil Piercing – Defendant's Domination and Control of QB Wash and Use Thereof to Perpetrate Wrongs Against Plaintiff ........................................................................................................29

1.  Domination and Control of QB Wash by Defendant..........................................29

2.  Defendant's Use of His Domination and Control of QB Wash to Perpetrate Wrongs Injuring Plaintiff..................................................36

F.  Allegations Concerning Tortious Interference, the Economic Interest Defense and Causation................................................................................37

1.  Defendant Engaged in Tortious Interference with the Lease...........................37

2.  The Economic Interest Defense Is Unavailable Because Defendant Served His and His Son's Interests, Not the Interests of QB Wash .................37

3.  The Economic Interest Defense Is Also Unavailable Because Defendant Directly and Indirectly Engaged in Multiple Independent Torts and Other Unlawful Acts.........................................................38

4.  Defendant's Actions Were the "But For" Cause of the Damages Resulting from His Economic Coercion Scheme ................................38

G.  Conduct Supporting an Award of Punitive Damages Against Defendant.................38

CLAIMS FOR RELIEF .......................................................................................................41

FIRST CLAIM FOR RELIEF – For Breach of Lease Based on Piercing the Corporate Veil ......41

SECOND CLAIM FOR RELIEF – For Tortious Interference with Contract ..............................42

JURY DEMAND ................................................................................................................42

PRAYER FOR RELIEF .......................................................................................................43

Plaintiff 138-77 Queens Blvd LLC ("Plaintiff"), by its attorneys, Rosenberg & Estis, P.C., as and for its Complaint against defendant Scott E. Silver ("Defendant" or "Scott"), alleges as follows:

## INTRODUCTION

1.     This action seeks damages arising from breaches of a commercial lease (the "Lease") for premises in Briarwood, Queens owned by Plaintiff (the "Premises") at which Scott's son, Zachary Silver ("Zachary"), operated a carwash and automotive lube business (the "carwash and lube business") financed by Scott.

2.     As a result of breaches of the Lease by Scott and Zachary (together, the "Silvers"), Plaintiff suffered out-of-pocket losses of over $600,000, creating severe financial hardship for Plaintiff's principal owner, a 93-year-old widow who had relied on rent from the Premises for the majority of her income prior to the Silvers' breaches.

3.     Starting shortly after Zachary took over management in January 2016, the carwash and lube business began experiencing operational problems and financial losses, and the Silvers began continually paying the rent late in the summer of 2018.

4.     In March 2020, with the onset of the COVID-19 pandemic, the Silvers ceased all rental payments.

5.     In June 2020, Plaintiff offered to waive two months of back rent in light of the pandemic, and alternatively offered to accept surrender of the Premises and waive all claims arising from the Lease.  The Silvers refused both offers.  Instead, they retained possession of the Premises, continued to withhold all rent, and offered alternatively to purchase the Premises for $2 million in cash (roughly half their market value), or pay a rent far below market rate.

6.      Plaintiff rejected these terms and commenced an ejectment action in Queens County Supreme Court in September 2020 (the "Eviction Action") against the tenant entity owned by the Silvers, QB Wash LLC ("QB Wash").

7.      The Silvers answered the complaint and opposed a motion by Plaintiff for use and occupancy *pendente lite*, arguing that QB Wash's business had faced a prolonged closure and was suffering ongoing harm from the pandemic that relieved them of any obligation to pay rent.

8.      In January 2021, Queens County Supreme Court entered an Order granting Plaintiff's motion for use and occupancy.  Rather than comply with the Order, the Silvers then placed QB Wash into Chapter 7 bankruptcy.

9.      Discovery in the bankruptcy case revealed that the Silvers had withheld rent and refused to surrender the Premises as part of a deliberately planned strategy to recoup Scott's losses from their failed business venture.  By refusing to pay rent, they intended to economically coerce Plaintiff either to sell Scott the Premises for a price far below market or to accept a deeply discounted rent.   In addition, continuing to operate the carwash and lube business while withholding rent enabled Scott to extract tens of thousands of dollars in cash from QB Wash.  Scott also orchestrated a series of fraudulent transfers to insulate Zachary from liability on his personal guaranty of the Lease (the "Personal Guaranty").

10.      Zachary made the Silvers' stratagem explicit in a June 18, 2020 email, copying Scott, in which he explained that he was "using the eviction/fee moratorium as a tool to leverage a better lease deal."

11.      Disclosure of QB Wash's financial records revealed the extent of the Silvers' efforts to unlawfully maximize that leverage.  They show that the carwash and lube business was closed for only about seven weeks between March and May 2020, and that upon reopening, the

business had thrived, enjoying some of its highest-grossing months ever.  Zachary's sworn statements in state Supreme Court in late 2020, that "the Property was closed and made unusable for the better part of the year," that "QB Wash has not been able to resume normal operations," that "major portions of QB Wash's business have been lost, and the status quo is not expected to change," and multiple similar allegations, were all entirely false and perjurious.  The legal arguments on which the Silvers based their defenses and counterclaims in the Eviction Action were also frivolous and sanctionable.

12.     At the same time as the Silvers were defending the Eviction Action on false and frivolous grounds, Scott supervised the looting of QB Wash, diverting more than $50,000 to family trusts he controlled while withholding all rent from Plaintiff.

13.     During the period the Silvers were withholding rent, Scott also formed a new Delaware entity, Wash Funding LLC ("Wash Funding"), which took liens on substantially all of Zachary's assets to render him judgment-proof and insulate him from any claims on the Personal Guaranty.

14.     Substantial evidence, detailed below in paragraphs 149 to 180, establishes that Scott personally planned and directed the Silvers' asset diversion and economic coercion scheme.  He was well-equipped to do so – and fully aware of the tortious and wrongful nature of his actions – because he is the general counsel of one of the largest consumer debt collection firms in the nation.

15.     Scott's domination and control of QB Wash and use of QB Wash to perpetrate wrongs against Plaintiff for his own benefit warrants piercing QB Wash's corporate veil to hold him personally liable for QB Wash's debts to Plaintiff (First Claim for Relief).

16.     Scott's conduct in planning, directing and executing the coercive breach of the Lease by QB Wash also constitutes tortious interference with contract (Second Claim for Relief).

17.     Scott's actions manifest a brazen disregard for the rights of Plaintiff and its owners that warrants an award of punitive damages.  The torts and other wrongs committed in furtherance of the scheme – fraudulent transfers, tortious interference with contract, perjury, and plainly frivolous litigation, all in furtherance of the abusive goal of applying economic pressure to obtain an unfair rent or below-market sale of the Premises – reflect an extraordinary level of moral culpability.  The conduct was extensively and deliberately planned, by an individual with special expertise in the relevant law.  It was directed at an elderly, financially vulnerable individual who had been widowed months earlier.  It sought to exploit a national health and economic crisis for personal gain.  This conduct must not escape sanction.

## PARTIES

18.     Plaintiff is a limited liability company organized under the laws of the State of New York with a principal office at 797 Flanders Drive, Valley Stream, New York.  Its sole asset is the Premises. Plaintiff is beneficially owned 50% by Maureen Wohl ("Maureen"), age 93, whose interest is held in a marital trust created under her deceased husband's will (the "Marital Trust").  The remaining 50% interest in Plaintiff is held directly by Maureen's two adult children, Ellen Vaknine ("Ellen") and Ethan Wohl ("Ethan"), 25% each.  For Maureen, her 50% interest in Plaintiff is her largest asset and provided the majority of her income before the breaches of the Lease giving rise to this action.

19.     According to public records, Defendant's principal residence is 95 Lenwood Boulevard, Charleston, South Carolina and his principal business address is 206 Meeting Street, Suite 206, Charleston, South Carolina.  At all relevant times, Scott was employed as the general counsel of Sherman Financial Group ("Sherman Financial"), one of the largest consumer debt collection firms in the country.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant, and as pled below in paragraphs 131 to 147, the amount in controversy exceeds the jurisdictional minimum of $75,000, exclusive of interest and costs.

21.     Because Plaintiff is a limited liability company, its citizenship is determined by the citizenship of its members.

22.     The Marital Trust, Ellen and Ethan are Plaintiff's only members.

23.     The Marital Trust is a traditional trust whose citizenship is determined by the citizenship of its trustee, Maureen.  Maureen is domiciled in Nassau County, New York, where she has lived since 2019.  She accordingly is a New York citizen.

24.     Ellen is domiciled in Nassau County, New York, where she has lived since 2007. She is accordingly a citizen of New York.

25.     Ethan is domiciled in Essex County, New Jersey, where he has lived since 2008. He is accordingly a citizen of New Jersey.

26.     The Defendant has maintained his principal residence and principal business address in Charleston, South Carolina since in or about 2017.  He is accordingly a domiciliary and citizen of South Carolina.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims pled herein occurred in this District and because the Premises are located in this District.  In addition, the Lease (rider ¶ 48), provides that "[a]ll actions or proceedings relating, directly [or] indirectly, to this Lease shall be litigated only in courts located within the County of Queens or a judicial district of which the County of Queens is a part."

## FACTS

A.       **Background and Litigation History**

1.       **The Premises**

28.       The Premises are located at 138-77 Queens Boulevard and an adjacent address, 138-11 87th Avenue, and comprise tax lots 11 and 110 in block 9645, County of Queens.  They occupy a full blockfront on Queens Boulevard in Briarwood, between 86th Road and 87th Avenue.  They have been continuously operated as a car wash and lube shop since at least the 1970s.

29.       Bert Wohl ("Bert"), Maureen's husband and Ellen and Ethan's father, held title individually and as trustee of a family trust from the early 1980s until his passing in March 2019.  The Premises were then conveyed to Plaintiff from Bert's estate and the family trust in January 2020.  No change in beneficial ownership resulted from the conveyance to Plaintiff.  For simplicity, references herein to Plaintiff include Bert, his estate, and the family trust, as predecessor owners of the Premises.

2.       **The Subject Lease and Personal Guaranty**

30.       In 2010, Bert entered into the Lease, dated as of June 2, 2010, with an entity named Blvd Wash & Lube Ltd.

31.       The Lease had a 25-year term and was structured as a "triple net" lease that required the tenant, in addition to paying base rent, to reimburse the landlord for real estate taxes and insurance and take full responsibility for maintenance and repairs.  Lease rider ¶¶ 51 52, 59.

32.       After an initial discounted rent period, the Lease provided for fixed annual rent increases yearly until June 2020, when the base rent was scheduled to reset to market rate (the "Rent Reset").  If the parties were unable to reach agreement on the new rent, the Lease set forth a detailed procedure involving the appointment of appraisers to determine the new rent.  Lease rider ¶ 50.

33.    In March 2011, the original tenant, Blvd Wash & Lube Ltd., sold its business and assigned the Lease to LB One, LLC ("LB One").

34.    In January 2016, LB One sold its business and assigned the Lease to QB Wash, a New York limited liability company owned and controlled by the Silvers.

35.    Under the Contract of Sale of Business between LB One and QB Wash, QB Wash purchased the business for $1.2 million in cash and a $1.33 million promissory note payable to LB One (the "LB One Note"), under which QB Wash was required to make monthly payments of $9,790[1] for 19 years.

36.    The cash for the purchase was provided by Scott and/or a family trust controlled by him.

37.    In connection with the assignment of the Lease to QB Wash, Zachary executed an Agreement for the Personal Guarantee of Lease dated as of January 8, 2016 (the Personal Guaranty), pursuant to which he guaranteed QB Wash's performance under the Lease.

### 3.    QB Wash's Troubled Operating History

38.    Zachary assumed day-to-day management of the carwash and lube business upon its sale to QB Wash in January 2016.  Within a few months, the business began encountering financial and operational difficulties.

39.    Starting with a violation in March 2016, QB Wash was fined repeatedly by the New York City Fire Department (the "Fire Department") for significant violations related to machinery and materials handling, accruing over $7,800 in fines in 2016-19.  By contrast, the prior tenants in the Premises did not incur any Fire Department fines in the prior 15 years or more.  In the case of

---

[1]  For clarity, cents are omitted from all amounts stated herein.

a number of the violations, QB Wash defaulted, and Zachary resolved the violations only after Plaintiff's representatives pressed him to do so.

40.     Starting in late 2016, QB Wash began intermittently making late rental payments, paying each of November 2016, December 2016 and February 2017 after the grace period provided in the Lease.

41.     In April 2017, after making 14 monthly payments on the LB One Note, QB Wash stopped paying LB One and the Silvers then alleged that they had been deceived by LB One regarding the carwash and lube business when they acquired it, over a year earlier.

42.     In June 2017, LB One and QB Wash entered into a settlement whereby the Scott Silver Family Trust paid $967,500 to satisfy the LB One Note – a discount of roughly 25% from the full amount then due.

43.     The settlement with LB One eliminated the obligation to make monthly payments on the LB One Note, but within a year, in the summer of 2018, QB Wash again began paying the rent for the Premises late.

44.     In late 2018 and 2019, Plaintiff agreed to accept payment of the insurance and real estate tax reimbursements required under the Lease in deferred installments to accommodate QB Wash's apparent cash flow difficulties.

45.     Starting in January 2019, Scott began a series of wire transfers to QB Wash to cover its operating deficits, contributing a total of $165,000 in the 13 months between January 2019 and February 2020.

46.     Despite the cash infusions, QB Wash's payment performance under the Lease continued to deteriorate.  Beginning in March 2019, QB Wash began making incomplete rent payments, with portions of the rent due arriving more than 30 days late.

47.     After accepting late payments without charging late fees or interest for nearly a year, Plaintiff's representatives advised Zachary in July 2019 that Plaintiff would begin imposing the late charges provided in the Lease.  He responded in a July 24, 2019 email, "OK I understand. Times have been very hard. Thank you so much for your leniency up to this point."

48.     QB Wash continued to pay progressively later, however, and never made a timely payment of monthly rent after the summer of 2018.

49.     Over the period that Zachary managed the carwash and lube business at the Premises, the business also experienced other operational problems.

50.     In April 2018, a worker suffered a grievous injury resulting in the amputation of his leg while working at the Premises, according to his attorneys.  He later sued QB Wash, as well as Plaintiff and a number of other parties for his injuries.  *See Luis Coj-Carillo v. 138-77 Queens Blvd LLC*, No. 714151/2020 (Sup. Ct. Queens Cnty.).

51.     Plaintiff later discovered that QB Wash had also spilled hundreds of gallons of motor oil in the cellar of the Premises, and had failed to report or remediate it.

52.     QB Wash also substantially underreported its business revenue in its sales tax filings with the New York State Department of Taxation and Finance (the "NYS Tax Department"), apparently over a period of years.  The NYS Tax Department assessed a sales tax deficiency of $125,468 for the fiscal quarter ended November 30, 2019, reflecting unreported sales of more than $1.4 million through that date, plus interest and penalties.

53.     In July 2020, the New York City Department of Environmental Protection ("DEP") made findings that a DEP water meter had been illegally removed without a permit and unmetered water service had been installed at the Premises.

54.     QB Wash also received scathing customer reviews.  On the Google Maps website, as of October 2020, its business was rated 3.1 stars based on 278 reviews, one of the five lowest ratings among the first 60 listings for "Car wash in Queens NY" in Google Maps.

### 4.     The Rent Reset Process, QB Wash's Nonpayment of Rent, Other Lease Defaults, and Termination of the Lease

55.     In February 2020, pursuant to the Rent Reset procedure in the Lease, Zachary met twice with Plaintiff's representatives, Ellen and Ethan.[2]   These meetings occurred before COVID-19 was declared a pandemic and perceived as a threat in the New York City area.  At the first meeting, on February 6, 2020, Zachary stated that the rent was "unsustainable" and "excessive" and that he would need a rent reduction to continue in the Premises.

56.     At the parties' second meeting, on February 27, 2020, Zachary reiterated that he would need a substantial rent reduction, but also stated that he had the funds to purchase the Premises and was prepared to pay $2 million "all cash" to acquire them, roughly half of the amount for which they had been appraised in 2019.

57.     Plaintiff declined to entertain a sale, and following the parties' February 27, 2020 meeting, the Silvers ceased to make further rental payments.

58.     On March 20, 2020, the Governor ordered the closure of non-essential businesses in response to the COVID-19 pandemic, effective March 22, 2020.  QB Wash's automotive lube business, which had historically accounted for roughly one-third of the tenant's revenue, was categorized as an essential business and was unaffected by the shutdown.  https://esd.ny.gov/-guidance-executive-order-2026 (deeming "auto repair and maintenance" to be an essential

---

[2]  Unless otherwise indicated, all meetings and communications discussed herein were conducted by Ethan and Ellen on behalf of Plaintiff and Zachary on behalf of QB Wash.

service).  The car wash business was deemed non-essential and was therefore subject to closure.
*See id.*

59.     While the Governor's closure order continued to apply to non-essential businesses
in New York City until June 22, 2020, *see* https://gothamist.com/news/everything-you-need-
know-about-phase-2-reopening-nyc, financial and water usage records show that QB Wash
resumed carwash operations on or about May 9, 2020, approximately seven weeks after their
closure.

60.     Meanwhile, the parties designated appraisers for the Rent Reset process in March
2020 and exchanged appraisals in late May 2020.  The party appraisers' divergent valuations
triggered appointment of a third, neutral appraiser, and in July 2020, Plaintiff accepted the Silvers'
proposal to appoint Steven Schleider, a prominent MAI appraiser in New York City.  *See*
https://www.mvsappraisal.com/company/.

61.     The parties also addressed the Silvers' ongoing non-payment of rent in a series of
negotiations in May and June 2020.  Plaintiff offered to waive two months' base rent and
associated late fees and defer payment of roughly one-third of the base rent coming due over the
summer.  Alternatively, Plaintiff offered the Silvers the option of terminating the Lease and
surrendering the Premises without liability for the accumulated rent arrears, then over $80,000.

62.     The Silvers rejected these offers, retaining possession but continuing to withhold
all rent, including real estate tax and insurance reimbursements.  The Silvers also ceased paying
for the water used in the carwash business at the Premises, accruing more than $37,000 in unpaid
water and sewer charges over the following eight months.

63.     Following the Silvers' rejection of Plaintiff's offers, Plaintiff drew down the one-
month security deposit it was holding, and sent QB Wash several demands to replenish the security

deposit.  Plaintiff also subsequently issued notices to cure various Lease violations, including an unpaid water bill, a Fire Department violation, and a Determination of Theft of Services and Cease and Desist Notice (the "Theft of Services Violation") issued by DEP.

64.     On August 14, 2020, the neutral appraiser, Steven Schleider, rendered his Rent Reset determination, finding the fair market base rent for the Premises to be $21,729 per month, a 25% increase over the prior base rent.

65.     Thereafter, Ethan and Ellen conferred with Zachary, and he again offered to purchase the Premises for $2 million.  Alternatively, he offered to pay $14,500 per month base rent – a 1/3 discount to the fair market rent determined by the neutral appraiser the Silvers had selected.  Plaintiff refused both offers.

66.     Several days later, Ethan emailed Zachary: "We have given further thought to how to move forward here and would like to discuss an approach that lets you walk away without liability for the back rent here. Please let us know when you are available to speak again."  Zachary did not respond to that email, or to a followup email again proposing a conversation.

67.     The Silvers then allowed two pending cure notice periods to lapse without corrective action, and Plaintiff then sent a Lease cancellation notice on August 27, 2020, terminating the Lease effective September 3, 2020.

68.     After sending the Lease cancellation notice, Ethan then sent a third email, urging a conversation prior to the start of eviction proceedings, copying both Scott and the attorney who had represented QB Wash in the Rent Reset process, Michael Wood ("Wood"), a partner with the law firm Cermele & Wood LLP.

69.     Wood responded with an email inviting a call to discuss a resolution and subsequently spoke with Ethan.  On the call, Wood repeated the Silvers' previous offer: they would

pay a base rent of $14,500 per month or, alternatively, were prepared to purchase the Premises for $2 million – the third time the Silvers had offered to purchase the Premises.  Wood advised that absent Plaintiff's agreement, QB Wash would remain in possession and continue to operate its business.  Plaintiff again refused these terms.

5.     <b>The Eviction Action and QB Wash's Bankruptcy Case</b>

70.     On September 4, 2020, Plaintiff commenced the Eviction Action in Queens County Supreme Court, captioned *138-77 Queens Blvd LLC v. QB Wash LLC*, No. 715071/2020.

71.     In October 2020, QB Wash responded with an answer and counterclaims, asserting that it had suffered severe financial harm from COVID-19 and that the pandemic wholly excused its obligation to pay rent or perform its other obligations under the Lease.  QB Wash further asserted that Plaintiff had breached the Lease and violated the New York City commercial tenant anti-harassment statute by serving default notices and seeking to terminate the Lease.  Eviction Action, NYSCEF No. 13.

72.     Plaintiff then moved for an order directing payment of use and occupancy *pendente lite*, and QB Wash opposed the motion, again alleging that COVID-19 had severely impacted its business.  Eviction Action, NYSCEF No. 50.

73.     On January 15, 2021, the state Supreme Court, the Honorable Robert J. McDonald, J.S.C., entered an Order (the "U&O Order"), finding that "permitting tenant to remain in possession of the subject premises without paying for its use would be 'manifestly unfair' " and directing QB Wash to pay prospective use and occupancy, post a bond for the rent arrears, and pay the water and sewer arrears.

74.     In late January 2021, a senior bankruptcy partner at a major law firm, McDermott Will & Emery, contacted Plaintiff's undersigned counsel on behalf of the Silvers to explore a settlement.  To induce Plaintiff to release all claims against Zachary, he provided a list of Zachary's

assets, and explained that Zachary's principal asset, a brokerage account at Wells Fargo holding $398,000 (the "Wells Fargo Brokerage Account") "was pledged to QB Wash's lender in connection with financing the acquisition of QB Wash and is subject to a deposit account control agreement."

75.     Plaintiff refused to release its claims, and on February 8, 2021, shortly after the U&O Order's deadline for posting a bond, QB Wash filed for bankruptcy under Chapter 7 of the Bankruptcy Code, Case No. 1-21-40301-ess (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

76.     The filing of the Bankruptcy Case automatically stayed the Eviction Action.

77.     A Bankruptcy Trustee was appointed, and Plaintiff thereafter entered into a stipulation with him under which he agreed to surrender possession of the Premises to Plaintiff (the "Surrender Stipulation").

78.     Upon inspection of the Premises on March 11, 2021 pursuant to the Surrender Stipulation, Plaintiff discovered a substantial oil spill in the cellar at the Premises, where motor oil and waste oil tanks used in the automotive lube business were located (the "Oil Spill").

79.     Plaintiff immediately engaged an environmental consultant, who duly reported the Oil Spill to the New York State Department of Environmental Conservation ("DEC") (Spill Number 2010037).

80.     Plaintiff then arranged remediation by a licensed contractor, and over 300 gallons of oily waste was subsequently removed from the cellar.  Inspection revealed that (1) tanks for collecting waste oil had been allowed to overfill, and (2) one of the tanks holding motor oil was corroded and had likely leaked.  Following full remediation and submission of a report by Plaintiff's consultant, DEC noted the Oil Spill as resolved.

81. On March 16, 2021, the Bankruptcy Court approved the Surrender Stipulation, and Plaintiff thereupon resumed possession of the Premises.

82. On April 15, 2021, Plaintiff entered into a new lease for the Premises (the "2021 Lease") with an experienced car wash operator who was the original tenant under the Lease executed in 2010. The 2021 Lease provides three years of discounted rent, with a market-rate base rent of $22,000 starting in May 2024, or upon the sooner assignment of the 2021 Lease.

83. The Bankruptcy Trustee conducted an investigation of QB Wash's affairs, and obtained documents from QB Wash and the Silvers, which he provided to Plaintiff. Plaintiff also moved for disclosure in the Bankruptcy Court and obtained additional documents and information from QB Wash and the Silvers.

84. The Bankruptcy Trustee ultimately entered into settlements with the Scott Silver Family Trust and Deirdre Silver Family Trust (together, the "Silver Family Trusts"), Wash Funding and Zachary under which the Bankruptcy Estate received a total of $132,840 to settle claims for monies they had received from QB Wash. None of these funds were ultimately paid to Plaintiff, however, because claims by the NYS Tax Department for unpaid sales taxes and by the NYS Department of Labor for unpaid unemployment insurance contributions were entitled to priority under the Bankruptcy Code and fully consumed the net settlement proceeds.

85. On August 22, 2022, the Bankruptcy Court closed the Bankruptcy Case.

**B.** **Defendant's Scheme to Coerce a Below-Market Rent or Discounted Sale of the Premises, Strip Assets from QB Wash, and Prevent Plaintiff from Collecting on the Personal Guaranty**

86. In early 2020, Scott faced a serious problem: the carwash and lube business was losing money and he had been forced to contribute $165,000 in cash over the preceding 13 months to keep the business afloat.

87.     With the arrival of the COVID-19 public health and economic crisis, however, Scott saw an opportunity, and he devised a strategy: the Silvers would withhold all rent, exploit New York State's moratorium on evictions and the court delays resulting from the pandemic to force Plaintiff's principals to pay hundreds of thousands of dollars out of pocket for real estate taxes, legal fees, insurance, water charges, and other property expenses, and use the resulting economic pressure to compel them to sell the Premises at a deep discount or accept a rent far below market rate.

88.     By withholding all rent and allowing water charges to accrue unpaid, the carwash and lube business' monthly expenses would be reduced by $30,000-$35,000 per month, generating enough cash to fund the litigation with Plaintiff and also enable Scott to recoup some of his losses by siphoning funds out of the business.

89.     Scott also planned for the possibility that Plaintiff's principals would not capitulate. To insulate Zachary from liability under the Personal Guaranty and deter any collection suit by Plaintiff, Scott formed Wash Funding and caused it to take a pledge of Zachary's principal asset, the Wells Fargo Brokerage Account, which held approximately $400,000.

90.     Scott had good reason, however, to believe his pressure campaign would succeed. As the Silvers later disclosed in litigation with Plaintiff, they had conducted a nationwide search for assets owned by Maureen and her late husband Bert, and correctly determined that they owned only two other income properties – a dollar store in Queens and a small retail strip in Fort Lauderdale, Florida – both much less valuable than the Premises.  Through their in-depth research, the Silvers had also discovered that the Florida property was vacant and undergoing major renovations, requiring significant cash investments and leaving Maureen with just one other property to provide her income.

91.     Scott also knew that by withholding all payments for real estate taxes, insurance, and even the water used in the carwash operations, and by imposing litigation costs to recover possession of the Premises, he would not only deprive Maureen of her principal source of income but would also impose on her and her children hundreds of thousands of dollars in out-of-pocket expenses.

92.     In fact, in 2020 alone, Plaintiff's unreimbursed out-of-pocket costs for real estate taxes, insurance and legal fees totaled over $100,000.

93.     In 2021, Plaintiff's unreimbursed out-of-pocket costs for real estate taxes, water and sewer charges, legal fees, and cleanup of the Oil Spill totaled an additional nearly $200,000.

94.     Scott's plan to impose severe financial costs on Maureen thus achieved its goal.  As discussed below (¶ 201), the loss of income from the carwash and out-of-pocket costs associated with it reduced Maureen's income in both 2020 and 2021 by more than two-thirds.

95.     Scott also knew that Maureen, then age 91, would be particularly susceptible to a pressure campaign because she had lost her husband of 52 years just months earlier, in March 2019.

C.      **Tortious and Illegal Acts in Furtherance of Defendant's Coercion Scheme**

96.     In furtherance of Scott's scheme, the Silvers committed multiple torts and illegal acts, including perjury in both state Supreme Court and the Bankruptcy Court, numerous unlawful fraudulent transfers, the assertion of frivolous and sanctionable arguments and counterclaims in the Eviction Action, and malicious prosecution of the Eviction Action counterclaims.

1.   **Defendant's Formation of Wash Funding and**
   **Fraudulent Transfers to Shield His Son's Assets**
   <u>**and Prevent Collection on the Personal Guaranty**</u>

97.   In April 2020, Scott launched his strategy by forming a new Delaware limited liability company, Wash Funding.

98.   There was no valid reason to form Wash Funding; its only role was to conceal the related-party nature of the insider debt Scott later transferred to it.  As discussed below in Point C.4 (¶ 129), the Silvers later affirmatively misrepresented Wash Funding to be an unrelated party in the Bankruptcy Court.

99.   In May 2020, Scott and Zachary jointly consulted with an attorney at Foley & Lardner, a major law firm retained by Scott, for legal advice related to the Premises.  Scott had previously retained Foley & Lardner for a large transaction conducted by the firm where he is general counsel, Sherman Financial.

100.   Thereafter, in June 2020, the Silver Family Trusts transferred to Wash Funding two promissory notes that Zachary had ostensibly executed in 2016 and 2017 in connection with the acquisition of the carwash and lube business.  Wash Funding then filed a UCC-1 Financing Statement with the New York Secretary of State, purporting to perfect a security interest in "all assets" belonging Zachary.[3]

101.   According to the Silvers' counsel at McDermott Will & Emery (a second prominent law firm that Scott later engaged to advise on placing QB Wash into bankruptcy), Wash Funding also took a pledge of the Wells Fargo Brokerage Account, which held approximately $400,000 and represented substantially all of Zachary's assets.

---

[3]   Contemporaneously, Wash Funding also filed a second UCC-1 Financing Statement with respect to "[a]ll items of Personal Property, Fixtures and Equipment" owned by QB Wash – another fraudulent transfer, which the Bankruptcy Trustee later voided.

102.    The foregoing liens on Zachary's assets (the "Voidable Liens") constituted unlawful fraudulent transfers that violated the New York Debtor and Creditor Law (the "DCL").

103.    First, the Voidable Liens violated DCL § 273(a), which prohibits transfers made "with actual intent to hinder, delay or defraud" creditors.

104.    As set forth above, the Voidable Liens were part of a scheme to financially coerce Plaintiff by breaching the Lease, and were executed for the purpose of shielding Zachary from liability on the Personal Guaranty.

105.    In addition, they reflect many of the "badges of fraud" enumerated in DCL § 273(b):

    (a)    The Voidable Liens were given by the debtor, Zachary, to an insider, Wash Funding, which was controlled by his father, Scott, and owned by family trusts (DCL § 273(b)(1));

    (b)    Zachary retained possession and control of the property subject to the Voidable Liens after they were given (DCL§ 273(b)(2));

    (c)    the related-party nature of the Voidable Liens was concealed (DCL § 273(b)(3));

    (d)    at the time the Voidable Liens were made, QB Wash was in default under the Lease and Zachary faced the likelihood of being sued on the Personal Guaranty – indeed the Voidable Liens were executed within days after the Silvers had rejected Plaintiff's offers of a rent abatement or surrender of the Premises without liability (DCL § 273(b)(4));

    (e)    the Voidable Liens covered substantially all of Zachary's assets (DCL § 273(b)(5));

(f)    as further discussed below (¶ 107), no value was given in exchange for the Voidable Liens (DCL § 273(b)(8));

(g)    QB Wash was insolvent at the time the Voidable Liens were made, and they left Zachary with insufficient assets to satisfy his and QB Wash's joint liabilities to Plaintiff (DCL § 273(b)(9)); and

(h)    the Voidable Liens were made at a time when QB Wash and Zachary were incurring a growing liability to Plaintiff by withholding all payments of rent under the Lease (DCL § 273(b)(10)).

106.   The Voidable Liens also violated DCL § 274(a) and/or DCL § 273(a)(2), which prohibit transfers made "without receiving a reasonably equivalent value in exchange for the transfer" at a time that the transferor was insolvent or expected to incur debts beyond the transferor's ability to pay.

107.   The value putatively given for the Voidable Liens consisted of funding provided by the Silver Family Trusts between three and four years earlier, in 2016 and 2017, to finance the purchase of the lube and carwash business.  In the QB Wash Bankruptcy Case, however, the Silvers admitted that they had no contemporaneous communications or documentation establishing when the loan documents were actually executed.  There is thus no evidence that the promissory notes were given as part of a contemporaneous exchange of value, and substantial reason to believe that they were created later and backdated as part of Scott's asset diversion scheme.

### 2.    Fraudulent Transfers of Cash from QB Wash Benefitting Defendant

108.   Between April and December 2020, while the Silvers were refusing to pay rent to Plaintiff, they made a series of cash payments from QB Wash to Wash Funding and the Silver Family Trusts totaling nearly $40,000.

109.    These payments constituted additional fraudulent transfers in violation of Article 10 of the DCL.  Specifically, they violated DCL §273(a)(1) because they were made with actual intent to hinder, delay or defraud Plaintiff and other creditors of QB Wash; and violated DCL § 274(a) because they were made at a time when QB Wash was insolvent and QB Wash did not receive a reasonably equivalent value in exchange for such transfers.  In addition, they violated DCL § 274(b), which prohibits payments to insiders on pre-existing debt if the payee had reason to believe the payor was insolvent.

110.    In late 2020, QB Wash made over $12,500 in additional payments to attorneys and a surveying firm in connection with the purchase by a family trust controlled by Scott of a car wash property in Danbury, Connecticut operated by an unaffiliated tenant.  The Silvers thus wrongfully diverted funds from QB Wash to help Scott purchase another car wash property.  QB Wash received no benefit from these payments, which constituted additional unlawful fraudulent transfers in violation of DCL §§ 273(a)(1) and 274(a).

111.    The Bankruptcy Trustee later settled the unlawful voidable transactions referenced in paragraphs 108 and 110 for payment of $82,840 from the Silver Family Trusts and Wash Funding.

### 3.    Defendant's Legal Pressure Campaign, Premised on Perjury and Frivolous, Sanctionable Legal Arguments

112.    Between June and September 2020, Scott and Zachary jointly corresponded more than 50 times with an attorney, Michael Wood, who represented QB Wash in connection with the Rent Reset and subsequently in the Eviction Action.  The Bankruptcy Trustee later waived privilege and produced communications between Wood and the Silvers to Plaintiff.

113.    Zachary explained in an early email to Wood, copying Scott, that "I have not paid rent for the months of March, April, May, or June.  I am using the eviction/fee moratorium as a tool to leverage a better lease deal and need advice on how far (or not) to push it."

114.    Between September 2020 and February 2021, the Silvers proceeded with the strategy Zachary described, adopting a litigating position in Plaintiff's Eviction Action that was premised entirely on the contention that the carwash and lube business operated by QB Wash had experienced an extended closure and was continuing to suffer ongoing harm from the COVID-19 pandemic.

115.    Specifically, in a 30-page Answer and Counterclaims (the "Answer and Counterclaims"), verified under oath by Zachary and filed on October 26, 2020 in the Eviction Action, the Silvers made a series of specific allegations regarding the impact of COVID-19 on QB Wash's business:

> QB Wash is one of the numerous small shops renting commercial space in New York who have been subject to the irreparable financial hardship that this pandemic brought (¶ 4)
> . . .
> Between March 2020, and present [October 2020], QB Wash has not been able to resume normal operations at the Property (¶ 17)
> . . .
> QB Wash might not ever be able to resume operations as contemplated by the Lease (¶ 19)
> . . .
> [M]ajor portions of QB Wash's business have been lost, and the status quo is not expected to change for the foreseeable future (¶ 20)
> . . .
> QB Wash was forced to bring the Property to a complete shutter in or around March 2020 [and] [t]o date the Property remains un-tenantable (¶¶ 31-32)
> . . .
> To date, QB Wash's business operations are not fully operational at 100% capacity (¶ 35)
> . . .
> As a result of the COVID-19 pandemic and the ensuing Executive Orders, QB Wash has been deprived of the use of the Property as of February

> 2020, and is now operating at minimum capacity, subject to the Executive
> Orders' restrictions in place and social distancing that will be in effect for
> the foreseeable future (¶ 38)
>
> . . .
>
> the Property was closed and made unusable for the better part of the year
> (¶ 39).

116.    Financial records and bank statements obtained in the Eviction Action and
Bankruptcy Case establish that all of these statements were entirely false.

117.    In fact, the carwash and lube business at the Premises had closed for *less than two
months*, from approximately March 22 to May 9, 2020.

118.    Following its reopening in May, the business thrived.   Far from suffering
impairment, the business experienced some of its best months ever.   Over the four full months
between the reopening in May 2020 and the filing of the Silvers' Answer and Counterclaims in
October (i.e., June 2020-September 2020), QB Wash's revenue was *more than 10 percent higher*
than in the same period a year earlier and was, in fact, QB Wash's *best performance over those
months in any year on record*.

119.     The legal arguments that the Silvers asserted in their Answer and Counterclaims
were also wholly frivolous.

120.    The Silvers argued that the pandemic excused QB Wash's obligation to pay rent or
perform other obligations under the Lease based on frustration of purpose, impossibility of
performance, and various provisions in the Lease.

121.    In fact, even if the carwash and lube business had been impaired due to COVID-19
as the Silvers falsely alleged, there is no principle of law that would have entitled them to retain
possession of the Premises and withhold rent. The remedy for frustration of purpose and
impossibility of performance is *recission* – returning the keys and vacating the premises. No case
allows a tenant to withhold rent on the grounds of frustration or impossibility while continuing to

occupy the premises at issue.  Likewise, no provision in the Lease even colorably justified any rent reduction, let alone the total cessation of rent and utility payments to which the Silvers argued they were legally entitled.

122.    Zachary again made objectively false statements in the Silvers' subsequent submissions in opposition to Plaintiff's motion for use and occupancy.  In an affidavit sworn to on December 9, 2020 (¶ 21), he stated:

> QB Wash was barred from operating the Property as a car wash, automotive lube and detail shop for at least five months. Now, as circulation has begun – although in a significantly slower pace – the Property is being operated to a reduced capacity, subject to mandated masks, social distancing and added security protocols, which understandably, continue to keep customers away.

123.    At the time Zachary executed this affidavit, QB Wash had just completed one of its best months – and its highest grossing November ever.

124.    The false statements of material fact and frivolous legal arguments described above were wrongful and violated applicable law.

125.    First, Zachary's knowing false statements under oath constitute perjury in the second degree in violation of N.Y. Penal Law § 210.10, which imposes liability when a person "swears falsely and when his false statement is (a) made in a subscribed written instrument for which an oath is required by law, and (b) made with intent to mislead a public servant in the performance of his official functions, and (c) material to the action, proceeding or matter involved."

126.    Second, the false statements and frivolous arguments violated Part 130 of the Rules of the Chief Administrative Judge of the New York Courts.  22 N.Y.C.R.R. Section 130-1.1(c) deems conduct frivolous and sanctionable if:

(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;

(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or

(3) it asserts material factual statements that are false.

127.   The Silvers' litigation conduct meets all three definitions: (1) the legal arguments advanced were manifestly meritless, (2) the purpose of the filings was to delay the Eviction Action, impose financial injury on Plaintiff, and coerce its owners economically, and (3) the Silvers' claims and defenses were premised on materially false statements.

128.   Finally, the Silvers' assertion of meritless counterclaims also constitutes the common law tort of malicious prosecution: the causes of action they pled patently lacked merit; they were asserted for the improper purpose of economic coercion; Plaintiff suffered special damages by being deprived of possession of the Premises; and the action terminated in Plaintiff's favor after Plaintiff obtained all possible relief in the Bankruptcy Court.

### 4.    Additional Perjury in the Bankruptcy Court

129.   The Silvers also committed additional perjury in the Bankruptcy Court.   The bankruptcy petition, filed on behalf of QB Wash by a sole practitioner after the Silvers had consulted extensively with bankruptcy counsel at McDermott Will & Emery engaged by Scott, identified Wash Funding as a secured creditor.   The petition, executed by Zachary under penalty of perjury, however, falsely represented Wash Funding to be an unrelated party:

**Is the creditor an insider or related party?**
■ No
☐ Yes

### D.    Breaches of the Lease and Plaintiff's Resulting Damages

130.   QB Wash committed multiple breaches of the Lease, for which Defendant is liable.

1.    **Nonpayment of Rent**

131.   First, QB Wash failed to pay any rent for over a year, from March 1, 2020 through the date Plaintiff regained possession, March 16, 2021.

132.   QB Wash's failure to pay base rent, real estate tax reimbursements, and insurance reimbursements breached Article 1 of the Lease and paragraphs 48, 51 and 52 of the rider thereto, and holdover damages are payable from the date of Lease termination through the date Plaintiff regained possession (September 3, 2020 to March 16, 2021) pursuant to Lease rider paragraph 75. In addition, late fees and interest are payable pursuant to Lease rider paragraph 77.

133.   The total base rent, holdover damages, real estate tax reimbursements, insurance reimbursements, and late payment fees and interest due to Plaintiff (the "Rent Nonpayment Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---|
| Base Rent (though September 2, 2020) | $66,636 |
| Holdover Damages | |
|    (September 3, 2020 to March 16, 2021) | 280,283 |
| Real Estate Tax and Insurance Reimbursements | 95,757 |
| Late Payment Fees and Interest | 205,189 |
| Total | $647,865 |

2.    **Unpaid Water Charges**

134.   QB Wash also failed to pay any of the water and sewer charges it incurred with respect to tax lot 110 from and after September 2019 and failed to pay any of the water and sewer charges it incurred with respect to tax lot 11 from and after June 2020.

135.   QB Wash's failure to pay water and sewer charges breached Articles 6 and 12 of the Lease and paragraph 55 of the rider thereto.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

136.   The water and sewer charges not paid by QB Wash constituted a liability of Plaintiff and a lien on the Premises.

137.     The total water and sewer charges, which have been paid by Plaintiff, together with late payment fees and interest thereon (the "Water Charge Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---|
| Water Charges | $38,242 |
| Late Payment Fees and Interest | 10,999 |
| Total | $49,241 |

### 3.     Damages from the Oil Spill

138.     QB Wash also breached the Lease by allowing the Oil Spill to occur and by failing to report or remediate it.

139.     The occurrence of the Oil Spill breached Article 47 of the Lease, and QB Wash is accordingly liable for the costs of remediating the Oil Spill.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

140.     The total costs Plaintiff incurred to remediate the Oil Spill, together with late payment fees and interest thereon (the "Oil Spill Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---|
| Environmental Consultant | $11,645 |
| Testing and Remediation | 15,834 |
| Late Payment Fees and Interest | 7,835 |
| Total | $35,314 |

### 4.     Damages from Municipal Violations

141.     QB Wash also breached the Lease by failing to comply with all laws, orders and governmental regulations, and specifically (a) the Theft of Services Violation issued by DEP, (b) violations issued by the Fire Department, and (c) a violation issued by the New York City Department of Sanitation (the "Sanitation Department").

142.     QB Wash's failure to remedy the Theft of Services Violation breached Articles 6 and 12 of the Lease.  QB Wash's failure to pay the violations issued by the Fire Department and

Sanitation Department breached Article 6 of the Lease.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

143.    Plaintiff's costs to remedy the Theft of Services Violation and pay the fines imposed by the Fire Department and Sanitation Department, together with late payment fees and interest thereon (the "Municipal Violation Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---|
| Plumber Charge to Cure Theft of Services Violation | $750 |
| Payment of Fire Department Violations Nos. 011704060Y and 01170203J and Sanitation Department Violation No. 046443699M | 2,302 |
| Late Payment Fees and Interest | 961 |
| Total | $4,013 |

### 5.    Lease Termination Damages

144.    QB Wash is also liable for damages resulting from the early termination of the Lease, from the date of surrender of the Premises, March 16, 2021, through the end of the term of the Lease, May 31, 2035.

145.    Pursuant to Article 18 of the Lease, damages resulting from the early termination of the Lease (the "Lease Termination Damages") are calculated as the "deficiency between the rent hereby reserved and or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this lease."  Deficiency damages accrue monthly over the remaining term of the Lease.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

146.    The total Lease Termination Damages and interest through August 15, 2022, are as follows:

| Base Rent | $132,878 |
| Real Estate Tax Reimbursements | 637 |
| Late Payment Fees and Interest | 29,564 |
| Total | $163,079 |

147.     Assuming the 2021 Lease is fully performed, the Lease Termination Damages through the original expiration date of the 2010 Lease, in 2035, will ultimately total approximately $500,000.

### 6.     Contractual Damages for Attorneys' Fees

148.     Pursuant to the Article 19 of the Lease and paragraph 61 of the rider thereto, QB Wash is obligated to pay the reasonable attorneys' fees, costs, expenses and disbursements incurred by Plaintiff as a result of QB Wash's breaches of the Lease, in an amount to be determined after trial of this matter (the "Attorneys' Fee Damages").   To date, Plaintiff has incurred over $250,000 in attorneys' fees and costs in connection with the Eviction Action, the Bankruptcy Case and the present action.

### E.     Allegations Concerning Veil Piercing – Defendant's Domination and Control of QB Wash and Use Thereof to Perpetrate Wrongs Against Plaintiff

#### 1.     Domination and Control of QB Wash by Defendant

149.     Extensive evidence establishes that Defendant dominated and controlled QB Wash, and that he planned and directed the economic coercion scheme and wrongful acts described in this complaint.

150.     First, email communications between the Silvers in early 2020 show that Scott was intimately involved in QB Wash's strategic business decisions, and that Zachary sought Scott's direction and deferred to him.

151.    Presented with an offer from a third party to purchase the carwash and lube business in January 2020, Zachary wrote: "What do you think?  I think pass see how the year goes..." to which Scott replied "Yes, pass."

152.    Emails in early February 2020 shows Scott heavily marking up Zachary's proposed talking points for the Rent Reset negotiation with Plaintiff, and other emails in March 2020 reflect Scott drafting correspondence for Zachary to send to Plaintiff.

153.    In other emails in March and May 2020, Zachary requested direction from Scott whether to send various documents to Plaintiff in connection with the Rent Reset process.

154.    Zachary's deference to Scott, as shown in these emails, reflects the nature of their relationship, Scott's role in providing funding, and his far greater business and legal experience.

155.    First, Scott had financed the carwash and lube business, providing the capital to purchase the business in 2016 and pay off the seller's promissory note in 2017, and he then covered the operating deficits incurred by the business in 2019-2020.

156.    Second, in addition to being Zachary's father, Scott was a highly experienced business lawyer.  Zachary, by contrast, was just 24 when he began operating the carwash and lube business, and was still in his twenties when the wrongful acts described in this complaint occurred.

157.    The Silvers' email correspondence in early 2020 shows that they took conscious steps to conceal Scott's role.  In an email dated April 10, 2020, Zachary forwarded Scott a screenshot of an email sent by Plaintiff and explained that "I decided to send the email in this format rather than forward. Did not want you to be accidentally looped in on any correspondence."

158.    Scott further hid his involvement by forming Wash Funding, which replaced the Scott Silver Family Trust and the Deirdre Silver Family Trust as putative creditors of QB Wash.

159.     By directing communications with Plaintiff through others, initially Zachary and subsequently counsel for QB Wash, Scott succeeded in concealing his role – until revealed in the Bankruptcy Court though discovery obtained by the Bankruptcy Trustee and by Plaintiff.

160.     The Silvers' total email production consisted of eight email chains from the period January to May 2020.  They represented in the Bankruptcy Case that all subsequent emails between them concerning the Premises included counsel, and they withheld production on the basis of attorney-client privilege and common interest protection.

161.     Scott's assertion of privilege obscures the full extent of his involvement, but the privilege log the Silvers produced in the Bankruptcy Case further documents Scott's central role in planning and directing the Silvers' coercion strategy.  Between May 2020 and the filing of the Bankruptcy Case on February 8, 2021, the log shows Scott sending, receiving or being copied on over 80 emails with three law firms advising him and Zachary regarding the carwash and lube business, two of them major law firms retained by Scott himself, and the third engaged by QB Wash on the recommendation of another member of the Silver family.

162.     The fact that Scott asserted privilege on the basis of "common interest" with Zachary for more than 80 emails further establishes and concedes that he was acting on behalf of QB Wash over the course of planning and conducting its litigation with Plaintiff.

163.     Individual log entries further illustrate Scott's dominant role.  The log shows that the Silvers first consulted with counsel at one prominent law firm retained by Scott, Foley & Lardner.  In addition to asking "Questions regarding lease", the log shows that Scott forwarded to Zachary correspondence sent only to him by a partner at Foley & Lardner.

164.     In January 2021, after state Supreme Court entered the U&O Order, the log shows that Scott initiated contact with a partner at another leading law firm, McDermott Will & Emery,

and obtained an introduction to its Global Co-Chair of Restructuring & Insolvency, who then personally provided legal advice regarding QB Wash's bankruptcy filing, represented the Silvers in negotiations with Plaintiff, and later represented them in negotiations with the Bankruptcy Trustee.

165.    Scott's professional experience made him particularly well suited to plan and direct the Silvers' asset diversion and economic coercion scheme.  As the general counsel of Sherman Financial, which the Wall Street Journal has described as "one of the biggest and least-known companies" in the consumer debt collection industry, he is well-versed in both litigation and asset protection.  Scott's strategic use of the pandemic to pressure Plaintiff mirrors the strategy he implemented at Sherman Financial.  In April 2021, the Wall Street Journal reported that "[w]hen Covid-19 hit the economy, most debt collectors gave borrowers a break, cutting back on lawsuits amid lockdowns, closed courts and loan-forbearance initiatives."  Sherman Financial, however, "did the opposite" and "filed more lawsuits to squeeze cash from people behind on their credit-card bills."  Shane Shifflett & Justin Scheck, *Most Big Debt Collectors Backed Off During the Pandemic. One Pressed Ahead.*, Wall Street Journal, April 7, 2021, *available at* https://www.wsj.com/articles/most-big-debt-collectors-backed-off-during-the-pandemic-one-pressed-ahead-11617804180?st=w1zmut7kkemr1qt&reflink=desktopwebshare_permalink.

166.    Scott, through the Silver Family Trusts, was also the principal beneficiary of the Silvers' coercion scheme: while withholding rent from Plaintiff, the Silver Family Trusts extracted over $50,000 from QB Wash through the fraudulent transfers described above.

167.    A principal goal of the scheme – forcing Plaintiff's principals to sell the Premises at a below-market price – was also for Scott's benefit.  Neither QB Wash nor Zachary had the means to complete the transaction; only Scott had the funds to do so.

168.    Scott's role as de facto owner of QB Wash is also shown by QB Wash's own financial records, which show Scott's cash contributions in 2019-2020 booked as "Shareholder Notes Payable."

169.    An examination of Zachary under oath in the Bankruptcy Case further demonstrates his deference to his father and passive role in executing the Silvers' scheme.  In response to questioning by the Bankruptcy Trustee's counsel, Zachary conveyed little knowledge of QB Wash's financing or the conduct of the litigation with Plaintiff.

170.    Asked about Wash Funding and the financing for QB Wash, Zachary disclaimed knowledge of all but the most basic facts:

> TRUSTEE'S COUNSEL:  . . . There is a secured creditor on your business, correct?
>
> ZACHARY:  As I understand.
>
> TRUSTEE'S COUNSEL:  Okay.  And who is that secured creditor?
>
> ZACHARY:  Wash Funding, LLC.
>
> TRUSTEE'S COUNSEL:  And are the principals of that family members of yours?
>
> ZACHARY:  I believe the principals are trusts.
>
> TRUSTEE'S COUNSEL:  Okay.  Now, are the trusts related to family members of yours?
>
> ZACHARY:  Yes.
>
> TRUSTEE'S COUNSEL:  . . . And when did the security interest come into place, do you know?
>
> ZACHARY:  No.  I believe the security interest went into place -- I don't know, I'm sorry.
>
> TRUSTEE'S COUNSEL:  Was it last year?
>
> ZACHARY:  Again, if I gave an answer, I would be making it up.  I don't know the exact intricacies of when the security interest went into place off the top of my head.
>
> TRUSTEE'S COUNSEL:  Okay.  When was the last time that lender advanced any money to the business?
>
> ZACHARY:  I don't know.
>
> TRUSTEE'S COUNSEL:  Was it last year?
>
> ZACHARY:  Possibly.

> TRUSTEE'S COUNSEL:  And who -- if those funds came in, who would they have come in from?
>
> ZACHARY:  I'm not sure.

171.    Asked about QB Wash's litigation strategy in the Eviction Action, Zachary again disclaimed knowledge:

> TRUSTEE'S COUNSEL: Now, you were also -- you were in litigation with the landlord, correct?
>
> ZACHARY: Correct.
>
> TRUSTEE'S COUNSEL: And you retained a firm in White Plains to represent you?
>
> ZACHARY: Correct.
>
> TRUSTEE'S COUNSEL: At any point during your (indiscernible), did you have discussions with them about what's called a Yellowstone injunction?
>
> ZACHARY: I don't recall the exact conversations I had with my attorney.
>
> TRUSTEE'S COUNSEL: Well, did you ever have a conversation about trying to get any sort of stay or injunction at the beginning of the case?
>
> ZACHARY: Again, I just don't remember the exact conversations I had with my attorney.

172.    Scott's dominant role in devising and executing the Silvers' scheme is further established by Zachary's prior behavior.  Zachary, who was just 24 when Scott bought the carwash and lube business for him, and in his late 20's when the wrongful acts at issue in this case occurred, showed himself to be a mild-mannered individual who clearly struggled with the demands of operating the carwash and lube business.

173.    In June 2017, Zachary defaulted on a Fire Department violation and then assured Plaintiff he would attend the rescheduled hearing.  He then missed the rescheduled hearing and subsequently wrote to Plaintiff:

> I was unable to make the appearance regarding violation 011588437J due to an important obligation. . . .
>
> I understand that at the beginning of our relationship i made some mis-steps. I want to assure you guys that your property and in turn my business are in good hands.

174.     Around the same time, QB Wash defaulted on a DEP hazardous materials violation.

Zachary later explained in an October 11, 2017 email:

> I honestly had no idea about this (not that it is an excuse). Apparently it
> was a 500 dollar fine that defaulted automatically into 5K. I have retained
> some company that says they are going to reopen the case and I'll pay
> some nominal amount. Will keep you updated. Sorry about this. God
> forbid anything serious happens with it I have set aside the 5,000 to pay it
> before there is any real issue.

175.     In October 2018, after a series of consecutive late rent payments, one of Plaintiff's

principals met with Zachary and offered to allow reimbursement of certain property expenses in

installments.  Zachary then wrote to her:

> Hi Ellen,
>
> Meeting with you earlier this week was such a pleasure. Thank you for
> taking the time.
>
> I appreciate and agree to the terms you have offered. . . .
>
> I know this is not something you are not at all obligated to do- Thank you
> so much for working with me.
>
> I understand communication is very important to this relationship. I will be
> very diligent in maintaining it.

176.     In a January 9, 2019 email responding to an offer by Plaintiff to allow payment of

other expenses in installments, Zachary replied:

> I want to thank you for being so considerate and flexible with me over the
> past few months. With so many large payments ahead of me I feel it is
> probably better to take other money I have and pay all or most of what I
> owe to you; the way business is right now it will just to hard to manage
> those payments and will not be fair to you. If you could please give me no
> more than five days to see exactly how much I can get together. I think I
> will be able to pay the property taxes and insurance in full and maybe
> amortize one months rent over a couple months. You have been more
> than fair with me and it does not go un appreciated- after this things will
> be a lot smoother. Thank you for everything.

177.     Finally, in a July 24, 2019 email, responding to correspondence advising that

Plaintiff would begin imposing late fees after nearly a year of consistently late rent payments,

Zachary wrote:

> OK I understand. Times have been very hard. Thank you so much for
> your leniency up to this point.

178.     These emails reflect the tenor of Plaintiff's principals' interactions with Zachary at all times before Scott devised the Silvers' coercive nonpayment strategy in early 2020.

179.     Based on Zachary's demonstrated prior conduct and demeanor, it is not credible that, in the absence of Scott's planning, direction and actions to shield his assets, Zachary would have elected to reject Plaintiff's offer in June 2020 to waive over $80,000 in back rent and let him walk away without liability.  It is also not credible that Zachary would have himself decided to embark on litigation across multiple courts to gain strategic advantage, risking years of litigation on the Personal Guaranty and exposing his roughly $400,000 in assets to the probability of an adverse judgment.

180.     In sum, there is extensive evidence that Scott exercised plenary domination and control of QB Wash, that he planned and directed the scheme at issue in this complaint, and that the wrongful conduct described herein was primarily intended to serve his financial interests. Accordingly, he is properly treated as an equitable owner of QB Wash.

### 2.     Defendant's Use of His Domination and Control of QB Wash to Perpetrate Wrongs Injuring Plaintiff

181.     Scott wrongfully used his domination and control of QB Wash to perpetrate multiple wrongs against Plaintiff.

182.     Without any colorable legal grounds, he deprived Plaintiff and its owners of hundreds of thousands of dollars of income, and forced them to pay additional hundreds of thousands of dollars out-of-pocket to cover operating costs associated with the Premises.

183.     At the same time as he was imposing these costs, he used the fraudulent transfers detailed above in paragraphs 108 and 110 to unlawfully divert monies from QB Wash to family

trusts he controlled, knowing that QB Wash was in arrears to Plaintiff and did not have the means to later make the payments due to it.

184.    He further used the fraudulent transfers detailed above in paragraphs 100 and 101 to insulate his son from liability on the Personal Guaranty for QB Wash's breaches.

185.    He forced Plaintiff to incur the expense and burden of prosecuting litigation to which QB Wash had no colorable defense.

186.    Finally, his objective in taking these actions was to deprive Plaintiff and its principals of the fair value of their property by coercing a below-market rent or discounted sale of the Premises – a wrongful and manifestly unjust objective.

187.    Scott's wrongful conduct warrants piercing QB Wash's corporate veil and holding him personally liable for QB Wash's debts to Plaintiff.

**F.    Allegations Concerning Tortious Interference,
the Economic Interest Defense and Causation**

**1.    Defendant Engaged in Tortious Interference with the Lease**

188.    Scott tortiously interfered with the Lease by (a) planning and directing QB Wash's breaches of the Lease, and (b) insulating Zachary from the financial consequences of QB Wash's breaches through the Voidable Liens.

**2.    The Economic Interest Defense Is Unavailable Because Defendant
Served His and His Son's Interests, Not the Interests of QB Wash**

189.    Scott had an economic interest in QB Wash but he may not assert a defense of economic interest because his interference primarily served his and Zachary's interests, rather than the interests of QB Wash.

190.    First, by acting to insulate Zachary from liability on the Personal Guaranty and therefore from the consequences of QB Wash's breaches of the Lease, Scott served Zachary's interests and his own interests as Zachary's father, rather than the interests of QB Wash.

191.     Second, Scott's strategy of causing QB Wash to breach the Lease by withholding rent served his own interests, rather than the interests of QB Wash, because it allowed him to extract tens of thousands of dollars from QB Wash and pay it to family trusts he controlled.

192.     Third, Scott's interference with the Lease served his own interests, rather than the interests of QB Wash, because they advanced the goal of pressuring Plaintiff to sell the Premises to him at a below-market price.

> 3.     **The Economic Interest Defense Is Also Unavailable
> Because Defendant Directly and Indirectly Engaged in
> Multiple Independent Torts and Other Unlawful Acts**

193.     Scott is also barred from asserting the economic interest defense because he directly and indirectly employed multiple independent torts and other unlawful acts in connection with his tortious interference.  As alleged above in Point C (¶¶ 96-129), Scott's unlawful acts consisted of personally executing or directing and benefitting from fraudulent transfers, sanctionable litigation conduct, perjury and the malicious prosecution of Plaintiff.

> 4.     **Defendant's Actions Were the "But For" Cause of the
> Damages Resulting from His Economic Coercion Scheme**

194.     The facts and circumstances set forth in Point E.1 above (¶¶ 149-180) establish that but for Scott's wrongful conduct, QB Wash would not have engaged in its scheme to coerce Plaintiff and Plaintiff consequently would not have sustained the Rent Nonpayment Damages, the Water Charge Damages or the Attorneys' Fee Damages.

> G.     **Conduct Supporting an Award of Punitive Damages Against Defendant**

195.     The scheme planned and directed by Scott manifests a conscious disregard for the rights of Plaintiff and its owners, Maureen, Ellen and Ethan.

196.     The torts and other wrongs committed in furtherance of the scheme – fraudulent transfers, tortious interference with contract, perjury and plainly frivolous litigation, all to achieve

the abusive goal of applying economic pressure to obtain an unfair rent or below-market sale of the Premises – reflect an extraordinary level of moral culpability, warranting substantial punitive damages.

197.   Scott's actions collectively reflect a level of flagrant abuse that demands exemplary damages to further the strong public policy interest in deterring similar conduct.

198.   First, the conduct at issue was extensively planned and highly intentional.  Far from reflecting a rash or isolated ill-considered action, Scott's asset diversion and economic coercion scheme was the result of careful planning, involving formation of a new Delaware entity to camouflage related-party transactions, execution and filing of multiple documents in furtherance of the scheme, receipt of wrongful cash payments from QB Wash spanning nearly a year, and the conduct of a frivolous court case, premised on numerous false statements contained in multiple submissions to the Court.

199.   Second, Scott is an attorney who specializes in debtor-credit law and so was especially well-aware that the conduct at issue was wrongful.  The likelihood that he will have future opportunities to engage in similar misconduct makes the importance of deterrence particularly strong.

200.   Third, the principal target of the scheme was a then-91 year old widow who had just recently lost her husband of over 50 years and was dependent on the Premises for the majority of her household income.  Scott's scheme in fact deprived Maureen of the large majority of her income in both 2020 and 2021.

201.   In 2020, the scheme cost her approximately $120,000, reducing her income from around $170,000 to around $50,000.  In 2021, the scheme cost her approximately $165,000, reducing her income from above $220,000 to below $60,000.

202.    The injury to Maureen was hardly incidental; it was the point of the scheme, which was pursued with full knowledge of its financial impact on her.  Indeed, the Silvers had conducted a nationwide asset search that had identified her as holding only one other property that was then producing income, and Scott thus knew she was highly dependent on income from the Premises.

203.    Fourth, the sanction of punitive damages is particularly warranted because Scott's scheme was founded on exploiting a national health and economic crises for his private gain.  It is an affront to all New Yorkers who suffered genuine harm from the pandemic that the Silvers falsely claimed injury when in fact their business had thrived.

204.    Fifth, the goal of Scott's scheme – depriving Maureen and her children of a fair rent or pressuring them into a discounted sale – is inherently wrongful.  Scott's attempt to coercively misappropriate their income or asset constitutes theft, plain and simple.

205.    Finally, Scott carried out his scheme without any colorable legal or moral justification.

206.    He was not facing any financial distress that could help explain or excuse his conduct – he was in fact ready and able to invest an additional $2 million in cash to acquire the Premises at a discount.

207.    There was also no overreach by Plaintiff or hard bargaining on its part that could have possibly justified Scott's abusive and unlawful tactics.  In fact, Plaintiff dealt with the Silvers with restraint and decency throughout their business relationship, forbearing from charging late fees and extending payment deadlines repeatedly in 2018-19, and then offering to waive rent for the entire period of QB Wash's pandemic-driven closure in March-May 2020, and alternatively offering to forgive all back rent, then totaling over $80,000, and drop all claims arising from the early Lease termination in exchange for the Silvers surrendering possession.

208.    Simply stated, Scott planned and directed the Silvers' coercion strategy with the brazen and unconscionable view that he was entitled to burden Plaintiff and its owners with whatever losses it was in his power to impose, regardless of contractual duty or the constraints imposed by law.  The Court must not allow this to stand.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### For Breach of Lease Based on Piercing the Corporate Veil

209.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 208 as if fully set forth herein.

210.    The Lease constituted a valid and enforceable contract between Plaintiff and QB Wash.

211.    QB Wash committed multiple breaches of the Lease, as set forth above in paragraphs 131 through 148.

212.    By reason of the foregoing breaches, Plaintiff suffered the Rent Nonpayment Damages, the Water Charge Damages, the Oil Spill Damages, the Municipal Violation Damages, the Lease Termination Damages, and the Attorneys' Fee Damages.

213.    Scott exercised complete domination and control over QB Wash, and accordingly should be deemed an equitable owner of QB Wash.

214.    Scott used his domination and control over QB Wash to commit multiple wrongs and injustices against Plaintiff.

215.    Scott's wrongful conduct warrants piercing QB Wash's corporate veil as to him.

216.    Scott is therefore liable to Plaintiff for the Rent Nonpayment Damages, the Water Charge Damages, the Oil Spill Damages, the Municipal Violation Damages, the Lease Termination Damages, and the Attorneys' Fee Damages.

## SECOND CLAIM FOR RELIEF
### For Tortious Interference with Contract

217.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 216 as if fully set forth herein.

218.    The Lease constituted a valid and enforceable contract between Plaintiff and QB Wash.

219.    Scott had actual knowledge of the Lease.

220.    Scott intentionally procured nonpayment of rent and water charges in breach of the Lease, as set forth above in paragraphs 131 through 137, and did so without justification.

221.    As a result of Scott's wrongful conduct, Plaintiff sustained the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages.

222.    While Scott had an economic interest in QB Wash, the economic interest defense does not apply because (a) Scott's interference primarily served his and his son Zachary's interests, rather than the interests of QB Wash, and (b) in connection with Scott's tortious interference, he directly and indirectly committed multiple independent torts and other unlawful acts.

223.    But for Scott's wrongful conduct, QB Wash would not have breached the Lease through nonpayment of the rent and water charges, and Plaintiff would not have sustained the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages.

224.    Scott is therefore liable to Plaintiff for the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages.

### **JURY DEMAND**

225.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.     On the First Claim for Relief, for the amount of the Rent Nonpayment Damages, the Water Charge Damages, the Oil Spill Damages, the Municipal Violation Damages, the Lease Termination Damages, and the Attorneys' Fee Damages;

B.      On the Second Claim for Relief, for the amount of the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages;

C.     For punitive damages on the First and Second Claims for Relief in the amount of not less than Two Million Dollars ($2,000,000); and

D.     For such other and further relief as the Court deems just and proper, including, without limitation, costs and disbursements.

Dated:   New York, New York
          August 30, 2022

                              **ROSENBERG & ESTIS, P.C.**

                    By: _____
                          Michael A. Pensabene, Esq.
                          Harris W. Davidson, Esq.
                          733 Third Avenue
                          New York, New York 10017
                          (212) 867-6000
                          *Attorneys for Plaintiff*

- 43 -