**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 138-77 QUEENS BLVD LLC,<br><br>*Plaintiff,*<br><br>-*against*-<br><br>SCOTT E. SILVER,<br><br>*Defendant.* | Case No. 1:22-cv-5155-KAM-MMH |

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**SCOTT E. SILVER'S MOTION TO DISMISS**

---

**LUNDIN PLLC**
Niall D. Ó Murchadha
John M. Lundin
Cynthia L. Botello
405 Lexington Avenue, 26th Floor
New York, NY 10174
Telephone: (212) 541-2402
NOMurchadha@LundinPLLC.com
JLundin@LundinPLLC.com
CBotello@LundinPLLC.com

*Attorneys for Defendant Scott E. Silver*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT............................................................................1

STATEMENT OF FACTS ................................................................................3

    A.    THE ALLEGATIONS AGAINST MR. SILVER.............................................3

    B.    PLAINTIFF'S DAMAGES AND CAUSES OF ACTION.....................................6

    C.    THE COURT RECORDS INTEGRAL TO THE COMPLAINT. ...........................7

ARGUMENT ..............................................................................................9

I.    LEGAL STANDARD ON A MOTION TO DISMISS....................................9

II.   THE ALTER EGO CLAIM AGAINST MR. SILVER MUST BE DISMISSED .............9

    A.    THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO ESTABLISH THAT MR. SILVER DOMINATED QB WASH. ...............................................9

    B.    THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO ESTABLISH THAT MR. SILVER DOMINATED THE SILVER FAMILY TRUSTS OR WASH FUNDING. ................12

    C.    THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO ESTABLISH THAT MR. SILVER CAUSED PLAINTIFF'S INJURY.................................13

III. THE TORTIOUS INTERFERENCE CLAIM AGAINST MR. SILVER MUST BE DISMISSED............................................................................15

    A.    THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO ESTABLISH THAT MR. SILVER WAS THE BUT-FOR CAUSE OF PLAINTIFF'S INJURIES...............................15

    A.    THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO ESTABLISH THAT MR. SILVER DID NOT HAVE AN ECONOMIC INTEREST DEFENSE. ................17

CONCLUSION ..........................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662, 678 (2009) ........................................................................... 9

*Am. Protein Corp. v. AB Volvo*,
  844 F.2d 56 (2d Cir. 1988) ...................................................................... 13

*Barbagallo v. Marcum L.L.P.*,
  820 F. Supp. 2d 429 (E.D.N.Y. 2011) .................................................... 18

*Bruen v. Savage*,
  1994 U.S. Dist. LEXIS 3386 (S.D.N.Y. Mar. 22, 1994) ...................... 15

*Burrowes v. Combs*,
  25 A.D.3d 370 (1st Dep't 2006) .............................................................. 16

*Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*,
  299 A.D.2d 204 (1st Dep't 2002) ............................................................ 16

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010). ..................................................................... 9

*Don King Prods.* v. *Smith*,
  47 F. App'x 12 (2d Cir. 2002) ................................................................. 17

*Dussault v. Republic of Arg.*,
  616 F. App'x 26 (2d Cir. 2015) ............................................................... 14

*E. Hampton Union Free Sch. Dist. v. Sandpebble Bldrs., Inc.*,
  16 N.Y.3d 775 (2011) .............................................................................. 12

*Ferrandino & Son, Inc. v. Wheaton Bldrs., Inc., L.L.C.*,
  82 A.D.3d 1035 (2d Dep't 2011) ............................................................. 16

*Foster v. Churchill*,
  87 N.Y.2d 744 (1996) .............................................................................. 17

*Freeman v. Complex Computing Co.*,
  119 F.3d 1044 (2d Cir. 1997) .................................................................. 13

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ...................................................................... 14

*Kelly-Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013) .................................................................... 17

*Key Items, Inc. v. Ultima Diamonds, Inc.*,
  2011 U.S. Dist. LEXIS 111524 (S.D.N.Y. Sept. 29, 2011) ................. 16

*Koninklijke Philips Elecs. N.V. v. ADS Grp.*,
    694 F. Supp. 2d 246 (S.D.N.Y. 2010) ........................................................................ 10, 12

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (1996) ................................................................................................ 16

*Mina Inv. H*oldings Ltd. v. Lefkowitz,
    16 F. Supp. 2d 355 (S.D.N.Y. 1998) ....................................................................... 16

*Morris v. State Dep't of Taxation & Fin.*,
    82 N.Y.2d 135 (1993) ................................................................................................ 12

*Nebraskaland, Inc. v. Ryan (In re Ryan),*
    2022 Bankr. LEXIS 2661 (Bankr. E.D.N.Y. Sept. 27, 2022) ...................................... 10, 12

*Network Enters. v. Reality Racing, Inc.*,
    2010 U.S. Dist. LEXIS 89598 (S.D.N.Y. Aug. 24, 2010) .................................... 12

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*,
    614 F.2d 832 (2d Cir. 1980) ..................................................................................... 18

*P. Kaufmann, Inc. v. Americraft Fabrics, Inc.,*
    232 F. Supp. 2d 220 (S.D.N.Y. 2002) ..................................................................... 17

*Shafferman v. Queens Borough Pub. Library (In re JMK Constr. Grp., Ltd.),*
    502 B.R. 396 (Bankr. S.D.N.Y. 2013) ..................................................................... 13

*Silver v. Kuehbeck,*
    2005 U.S. Dist. LEXIS 26956 (S.D.N.Y. Nov. 7, 2003) ......................................... 18

*TVT Records v. Island Def Jam Music Group,*
    412 F.3d 82 (2d Cir. 2005) ....................................................................................... 15

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*,
    455 F. App'x 102 (2d Cir. 2012) .............................................................................. 15

*VKK Corp. v. NFL*,
    244 F.3d 114 (2d Cir. 2001) ..................................................................................... 18

*White Plains Coat & Apron Co. v. Cintas Corp.*,
    460 F.3d 281 (2d Cir. 2006) ..................................................................................... 17

*William Wrigley Jr. Co. v. Waters*,
    890 F.2d 594 (2d Cir. 1989) ................................................................................. 9-12

*Wm. Passalacqua Builders v. Resnick Devs. S.*,
    933 F.2d 131 (2d Cir. 1991) ..................................................................................... 13

Defendant Scott E. Silver submits this memorandum of law, in addition to the Declaration of Niall Ó Murchadha ("NOM Decl."), and the exhibits attached thereto, in support of his motion to dismiss the claims asserted in the Complaint ("Compl.") filed in this action pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(7).

## PRELIMINARY STATEMENT

This is a case about a father helping his son, and a creditor who decided to bring a long-shot lawsuit to go after the father's deeper pockets once the son's business failed.

The story is not complicated. A family trust controlled by Mr. Silver loaned an initial $1.175 million to a company ("QB Wash LLC") established by his son Zachary Silver. QB Wash used the money as the cash portion of the funds to purchase a car wash business in 2016. The business struggled to stay afloat, and so another Silver family trust loaned approximately $1 million more a year later to refinance QB Wash's third-party debt, and yet another $165,000 was loan by Scott Silver personally between 2019 and 2020. Despite these infusions of cash, by 2020 QB Wash was unable to keep up with operating costs, including its substantial rent. The landlord—the Plaintiff in this action—terminated the lease in September 2020, brought an eviction proceeding, and obtained a court order requiring use and occupancy payments in January 2021, at which point QB Wash filed for Chapter 7 bankruptcy. QB Wash's remaining assets were paid out to the New York State Department of Taxation and Finance and the New York State Labor Department, so non-priority creditors including Plaintiff and the family trusts were not made whole. Plaintiff did re-occupy QB Wash's premises and re-leased the property to another car wash business, and the bankruptcy proceeding was wound up in August 2022.

Now the landlord is suing Mr. Silver for the entire amount of the unpaid rent, future damages, attorney fees, various minor costs, and $2 million in punitive damages. This action hangs from two hooks. First, in 2020, Mr. Silver allegedly advised his son not to settle with the

landlord, and instead to contest the eviction action in court in order to get better terms.  Plaintiff asserts that this advice is a proper basis for a tortious interference claim.  Second, also in 2020, another entity Mr. Silver allegedly controlled, Wash Funding, took assignment of the debts QB Wash owed to the family trusts and recorded liens against QB Wash's assets and Zachary Silver's assets.  Plaintiff asserts that this action—as well as $40,000 in loan interest payments and $7,500 in payments to an attorney from QB Wash—is a proper basis for an alter ego claim seeking to hold Mr. Silver liable for all QB Wash's debts.

To enhance these weak claims, and to confuse the issues on a motion to dismiss, Plaintiff relies on a pleading strategy that presumes the question, alleging that many of the events described were done by "the Silvers"—both Zachary Silver and Mr. Silver as a group—rather than by a specific person or entity.  So, for example, the Complaint alleges that "the Silvers" breached the lease, failed to pay rent, etc., when in fact QB Wash was the party in breach.  Similarly, the Complaint accuses "the Silvers" of making false or exaggerated statements in the eviction and bankruptcy proceedings, when in fact the statements were made by QB Wash's lawyers, sometimes with verifications by Zachary Silver.  The Complaint also misrepresents activity in the bankruptcy proceeding, such as by conflating avoidable preferences and wrongful fraudulent transfers.  Fortunately, common sense and publicly available records of the bankruptcy proceeding will allow the Court to see past these obfuscations.

Both of Plaintiff's claims should be dismissed.  As an initial matter, both claims fail because the Complaint cannot create a plausible inference that any of Mr. Silver's action were the "but-for" cause of Plaintiff's losses; the bankruptcy records make it clear that QB Wash simply did not have the money to pay Plaintiff regardless of what Mr. Silver did.  The alter ego claim also fails because Mr. Silver did not abuse the corporate form; as the Bankruptcy Trustee

acknowledged, the family trusts and/or Wash Funding were legitimately owed around $2 million by QB Wash, and recording debts, accepting minor interest payments, and attempting to increase the likelihood of further repayment are things any arm's-length lender would do.  The tortious interference claim similarly fails because but-for causation has not been established, and also because Mr. Silver's conduct is privileged due to a pre-existing economic interest in QB Wash— all of Plaintiff's attempts to manufacture a grand tortious conspiracy do not actually describe anything beyond a legitimate creditor single-mindedly trying to protect its interests, which does not rise to the level of a tort.

## STATEMENT OF FACTS

**A.**   **The Allegations Against Mr. Silver.**

Plaintiff is a New York LLC (Compl. ¶ 18) that owns a property in Briarwood, Queens, which is being used as a commercial car wash (*id*. ¶¶ 1, 28).  Plaintiff's principals are citizens of New York and New Jersey.  (*Id*. ¶¶ 21 – 25.)  In or about January 2016, the car wash lease and accompanying business were assigned by a prior tenant to non-party QB Wash LLC, which is a New York LLC owned by Defendant's son, non-party Zachary Silver.  (*Id*. ¶ 34.)  The Complaint alleges that Mr. Silver co-owns QB Wash alongside Zachary Silver, but this obviously false statement is contradicted by indisputable documentary evidence, *infra*.  Mr. Silver himself, or related family trusts (the "Silver Family Trusts"), provided a $1.175 million cash loan to QB Wash that was used as part of the payment to purchase the lease rights and business.  (*Id*. ¶¶ 35 – 36.)  QB Wash signed a $1.33 million promissory note for the benefit of the seller (the "Seller Note") and Zachary Silver executed a Personal Guarantee of Lease.  (*Id*. ¶¶ 35, 37.)  Zachary Silver managed the car wash business on a day-to-day basis.  (*Id*. ¶ 38.)

QB Wash soon ran into difficulties, making late rent payments toward the end of 2016, and stopped paying the Seller Note in April 2017.  (*Id*. ¶¶ 40 – 41.)  In June 2017, the Silver Family

Trusts made a $967,500 loan to QB Wash, which was used to pay off the Seller Note (*id.* ¶ 42), but QB Wash's rent payment issues continued in 2018 and 2019 (*id.* ¶¶ 43 – 48).  Between 2019 and 2020, Mr. Silver allegedly made a series of additional loans, totaling $165,000, to QB Wash "to cover its operating deficits".  (*Id.* ¶ 45.)  QB Wash also incurred other debts, including a personal injury claim and obligations to the New York City Fire Department, the New York State Department of Taxation and Finance, and the New York City Department of Environmental Protection.  (*Id.* ¶¶ 39, 50 – 53.)

In February 2020, the QB Wash stopped making rent payments.  (*Id.* ¶ 57.)  In April 2020, Mr. Silver formed non-party Wash Funding, which took assignment of QB Wash's loan debt to the Silver Family Trusts and filed liens against QB Wash and Zachary Silver's assets.  (*Id.* ¶¶ 97 – 101.)  After negotiations with QB Wash were unsuccessful, Plaintiff issued a notice terminating the lease effective September 3, 2020.  (*Id.* ¶¶ 55 – 69.)  Plaintiff brought an eviction action in Queens County Supreme Court, captioned *138-77 Queens Blvd L.L.C. v. QB Wash L.L.C.*, No. 715071/2020, and on January 15, 2021, the Court entered an order directing QB Wash to pay prospective use and occupancy, post a bond for the rent arrears, and pay the water and sewer arrears.  (*Id.* ¶¶ 70, 73.)

Then, on February 8, 2021, QB Wash filed for bankruptcy in the Eastern District of New York, *In re QB Wash*, Case No. 1-21-40301-ess.  (*Id.* ¶ 75.)  The Bankruptcy Trustee stipulated to return possession of the premises to Plaintiff, which was approved by the Bankruptcy Court on March 16, 2021, and Plaintiff re-leased the premises to another party in April 2021.  (*Id.* ¶¶ 77, 81 – 82.)  The Bankruptcy Trustee and the Silver Family Trusts, Wash Funding, and Zachary Silver, settled claims for money received from QB Wash for $132,840.  (*Id.* ¶ 84.)  These recovered funds

were paid against priority claims of New York State entities.  (*Id*. ¶ 84.)   The bankruptcy proceeding closed on August 22, 2022.  (*Id*. ¶ 85.)

The Complaint makes the following allegations against Mr. Silver:

First, Mr. Silver allegedly made the decision to have QB Wash not pay its rent and refuse to settle with Plaintiff in the hopes of a more favorable settlement later.   In support of this conclusion, the Complaint alleges that (1) Mr. Silver advised Zachary Silver regarding negotiations concerning QB Wash (*id*. ¶¶ 150 – 153); (2) Mr. Silver and Zachary Silver asserted a common interest privilege with regard to certain attorney-client communications (*id*. ¶¶ 160 – 164); (3) Mr. Silver was an "experienced business lawyer" (*id*. ¶¶ 154, 156, 165); (4) QB Wash had been funded by Mr. Silver (*id*. ¶¶ 166 – 168); (5) Zachary Silver was much younger than Mr. Silver (*id*. ¶ 156); (6) Zachary Silver was a "mild-mannered individual" who would never have made such decisions on his own (*id*. ¶¶ 172, 173 – 178); and (7) Zachary Silver could not recall certain legal minutiae at his deposition, such as when Wash Funding imposed its liens and whether QB Wash's attorney sought a Yellowstone injunction in the eviction action (*id*. ¶¶ 169 – 171).

Second, Mr. Silver allegedly concocted a scheme to protect Zachary Silver from claims by Plaintiff by placing a lien on his assets.  In support of this conclusion, the Complaint asserts that Mr. Silver formed Wash Funding in April 2020 (*id*. ¶ 97), and promissory notes for the money paid to start up QB Wash and to refinance the Seller Note were transferred to Wash Funding, and Wash Funding acquired liens on all of QB Wash's assets, as well as Zachary Silver's Wells Fargo brokerage account (*id*. ¶¶ 100 – 101).  However, the liens on QB Wash's assets were subsequently set aside in a so-ordered settlement between the Bankruptcy Trustee and Wash Funding.  (*Id*. ¶ 100 & n. 3; *see infra*.)

Third, Mr. Silver allegedly caused QB Wash to engage in frivolous litigation conduct in the eviction action and the bankruptcy proceeding.  In support of this conclusion, the Complaint alleges that (1) Mr. Silver and Zachary Silver jointly consulted with attorneys (*id*. ¶¶ 99, 112); (2) in court filings, Zachary Silvery made false statements regarding the effect of COVID shutdowns on QB Wash's business (*id*. ¶¶ 115 – 123); and (3) Zachary Silver verified a bankruptcy-court filing that incorrectly described Wash Funding as an "unrelated" creditor (*id*. ¶ 129).

Fourth, the Complaint alleges that Mr. Silver took money from QB Wash for his own and his family's use.  In support of this conclusion, the Complaint alleges that the Silvers paid out around $40,000 of QB Wash's money either to Wash Funding and the Silver Family Trusts or for their benefit but concedes that fraudulent transfer claims regarding these funds were settled by the Bankruptcy Trustee for more than $82,840.  (*Id*. ¶¶ 108 – 111.)  The Complaint admits that QB Wash's resources at the time it filed for bankruptcy protection were insufficient to pay the debts allegedly owed to Plaintiff.  (*Id*. ¶ 84.)  Indeed, even after the Trustee collected $136,301 from Zachary Silver, the Silver Family Trusts, and Wash Funding, "none of these funds were paid to Plaintiff," because claims by New York State agencies had "priority under the Bankruptcy Code and fully consumed the net settlement proceeds."  (*Id*., *see* NOM Decl. Ex. 2)

Fifth, the Complaint bases its claim for punitive damages on an allegation that Mr. Silver learned that Plaintiff was one of its members' primary sources of income and accordingly knew that she was "particularly susceptible" to a non-payment strategy.  (*Id*. ¶¶ 90 – 95.)

**B.**     **Plaintiff's Damages and Causes of Action.**

All of Plaintiff's claimed compensatory damages arise under the lease with QB Wash— indeed, every item of compensatory damages Plaintiff alleges includes a line item for contractual interest and fees.  The categories alleged are: (1) non-payment of rent in the amount of $647,865 (*id*. ¶¶ 131 – 133); (2) unpaid water charges, which QB Wash stopped paying in September 2019

and June 2020, in the amount of $49,241 (*id*. ¶¶ 134 – 137); (3) damages from an oil spill in the garage's basement in the amount of $35,314 (*id*. ¶¶ 138 – 140); damages from municipal violations in the amount of $4,013 (*id*. ¶¶ 141 – 143); lease termination damages in the amount of $163,079 (to date) *id*. (¶¶ 144 – 147); and attorney fees in an amount "over $250,000" (*id*. ¶ 148).  Plaintiff also demands punitive damages in the amount of $2 million.  (*Id*. Prayer for Relief.)

The Complaint asserts two causes of action.  The first, an alter ego claim, seeks to pierce QB Wash's corporate veil to hold Mr. Silver liable for all of Plaintiff's claimed damages.  (*Id*. ¶¶ 209 – 216.)  The second accuses Mr. Silver of tortiously interfering with the lease and demands he be held liable for the unpaid rent, the unpaid water charges, and the attorney fees.  (*Id*. ¶¶ 217 – 224.)

### C.   The Court Records Integral To The Complaint.

As described above, the Complaint repeatedly refers to the QB Wash bankruptcy proceeding and events that took place therein.  To support his motion to dismiss, Mr. Silver submits three documents, which  can be considered because they are "integral to" or "incorporated by reference in the complaint," s*ee DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010), because of the Complaint's lengthy description of the bankruptcy proceeding, and also because they are public court records of which judicial notice may be taken, *see, e.g., Chris H. v. New York*, 2017 U.S. Dist. LEXIS 103618, at *2 (S.D.N.Y. July 5, 2017).

First, the so-ordered settlement agreement between the Trustee and the Silver Family Trusts and Wash Funding is attached to the NOM Decl. as Exhibit 1.  This document sets forth the judicially determined facts concerning the supposed fraudulent transfers and the Wash Funding liens described in the Complaint.  (Compl. ¶¶ 99 – 101, 108 – 111.)  The following facts are apparent from the face of the document: (1) Mr. Silver is not a party to the settlement—as the recitals explain, the two payments the Complaint describes as fraudulent were made to the Family

Trusts or Wash Funding and to Cemele & Wood LLP, not to Mr. Silver, and the lien was recorded by Wash Funding;[1] (2) of these payments, only $7,840 was described as "fraudulent"; the payment to the Family Trusts was merely "avoidable"; (3) Wash Funding agreed to set aside its security interests in QB Wash's assets; (4) the Silver Family Trusts did lend over $2 million to QB Wash; and (5) the loans, and Wash Funding's right to enforce them as general, unsecured claims, were recognized by the Trustee.[2]

Second, the Trustee's Final Account and Distribution Report is attached to the NOM Decl. as Exhibit 2. This document describes QB Wash's financial condition, including debts and assets. Specifically, QB Wash had cash in hand of only $3,450, and the Trustee could only collect assets in the total amount of $136,301, which includes the recoupment of the $41,214 avoidable (i.e., non-fraudulent) transfer to the Family Trusts described above. (*Id. at* 3.) The Trustee recognized $173,451 of unsecured priority claims by the New York State Departments of Labor and Taxation and Finance, and only $89,554 of those claims were paid out. (*Id. at* 4.) The inescapable conclusion is that even if QB Wash had not paid any costs and fees relating to the bankruptcy itself (attorney fees, Trustee's compensation, etc.), it simply did not have the resources to pay Plaintiff any of the money it claims.

Third, the so-ordered settlement agreement between the Trustee and Zachary Silver is attached to the NOM Decl. as Exhibit 3. The recitals of this agreement clearly state that Zachary is the "principal and sole member of the Debtor" (*id. at* 1), clearly contradicting Plaintiff's assertion that Mr. Silver is a co-owner of QB Wash.

---

[1] Specifically, $41,214 to the Trusts and $7,840 to Cemele & Wood LLP. These are the transactions described in paragraphs 108 and 111 of the Complaint.
[2] *See* § 5, Silver Loan Claims.

## ARGUMENT

### I.   LEGAL STANDARD ON A MOTION TO DISMISS

A complaint may be dismissed under F.R.C.P. 12(b)(6) if "it fails to state a claim upon which relief can be granted." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110 (2d Cir. 2010). And although the Court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor," the Court must also "ascertain that the complaint 'contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* at 110 – 111*, quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In other words, a complaint is not required to have 'detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation.'" *Id., quoting Iqbal*, 556 U.S. at 678. "Nor does a complaint suffice if it tenders naked assertion devoid of further factual enhancement . . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

### II.   THE ALTER EGO CLAIM AGAINST MR. SILVER MUST BE DISMISSED

#### A.   The Complaint Fails to Allege Facts Sufficient to Establish That Mr. Silver Dominated QB Wash.

Under New York law, an alter ego claim "does not constitute a cause of action independent of that against the corporation; rather, it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners." *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993).[3] "It is well settled that New York courts are reluctant to disregard the corporate entity." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir.

---

[3] Under New York law, veil-piercing and alter ego claims "are indistinguishable, do not lead to different results, and should be treated as interchangeable." *Wm. Passalacqua Builders v. Resnick Devs. S.*, 933 F.2d 131, 138 (2d Cir. 1991).

1989); *see also, e.g., Koninklijke Philips Elecs. N.V. v. ADS Grp.*, 694 F. Supp. 2d 246, 251 (S.D.N.Y. 2010) ("As a rule, the corporate form is accorded great respect and is set aside only when necessary to avoid a manifestly inequitable result"). To prevail on its alter-ego claim, Plaintiff must show that Mr. Silver "must at the time of the transaction complained of: (1) have exercised such control that [the corporation] has become a mere instrumentality of [Mr. Silver], which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 138 (2d Cir. 1991). "The critical question is whether the corporation is a shell being used by the individual shareowners to advance their own purely personal rather than corporate ends." *Id.* To answer this question, the Second Circuit has provided a non-exhaustive list of factors to be considered:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id.* at 139. However, courts have repeatedly cautioned that many of these factors are inapplicable to small, closely held businesses. *See, e.g., id.* ("disregarding corporate separateness is a remedy that differs with the circumstances of each case"); *Nebraskaland, Inc. v. Ryan* (*In re Ryan*), 2022 Bankr. LEXIS 2661, at *30 (Bankr. E.D.N.Y. Sept. 27, 2022) ("In considering the Passalacqua factors, the focus here is on factors one, two, and three as factors four through ten are more suited to an analysis of control when there are affiliated corporate entities"). Because "small privately

held corporations [often lack] the trappings of sophisticated corporate life . . . preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history would inevitably beckon the end of limited liability for small business owners." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989).

The relevant[4] allegations against Mr. Silver in the Complaint are as follows:

- QB Wash initially borrowed $1.175 million from Mr. Silver (or other entities at his direction;

- When QB Wash appeared incapable of paying off the Seller Note, it borrowed another $967,500 from the Silver Family Trusts and yet another $165,000 from Mr. Silver to cover operating expenses;

- When QB Wash got into further difficulties, Mr. Silver facilitated conversations with lawyers and advised QB Wash's actual owner, Zachary Silver, not to settle and to dispute certain debts in court in the hope of a more favorable legal outcome or settlement;

- Once QB Wash's financial position appeared irretrievable, Mr. Silver recorded the previously mentioned debts to protect his interests;

- In the year before QB Wash filed for bankruptcy, Mr. Silver[5] accepted transfers in the amount of $52,000, which represented a *de minimis* 2.2% of the total amount owed.[6]

While many of these allegations are false, even taken as true for purposes of this motion the actions attributed to Mr. Silver are indistinguishable from those that any owner or lender or investor in a small business would take, and do not even approach the required standard to pierce

---

[4] Mr. Silver respectfully submits that the Complaint's long-winded attempt to characterize Zachary Silver as a nice young man in contrast to Mr. Silver as a hard-hearted business lawyer does not rise to the level of relevance.

[5] The Bankruptcy Court records prove that these transfers were made to the Silver Family Trusts and/or Wash Funding, not Mr. Silver personally.  (NOM Decl. Ex. 1.)  And although bankruptcy law considered Wash Funding and the Silver Family Trusts to be "insiders," and transfers to them might be avoidable, Plaintiff does not plead any facts showing that the rent obligation deserved priority over the $2.3 million QB Wash owed its lenders.

[6] Notably, none of these facts have any applicability to the *Passalacqua* factors.

the corporate veil.  If these facts were found sufficient, it really would "beckon the end of limited liability for small business owners."  *Supra; see also Network Enters. v. Reality Racing, Inc.*, 2010 U.S. Dist. LEXIS 89598, at *17 (S.D.N.Y. Aug. 24, 2010) ("Put simply, there is nothing in the complaint to indicate that Defendants exercised any more control over Reality Racing than would be expected of the directors or shareholders of any corporation"); *Koninklijke Philips Elecs. N.V. v. ADS Grp.*, 694 F. Supp. 2d 246, 252 (S.D.N.Y. 2010) ("that the individual defendants were actively involved in the control and management" of the company is insufficient to plead a veil-piercing claim); *Nebraskaland, Inc. v. Ryan* (*In re Ryan*), 2022 Bankr. LEXIS 2661, at *34 (Bankr. E.D.N.Y. Sept. 27, 2022) ("the Court has determined that beyond conclusory allegations of domination the Amended Complaint does not contain sufficiently supported allegations that, if proven true, would establish that Ryan and PW146 are alter egos"); *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989) ("We are unable to isolate any evidence which warrants, in our view, the district court's decision to pierce the corporate veil and impose personal liability on Eric Waters") (appeal from bench trial); *accord E. Hampton Union Free Sch. Dist. v. Sandpebble Bldrs., Inc.*, 16 N.Y.3d 775, 776 (2011) ("a plaintiff must do more than merely allege that the individual engaged in improper acts or acted in 'bad faith' while representing the corporation.  In this case, plaintiff failed to allege any facts indicating that Canseco engaged in acts amounting to an abuse or perversion of the corporate form"); *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 145 (1993) ("There is no showing that [the corporation] was set up as a sham or for the purpose of tax avoidance").

**B.    The Complaint Fails to Allege Facts Sufficient to Establish That Mr. Silver Dominated the Silver Family Trusts or Wash Funding.**

Another flaw in Plaintiff's alter ego theory is that the allegedly fraudulent payments made by QB Wash were not, in fact, made to Mr. Silver personally.  Instead, they were all made to the

Silver Family Trusts and to Wash Funding.  Accordingly, to prosecute an alter ego claim against Mr. Silver, Plaintiff must allege not only that QB Wash was Mr. Silver's alter ego, but also that Wash Funding and the Silver Family Trusts were his alter egos too.  No such allegations appear in the Complaint.

### C.      The Complaint Fails to Allege Facts Sufficient to Establish That Mr. Silver Caused Plaintiff's Injury.

It is insufficient for Plaintiff to show control (which as noted above has not been shown here); wrongful conduct and loss causation are also required elements of the claim.  *See Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) ("While complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required"); *Wm. Passalacqua Builders v. Resnick Devs. S.*, 933 F.2d 131, 138 (2d Cir. 1991) ("the control must be used to commit a fraud or other wrong that causes plaintiff's loss"); *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988) (must show "complete domination in respect to the transaction attacked"); *Shafferman v. Queens Borough Pub. Library* (*In re JMK Constr. Grp., Ltd.*), 502 B.R. 396, 407–08 (Bankr. S.D.N.Y. 2013) ("For those claims to be successful, QBPL must plead and prove that Kopf used his control of JMK to commit the acts that caused the injuries particular to QBPL").

Here, Plaintiff has failed to plead either wrongful conduct or loss causation.  There is no allegation that Mr. Silver engaged in fraud, either directed at Plaintiff or at QB Wash; although some transfers to Wash Funding and the Silver Family Trusts are described as "fraudulent," they were either de minimis (and therefore could not have caused Plaintiff's injury) or merely "avoidable."  (*See* NOM Decl. Ex. 1.)  There is no allegation whatsoever to support the contention that Mr. Silver's asserted "domination" and wrongful conduct led QB Wash to spill oil, fail to pay

13

for insurance or real estate taxes, or get ticketed for municipal violations.  The only "conduct" even allegedly engaged in by Mr. Silver was the decision not to pay rent and instead to fight Plaintiff in court, and a simple breach of contract—even an intentional one—does not reach the standard of a "wrongful or unjust act."

There are similarly no factual allegations to support Plaintiff's assertion that Mr. Silver's domination of QB Wash actually caused any of Plaintiff's injuries.  As the records and Plaintiff's own admissions show, the primary reason QB Wash did not pay Plaintiff was because QB Wash had no money to pay.  There is no reason to think that, left to his own devices, Zachary Silver would have prioritized paying rent overpaying money he owed to the State of New York.  Even his decision to pay small amounts of interest to the Silver Family Trusts or to Wash Funding cannot affect that conclusion; it is not "wrongful" to pay one unsecured creditor instead of another.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) ("the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because 'the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them'"); *Dussault v. Republic of Arg.*, 616 F. App'x 26, 28 (2d Cir. 2015) ("under New York law, preferring one creditor over another is neither actually nor constructively fraudulent").

Plaintiff's pre-motion letter [ECF Doc. No. 9] provides an alternative theory of damages, namely that but for Mr. Silver's interference, Zachary Silver would have walked away from the business earlier in 2020, but none of the facts alleged take this theory across the line between "possible" and "plausible."  In fact, the Complaint admits that Plaintiff and QB Wash were engaging in contractual Rent Reset appraisals and other negotiations during that time period (Compl. ¶¶ 60 – 66), that the final appraisal was issued on August 14, 2020 (*id.* ¶ 64), that

14

negotiations did not finally break down until after that date (*id.* ¶¶ 65, 68-69), and that Plaintiff sent a lease cancellation notice on August 27, 2020 (*id.* ¶ 67).  There are no allegations in the Complaint to support a plausible inference that, but for Mr. Silver's domination of QB Wash and his abuse of the corporate form, Zachary Silver and QB Wash would have abandoned the appraisal process and the negotiations.  Nor are there any allegations to support a plausible inference that Mr. Silver was personally responsible for any misstatements made in the eviction proceeding, to which he was not a party.

As to the punitive damages claim, New York law only allows for punitive damages for breach of contract in the case of a "a gross and wanton fraud upon the public," which is not alleged here—failing to pay rent bills is the sole viable basis for the alter ego damages sought—nor do the other damages—the oil spill etc.—complained of meet the high standard required.  *TVT Records v. Island Def Jam Music Group, 412 F.3d* 82, 93-96 (2d Cir. 2005) (citing cases); *see also, e.g., Bruen v. Savage*, 1994 U.S. Dist. LEXIS 3386, at *2 (S.D.N.Y. Mar. 22, 1994) ("The general rule in New York is that punitive damages are not available in breach of contract actions, even where the breach is malicious or intentional").  Thus, the demand for punitive damages should for that additional reason be dismissed.

## III.      THE TORTIOUS INTERFERENCE CLAIM AGAINST MR. SILVER MUST BE DISMISSED.

### A.      The Complaint Fails to Allege Facts Sufficient to Establish That Mr. Silver Was the But-For Cause of Plaintiff's Injuries.

"[U]nder New York law, 'tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom.'"  *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012), *quoting*

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). "Additionally, the plaintiff must assert that defendant's actions were the 'but for' cause of the alleged breach of contract—that is, that there would not have been a breach but for the activities of the defendant." *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 359 (S.D.N.Y. 1998); *accord Burrowes v. Combs*, 25 A.D.3d 370, 373 (1st Dep't 2006) ("Specifically, a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct").

The "but-for" element is not pleaded for the same reason set forth in the previous section: even if Mr. Silver had not done anything at all, QB Wash would still most likely not have paid Plaintiff, because QB Wash did not have the money to pay its creditors, and the Complaint provides no reason to suppose that QB Wash would have paid Plaintiff ahead of all its other creditors, including creditors with priority. *See Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 360 (S.D.N.Y. 1998) ("Because Plaintiffs have not adequately pleaded 'but for' causation, the tortious interference with contract claim against Nippon must be dismissed"); *Key Items, Inc. v. Ultima Diamonds, Inc.*, 2011 U.S. Dist. LEXIS 111524, at *15 (S.D.N.Y. Sept. 29, 2011) ("[I]f Ultima Diamonds was defunct and unable to perform prior to the date on which payment became due, the Global Defendants could not have been a but-for cause of the breach of contract") *rev'd on other grounds*, 2013 U.S. App. LEXIS 5183; *Ferrandino & Son, Inc. v. Wheaton Bldrs., Inc., L.L.C.*, 82 A.D.3d 1035, 1036 (2d Dep't 2011) ("Additionally, the plaintiff failed to allege that, but for HE2's actions, Wheaton would have continued the subcontract"); *Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*, 299 A.D.2d 204, 204 (1st Dep't 2002) ("The fact that defendant welcomed the breaching employees and agreed to their request for better terms of employment than those provided by plaintiff did not satisfy plaintiff's burden of establishing proximate causation").

16

A.    <u>**The Complaint Fails to Allege Facts Sufficient to Establish That Mr. Silver Did Not Have an Economic Interest Defense.**</u>

Lack of justification is an element of tortious interference and as the Complaint acknowledges, New York law recognizes that a pre-existing economic interest is a valid justification: "Procuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong.  It is clear that under New York law, the imposition of liability in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other."  *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 286 (2d Cir. 2006).  And it is well-settled that a "concrete, pre-existing interest such as" a financial interest is sufficient to invoke the defense.  *Id.* at 287 (citing cases).  If a complaint on its face establishes an economic interest, it thereby fails to plead the "without justification" element, and a motion to dismiss can be granted.  *See P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 232 F. Supp. 2d 220, 225 (S.D.N.Y. 2002) (dismissing tortious interference counterclaim on 12(b)(6) motion).[7]  For a valid economic interest, the interferer need not be acting in the interest of the breaching party—"acting in order to protect *its own economic interest* in the breaching party" is sufficient.  *Don King Prods. v. Smith*, 47 F. App'x 12, 15 (2d Cir. 2002) (emphasis by the Second Circuit).[8]  Mere "bad faith" is insufficient to overcome an economic interest defense.  *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996) ("While the absence of good faith motivated respondents' actions, such actions were

---

[7] Even if "economic interest" is classified as an affirmative defense, "[a]ffirmative defenses may be adjudicated [on a motion to dismiss] where the facts necessary to establish the defense are evident on the face of the complaint."  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013).

[8] Plaintiff misstates the holdings of the cases cited in the pre-motion letter [ECF Doc. No. 9 at p. 3]—these cases recognize that the defense relates to economic interests *in* the breaching entity, not economic interests *of* the breaching entity.

justified by economic considerations respecting Microband").   Although "'wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract."[9] *Barbagallo v. Marcum L.L.P.*, 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011); *Silver v. Kuehbeck*, 2005 U.S. Dist. LEXIS 26956, at *33 (S.D.N.Y. Nov. 7, 2003) (same); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 838 (2d Cir. 1980) (Defendant "was not motivated solely by a desire to inflict injury.   Moreover, Nifty presented no evidence that Pet employed unlawful means in soliciting and acquiring the A&P business.   Under New York law, 'unlawful means' refers only to criminal or fraudulent conduct.").

Here, it is specifically alleged that QB Wash owed the Silver Family Trusts and Wash Funding significant amounts of money, giving them, and Mr. Silver on their behalf, a significant pre-existing economic interest in QB Wash.   Nor has any allegation been made that the breach of QB Wash's contract with Plaintiff was procured by "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, [or] economic pressure."   *Supra*.   Plaintiff tries to point to the transfers to the Family Trusts and Wash Funding as evidence of fraud, but there is no reasonable basis to think that these transfers, or the liens obtained by Wash Funding after payment to Plaintiff had ceased, caused QB Wash's breach of its lease with Plaintiff.   Similarly, there is no basis to think that alleged misstatements by QB Wash in the eviction proceeding or the bankruptcy

---

[9] Similarly, Mr. Silver's alleged knowledge of the financial circumstances of one of the Plaintiff's principals does not constitute "wrongful means."   *Cf. VKK Corp. v. NFL*, 244 F.3d 114, 123 (2d Cir. 2001) ("Not infrequently, when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other.   The weaker party often must enter into the bargain because of his economic circumstances, a disparity in bargaining power to his disadvantage, or some combination of the two," but such disparity is not sufficient to establish economic duress).

proceeding either caused any breach of contract or were attributable to Mr. Silver rather than to

QB Wash or its attorney.  The tortious interference claim should therefore be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, all claims asserted against Mr. Silver should be dismissed.

Dated: November 18, 2022
      New York, New York

                    **LUNDIN PLLC**

By: _____
                    Niall D. Ó Murchadha
                    John M. Lundin
                    Cynthia L. Botello
                    405 Lexington Avenue, 26th Floor
                    New York, NY 10174
                    Telephone: (212) 541-2402
                    NOMurchadha@LundinPLLC.com
                    JLundin@LundinPLLC.com
                    CBotello@LundinPLLC.com

                    *Attorneys for Scott E. Silver*

19