UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

138-77 QUEENS BLVD LLC,

                                 **MEMORANDUM & ORDER**
                   *Plaintiff*,        22-cv-5155(KAM)(MMH)

       - against -

SCOTT E. SILVER,

                   *Defendant*.

----------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

      Plaintiff 138-77 Queens Blvd LLC brings this action against Defendant Scott E. Silver for breach of contract on the basis of piercing the corporate veil, and for tortious interference of contract.  Presently before the Court is Defendant's motion to dismiss the complaint for failure to state a claim.  (ECF No. 19.)  For the reasons set forth below, the Court DENIES Defendant's motion in its entirety.

**BACKGROUND**

**I.  Factual Background**

      On a motion to dismiss, the court accepts the truth of all well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor.  *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021).  In addition to the complaint, the court may consider documents incorporated by reference into the complaint and matters of proper judicial notice and public record.

*Id.* at 996.  Here, the Court may take Defendant's exhibits related to QB Wash LLC's underlying Bankruptcy Proceeding (ECF Nos. 19-3-19-5) into consideration, as the Court finds they are incorporated by reference into the Complaint.  Based on the foregoing, the Court accepts the following allegations as true.

### A. The Parties, the Premises, and the Lease

Plaintiff is a limited liability company organized under the laws of the State of New York.  Its sole asset is the property located at 138-77 Queens Boulevard and an adjacent address, 138-11 87th Avenue (the "Premises").  (ECF No. 1 ("Compl.") ¶¶ 18, 28.)  The Premises have been continuously operated as a car wash and lube shop since at least the 1970s.  (*Id.* ¶ 28.)

Bert Wohl ("Bert") — husband of Maureen Wohl ("Maureen") and father of Ellen Vaknine ("Ellen") and Ethan Wohl ("Ethan") — held title to the Premises individually and as trustee of a family trust from the early 1980s until his passing in March 2019. The Premises were then conveyed to Plaintiff from Bert's estate and the family trust in January 2020.  No change in beneficial ownership resulted from the conveyance to Plaintiff.  (*Id.* ¶¶ 18, 29.)  Plaintiff LLC is beneficially owned 50% by Maureen, age 93, whose interest is held in a marital trust created under her deceased husband's will.  The remaining 50% interest in Plaintiff LLC is held directly by Maureen's two adult children, Ellen and

Ethan, 25% each.[1]  (*Id.* ¶ 18.)  Maureen's 50% interest in Plaintiff LLC is her largest asset and provided the majority of her income prior to the events giving rise to this action.  (*Id.*)

Defendant ("Defendant" or "Defendant Silver") is an individual employed at all relevant times as the general counsel of Sherman Financial Group.  (*Id.* ¶ 19.)

In 2010, Bert entered into the Lease with an entity named Blvd Wash & Lube Ltd for a 25-year term. After an initial discounted rent period, the Lease provided for fixed annual rent increases until June 2020, when the base rent was scheduled to reset to market rate (the "Rent Reset").  (*Id.* ¶¶ 30-32.)  If the parties were unable to reach agreement on the new rent, the Lease set forth a detailed procedure involving the appointment of appraisers to determine the new rent.  (*Id.* ¶ 32.)

In March 2011, Blvd Wash & Lube Ltd. sold its business and assigned the Lease to LB One, LLC ("LB One"), which, in turn, sold its business and assigned the Lease to QB Wash in January 2016.  (*Id.* ¶¶ 32-34.)  The Complaint alleges that QB Wash is a New York limited liability company "owned and controlled by the Silvers."  (*Id.* ¶ 34.)  QB Wash purchased the business for $1.2 million in cash and a $1.33 million promissory note payable to LB One ("LB One Note"), under which QB Wash was required to make

---

[1] "Plaintiff" hereinafter refers to the plaintiff LLC, Maureen Wohl, the marital trust, as well as Ellen Vaknine and Ethan Wohl.

monthly payments of $9,790 for 19 years. (*Id*. ¶ 35.)  The Complaint further alleges that the cash for the purchase was provided by Defendant Silver, and/or a family trust controlled by him.  (*Id*. ¶ 36.)  In connection with the assignment of the Lease to QB Wash, Defendant Silver's son, Zachary Silver ("Zachary"), executed an Agreement for the Personal Guarantee of Lease dated as of January 8, 2016 (the "Personal Guaranty"), pursuant to which Zachary guaranteed QB Wash's performance under the Lease.  (*Id*. ¶ 37.)

### B. QB Wash's Initial Rent Payment Issues

Zachary assumed day-to-day management of the QB Wash carwash and lube business in January 2016, but within a few months, QB Wash's business encountered financial and operational difficulties.  (*Id*. ¶ 38.)  Starting in late 2016, QB Wash began intermittently making late rental payments, and by April 2017, QB Wash had stopped paying LB One on the LB One Note.  (*Id*. ¶¶ 40-41.)  In June 2017, LB One and QB Wash entered into a settlement whereby (1) the Scott Silver Family Trust paid $967,500 to satisfy the LB One Note, amounting to a discount of roughly 25% from the full amount then due, and (2) the obligation of QB Wash to make monthly payments on the LB One Note was eliminated.  (*Id*. ¶¶ 42-43.)  By summer 2018, QB Wash began making belated rent payments for the Premises.  (*Id*. ¶ 43.)  Plaintiff subsequently agreed to accept payment of the insurance and real estate tax reimbursements

4

required under the Lease in deferred installments to accommodate QB Wash's apparent cash flow difficulties. (*Id.* ¶ 44.)

Starting in January 2019, Defendant Silver began a series of wire transfers to QB Wash to cover its operating deficits, contributing a total of $165,000 between January 2019 and February 2020. (*Id.* ¶ 45.) Despite Defendant Silver's transfers, QB Wash made incomplete rent payments beginning in March 2019, with portions of rent arriving more than 30 days late. (*Id.* ¶ 46.) QB Wash continued to pay progressively later and has not made a timely payment of monthly rent after summer 2018. (*Id.* ¶ 48.)

### C. Events Prior to the Eviction Action

At a February 6, 2020 meeting with Ellen and Ethan, Zachary stated that the rent was "unsustainable," "excessive," and that he would need a rent reduction to continue in the Premises (Compl. ¶ 55.) At a second meeting on February 27, 2020, Zachary reiterated that he needed a substantial rent reduction, but also stated that he was prepared to pay $2 million "all cash" to acquire the Premises, roughly half of the amount for which the Premises had been appraised in 2019. (*Id.* ¶ 56.) Plaintiff declined to sell the Premises to Zachary. The Complaint alleges that following the February 27 meeting, "the Silvers ceased to make further rental payments." (*Id.* ¶ 57.)

In March 2020, then-Governor Cuomo ordered the closure of non-essential businesses in response to the COVID-19 pandemic via executive order. QB Wash's automotive lube business was categorized as an "essential business" and accordingly did not shut down, but the car wash business was deemed "non-essential" and therefore subject to closure. (*Id.* ¶ 58.) Although the executive order continued to apply to non-essential businesses in New York City until June 22, 2020, financial and water usage records showed that QB Wash resumed carwash operations on or about May 9, 2020. (*Id.* ¶ 59.)

### D. Defendant's Alleged Scheme

According to the Complaint, Defendant devised a scheme in early 2020 to recoup some of the losses he had incurred due to QB Wash's financial struggles: using QB Wash's withholding of rent from Plaintiff and exploiting New York State's moratorium on evictions and pandemic-related court delays to attempt to compel Plaintiff to sell the Premises at a deep discount or accept a rent far below market rate. (*Id.* ¶ 87.) Further, the Complaint alleges that, to insulate his son Zachary from liability under the Personal Guaranty and deter any collection suit by Plaintiff, Defendant formed Wash Funding (a Delaware limited liability company) in April 2020, and caused it to take a pledge of Zachary's principal asset, a Wells Fargo Brokerage Account holding approximately $400,000. (*Id.* ¶¶ 89, 97, 100-01.)

Between April and December 2020, during the time it was not paying rent to Plaintiff, QB Wash made a series of cash payments to Wash Funding and the Silver Family Trusts, totaling nearly $40,000. (*Id.* ¶ 108.)  In late 2020, QB Wash also made over $12,500 in additional payments to attorneys and a surveying firm in connection with the purchase of a Connecticut carwash property by a family trust controlled by Defendant. (*Id.* ¶ 110.)

The Complaint also asserts that Defendant believed his scheme would succeed because the Silvers had conducted a nationwide asset search revealing that Maureen owned only two other properties, both of which were less valuable than the Premises and one of which did not provide income at all. (*Id.* ¶ 90.)

### E. Rent Reset Process, the Eviction Action, and QB Wash's Bankruptcy Proceedings

Meanwhile, Plaintiff and QB Wash began the Rent Reset process in March 2020. (*Id.* ¶ 60.)  In July 2020, a neutral, third-party appraiser was appointed. (*Id.*)  In a series of negotiations in May and June 2020, Plaintiff offered to waive two months' base rent and late fees, as well as defer payment of roughly one-third of the base rent due over the summer. Plaintiff alternatively offered QB Wash the option of terminating the Lease and surrendering the Premises without liability for the accumulated rent arrears, then over $80,000. (*Id.* ¶ 61.)  The offers were rejected, and QB Wash retained possession of the

Premises but continued to withhold rent, real estate tax, and insurance reimbursements. QB Wash also ceased paying for water used in the carwash business, ultimately accruing more than $37,000 in unpaid water and sewage charges over the following eight months. (*Id.* ¶ 62.) After drawing down the security deposit it was holding, Plaintiff sent QB Wash several demands to replenish the deposit, as well as issued various notices to cure Lease violations. (*Id.* ¶ 63.)

In August 2020, the third-party appraiser found the fair market base rent for the Premises to be $21,729 a month. (*Id.* ¶ 64.) Zachary again offered to either purchase the Premises for $2 million or to pay $14,500 a month as base rent, a 1/3 discount to the fair market rent determined by the appraiser. Plaintiff refused both offers. (*Id.* ¶ 65.)

On September 4, 2020, Plaintiff commenced an eviction action against QB Wash LLC in Queens County Supreme Court. (*Id.* ¶ 70.) In January 2021, the state court entered an Order finding that "permitting tenant to remain in possession of the subject premises without paying for its use would be 'manifestly unfair'" and directing QB Wash to pay prospective use and occupancy, post a bond for the rent arrears, and pay the water and sewer arrears. (*Id.* ¶ 73.) On February 8, 2021, shortly after the state court Order's deadline for QB Wash to post a bond, QB Wash filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the

Eastern District of New York.  (*Id.* ¶ 75.)  Plaintiff thereafter entered into a stipulation with the Bankruptcy Trustee under which Plaintiff regained possession of the Premises.  (*Id.* ¶ 77.) Plaintiff then entered into a new lease for the Premises on April 15, 2021.  (*Id.* ¶ 82.)

The Bankruptcy Trustee also conducted an investigation of QB Wash's affairs, and obtained documents from QB Wash and the Silvers, which the Trustee provided to Plaintiff.  Plaintiff also moved for disclosure in the Bankruptcy Court and obtained additional documents and information from QB Wash and the Silvers. (*Id.* ¶ 83.)  The Bankruptcy Trustee ultimately entered into settlements with the Scott Silver Family Trust and Deirdre Silver Family Trust (together, the "Silver Family Trusts"), Wash Funding, and Zachary, under which the Bankruptcy Estate received a total of $132,840 to settle claims for monies they had received from QB Wash.  None of these funds were ultimately paid to Plaintiff, however, because claims by the NYS Tax Department for unpaid sales taxes and by the NYS Department of Labor for unpaid unemployment insurance contributions were entitled to priority under the Bankruptcy Code and fully consumed the net settlement proceeds. (*Id.* ¶ 84.)

## II.  Procedural History

Plaintiff commenced this action on August 30, 2022, bringing claims against Defendant for breach of contract on the

basis of piercing the corporate veil, and tortious interference with contract. (Compl. ¶¶ 209-24.) On the breach of contract claim, Plaintiff seeks Rent Nonpayment Damages, Water Charge Damages, Oil Spill Damages, Municipal Violation Damages, Lease Termination Damages, and Attorneys' Fee Damages. (*Id*. at 41.) On the tortious interference with contract claim, Plaintiff seeks Rent Nonpayment Damages, Water Charge Damages, and Attorneys' Fee Damages. (*Id*. at 42.) Plaintiff also seeks punitive damages on both claims of at least $2,000,000. (*Id*.)

On October 27, 2022, Defendant filed a letter requesting a pre-motion conference for his anticipated motion to dismiss the complaint for failure to state a claim. (ECF No. 8.) Plaintiff responded in opposition (ECF No. 9), and the Court held a pre-motion conference on November 14, 2022. (11/14/2022 Minute Entry.) The motion is now fully submitted and ripe for decision.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "detailed

10

factual allegations" are not required, "[a] pleading that offers labels or conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (quotations and citation omitted).

When considering a motion to dismiss under Rule 12(b)(6), a district court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). A court shall not dismiss a case on such a motion unless it is "satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## DISCUSSION

### I. Piercing QB Wash LLC's Corporate Veil

The Court finds that Plaintiff has alleged sufficient facts to plead that QB Wash's corporate veil should be pierced as to Defendant.

#### A. Legal Standard

A theory of liability based on piercing the corporate veil is not an independent cause of action. *Morris v. New York State Dep't of Tax'n & Fin.*, 623 N.E.2d 1157, 1160–61 (N.Y. 1993). The doctrine is typically invoked by a third party "seeking to go behind the corporate existence in order to circumvent the limited

liability of the owners and to hold them liable for some underlying corporate obligation." *Id.* at 1160 (citation omitted).[2]

As applicable in the instant action, "New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner', notwithstanding the fact that the individual is not a shareholder of the corporation." *Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1051 (2d Cir. 1997*); see also In re Vebeliunas*, 332 F.3d 85, 92 (2d Cir. 2003) (discussing how "[c]ourts have recognized that the element of control may be predicated upon the concept of equitable ownership" for an individual who "does not occupy a formal position of authority").[3]

Equitable ownership "is not an alternative to veil piercing, but rather a recognition that veil piercing can apply to someone who is not a legal owner of a corporation if he exercises sufficient control and uses that control to commit a fraud or

---

[2] In New York, "courts use the same standard to pierce the veils of" either limited liability companies or corporations. *In re Stamou,* No. 8-09-78895 (REG), 2013 WL 209473, at *7 (Bankr. E.D.N.Y. Jan. 17, 2013) (citing *Retropolis, Inc. v. 14th St. Dev. LLC,* 797 N.Y.S.2d 1, 2 (N.Y. App. Div. 2005)).

[3] Under New York law as interpreted by the Second Circuit, "alter ego" and "veil piercing" theories "are indistinguishable, do not lead to different results, and should be treated as interchangeable." *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.,* 933 F.2d 131, 138 (2d Cir. 1991); *see also In re Ryan*, No. 8-19-70203-LAS, 2022 WL 4486736, at *9, n.8 (Bankr. E.D.N.Y. Sept. 27, 2022); *MWH Int'l, Inc. v. Inversora Murten, S.A.,* No. 1:11-CV-2444-GHW, 2015 WL 728097, at *11 (S.D.N.Y. Feb. 11, 2015). Accordingly, this Court uses the terms interchangeably.

wrong." *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 733 (S.D.N.Y. 2017). Under a veil-piercing theory, a plaintiff must sufficiently allege that (1) the purported dominator of a corporation had complete control over the corporation so that the corporation had no separate mind, will, or existence of its own and that (2) such control "was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of." *Freeman,* 119 F.3d at 1053 (quotations and citation omitted).

**B. Application**

1. Complete Control or Domination Over QB Wash

In *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.,* the Second Circuit set forth ten non-exhaustive factors to assess whether a corporation has been sufficiently dominated to warrant piercing the corporate veil:

> (1) [T]he absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related

13

> corporations deal with the dominated
> corporation at arms length, (8) whether the
> corporations are treated as independent profit
> centers, (9) the payment or guarantee of debts
> of the dominated corporation by other
> corporations in the group, and (10) whether
> the corporation in question had property that
> was used by other of the corporations as if it
> were its own.

933 F.2d 131, 134 (2d Cir. 1991).

As the language of the factors make clear and as courts have subsequently established, the *Passalacqua* factors often "concern the relationship of a parent to its subsidiary," *United States v. Funds Held ex rel. Wetterer*, 899 F. Supp. 1013, 1029 (E.D.N.Y. 1995), and accordingly are "neither exhaustive nor universally relevant." *Am. Fed. Title Corp. v. GFI Mgmt Serv., Inc.*, 126 F. Supp. 3d 388, 403 (S.D.N.Y. 2015) (noting that "[t]he significance of corporate formalities, for example, changes depending on the corporate form at issue"), *aff'd,* 716 F. App'x 23 (2d Cir. 2017) (summary order). Therefore, it is well-established that determining whether the purported dominator "exercised complete domination is highly case-specific and must be made in view of the totality of the facts." *See, e.g., Mirage Ent., Inc. v. FEG Entretenimientos S.A.,* 326 F. Supp. 3d 26, 34 (S.D.N.Y. 2018) (cleaned up); *see also Freeman*, 119 F.3d at 1051 (noting that "[n]o one factor is decisive"); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,* 316 F. Supp. 3d 635, 646 (S.D.N.Y. 2018) ("There is no set rule regarding how many factors must weigh in

favor of piercing the corporate veil for control to be found."). Accordingly, in considering these factors, the general principle followed by courts is that "liability is imposed to reach an equitable result." *Smoothline Ltd. v. N. Am. Foreign Trading Corp.,* No. 00 CIV. 2798 DLC, 2002 WL 31885795, at *9 (S.D.N.Y. Dec. 27, 2002) (citing *Brunswick Corp. v. Waxman,* 599 F.2d 34, 35 (2d Cir. 1979) (citation omitted)).

Here, many factual allegations lead to a plausible inference that Defendant exercised complete control over QB Wash LLC. First, "a company may be considered undercapitalized 'when its liabilities exceed its assets, requiring personal loans to meet operating expenses,'" and "[i]nsolvency may also be weighed as evidence that a corporation was inadequately capitalized." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 441 (S.D.N.Y. 2018) (collecting cases); *see also Cardell Fin. Corp. v. Suchodolski Assocs., Inc.,* No. 09 CIV 6148 (VM), 2012 WL 12932049, at *22 (S.D.N.Y. July 17, 2012), *report and recommendation adopted sub nom. Cardell Fin. Corp. v. Suchodolksi Assocs., Inc.,* 896 F. Supp. 2d 320 (S.D.N.Y. 2012). QB Wash's financial difficulties — including but not limited to its failure to pay Plaintiff for rent either on time or at all, ultimately leading to this action — are extensively alleged in the Complaint. Starting in January 2019, Defendant himself made a series of wire transfers to QB Wash to cover its operating

deficits, contributing a total of $165,000 in the 13 months between January 2019 and February 2020.  (Compl. ¶ 45.)  The Scott Silver Family Trust also paid $967,500 to satisfy the LB One Note, pursuant to a June 2017 settlement agreement between LB One and QB Wash arising after QB Wash had stopped paying LB One.  (*Id*. ¶¶ 41-42.)

Although as Defendant points out, "undercapitalization alone is generally insufficient to warrant piercing of the corporate veil," *Tycoons Worldwide Grp. (Thailand) Pub. Co. v. JBL Supply Inc.,* 721 F. Supp. 2d 194, 206-07 (S.D.N.Y. 2010), that is not the case here, where many allegations, particularly in the context of the Complaint, point to Defendant's intimate involvement with and ultimately, domination over, QB Wash.

For one, over the course of QB Wash's bankruptcy proceeding, both the Bankruptcy Trustee and Plaintiff obtained documents from QB Wash as well as from Defendant.  (*See* Compl. ¶¶ 83-84.)  Even in the small business context, it is notable that Defendant Silver, a party purportedly dealing at arm's length with the dominated entity, QB Wash, would have discoverable material within a bankruptcy proceeding.  Further, Defendant's complete control of — rather than simply active involvement with — QB Wash can be inferred from the myriad of allegations regarding the "amount of business direction displayed by" QB Wash.  *See Passalacqua*, 933 F.2d at 139.  Email communications between the

Silvers in early 2020 show that Defendant was "intimately involved in QB Wash's strategic business decisions, and that Zachary sought [Defendant's] direction and deferred to him." (Compl. ¶ 150.) This included: Zachary soliciting Defendant's advice regarding a third party offer to purchase the carwash and lube business, to which Defendant replied, "Yes, pass"; emails showing Defendant heavily marking up Zachary's proposed talking points for QB Wash's Rent Reset negotiation with Plaintiff; emails reflecting Defendant drafting correspondence for Zachary to send to Plaintiff; and emails where Zachary requests direction from Defendant on whether to send various documents to Plaintiff in connection with the Rent Reset process. (*Id.* ¶¶ 151-53.) For the purposes of assessing this 12(b)(6) motion, the Court agrees that "Zachary's deference [on behalf of QB Wash] to [Defendant], as shown in these emails, reflects the nature of their relationship, [Defendant's] role in providing funding [to QB Wash], and [Defendant's] far greater business and legal experience" as compared to his son, Zachary (*see* Compl. ¶ 154), the nominal principal and sole member of QB Wash. (ECF No. 19-5, Ex. 3, at 1.)

Defendant's domination over QB Wash is also apparent from the high degree of Defendant's involvement in both engaging with and procuring legal counsel for — and purportedly on behalf of — QB Wash. Between May 2020 and February 2021, when the QB Wash bankruptcy case was initiated, Defendant either sent,

received, or was copied on over 80 emails with three law firms advising Defendant and Zachary regarding the carwash and lube business, with one firm engaged by QB Wash on the recommendation of another member of the Silver family, and the other two major law firms *retained by Defendant himself*. (Compl. ¶ 161.) Further, in May 2020, Defendant and Zachary jointly consulted with an attorney at Foley & Lardner, a law firm retained by Defendant for legal advice related to the Premises (*id.* ¶ 99), and records show that, in addition to asking "questions regarding lease," Defendant forwarded to Zachary correspondence *sent only to Defendant* by a Foley & Lardner partner. (*Id.* ¶ 163.) In light of these assertions, the Court cannot agree with Defendant's argument that the actions attributed to him "are indistinguishable from those that any owner or lender or investor in a small business would take." (Def. Mem. at 11.) Plaintiff has therefore sufficiently pleaded that Defendant exercised complete control and domination over QB Wash.[4]

---

[4] Defendant cherry-picks five allegations from the Complaint as being "relevant" to determining whether he exercised sufficient control or domination over QB Wash LLC, and argues that "none of these facts have any applicability to the *Passalacqua* factors." (Def. Mem. at 11, 11 n.6.) It is apparent to the Court that the Complaint asserts many other allegations that are relevant to the analysis, and that some do, in fact, invoke the *Passalacqua* factors. But even assuming, *arguendo*, that this Court was bound by a strict application of the factors — which it is not — even the *Passalacqua* court acknowledged that "any other pertinent factors" may also arise in the analysis, as there are an "infinite variety of situations that might warrant disregarding the corporate form." *See* 933 F.2d at 134.

2. <u>Fraud or Wrong Causing Injury to Plaintiff</u>

To satisfy the second prong, Plaintiff must allege facts from which the Court can plausibly infer that Defendant used his control of QB Wash LLC "to commit a fraud or wrong that caused [Plaintiff] unjustly to suffer a loss." *CBF Industria de Gusa S/A,* 316 F. Supp. at 649; *see also Freeman*, 119 F.3d at 1053. This requirement "can be satisfied either by showing outright fraud, or another type of wrong, such as a breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." *CBF Industria de Gusa S/A,* 316 F. Supp. at 649 (quotations and citation omitted). The Court finds that the allegations in the Complaint are sufficient to satisfy the requirement that Defendant exercised control over QB Wash to commit a fraud or wrong in contravention of Plaintiff's legal rights.

Defendant argues that this element is insufficiently pleaded by asserting that there are "no factual allegations to support Plaintiff's assertion that [Defendant's] domination of QB Wash actually caused any of Plaintiff's injuries." (Def. Mem. at 14; ECF No. 21 ("Def. Reply") at 3-7.) This is misguided.

Even setting aside that courts in this Circuit have sometimes declined to dismiss alter ego liability claims when the pleading of this prong is "minimal," Plaintiff's pleadings adequately allege that Defendant's control and domination of QB Wash harmed Plaintiff. *See, e.g., A Partner Ltd. v. Contour*

*Acquisition Grp., LLC*, No. 16-CV-6575 (AJN), 2017 WL 10221325, at *4 (S.D.N.Y. Sept. 22, 2017) (finding that two allegations regarding how control or domination harmed plaintiff allowed a plausible inference within the context of the entire amended complaint that the purported dominator "underfinanced or otherwise diverted assets from [the dominated corporation] in a way that harmed [p]laintiff"); *see also Paguirigan v. Prompt Nursing Emp. Agency LLC,* 286 F. Supp. 3d 430, 441 (E.D.N.Y. 2017).

Plaintiff's primary contentions on this issue can be summarized, in part, as follows:

> [Defendant] saw an opportunity, and he devised a strategy: the Silvers would withhold all rent, exploit New York State's moratorium on evictions and the court delays resulting from the pandemic to force Plaintiff's principals to pay hundreds of thousands of dollars out of pocket for real estate taxes, legal fees, insurance, water charges, and other property expenses, and use the resulting economic pressure to compel them to sell the Premises at a deep discount or accept a rent far below market rate.

(Compl. ¶¶ 87; *see also id.* ¶¶ 182–86.)

In support, Plaintiff alleges multiple ways by which Defendant used his control of QB Wash to commit wrongs causing injury to Plaintiff. Primarily, Plaintiff alleges that Defendant began effectuating the scheme described above in April 2020 by forming a new Delaware LLC, Wash Funding, and that Wash Funding's "only role was to conceal the related-party nature of the insider

20

debt [Defendant] later transferred to it." (*Id.* ¶¶ 97-98.)
Between April and December 2020, while QB Wash was not paying rent
to Plaintiff, QB Wash made a series of cash payments to Wash
Funding and the Silver Family Trusts, totaling nearly $40,000.
(*Id.* ¶ 108.)  Under New York law, "the diversion of funds to make
a corporation judgment-proof constitutes a wrong for the purposes
of determining whether the corporate veil should be pierced." *Fed.*
*Nat. Mortg. Ass'n v. Olympia Mortg. Corp.,* 724 F. Supp. 2d 308,
320 (E.D.N.Y. 2010).

Although Defendant argues that "it is not 'wrongful' to
pay one unsecured creditor instead of another" and characterizes
the transfers as a decision by Zachary "to pay small amounts of
interest to the Silver Family Trusts or to Wash Funding" (Def.
Mem. at 14), such an argument ignores the indicia of wrongdoing,
including that *Defendant himself* formed Wash Funding, and that, in
late 2020, QB Wash — which Defendant argues he did not dominate
— inexplicably "paid over $12,500 in additional payments to
attorneys and a surveying firm in connection with the purchase by
a family trust controlled by [Defendant] of a car wash property"
in Connecticut.  (Compl. ¶ 110.)

Further, other indicia lead to a plausible inference
that Defendant wrongfully sought to ensure that Plaintiff could
not recover from QB Wash or from his son Zachary, QB Wash's
personal guarantor.  In June 2020, the Silver Family Trusts

21

transferred two promissory notes to Wash Funding that Zachary had ostensibly executed in 2016 and 2017 in connection with the acquisition of the carwash and lube business.   Wash Funding then proceeded to file a UCC-1 Financing Statement with the New York Secretary of State, purporting to perfect a security interest in "all assets" belonging to Zachary.  (*Id.* ¶ 100.)   Wash Funding also took a pledge of a Wells Fargo Brokerage Account holding $400,000 — substantially all of Zachary's assets.  (*Id.* ¶ 101.)

Therefore, read "in its entirety, the instant Complaint describes the intertwined relationships" amongst QB Wash, Defendant, Defendant's son, Wash Funding, and the Silver Family Trusts, "and the ways in which those relationships were coordinated to effectuate the alleged scheme of which plaintiff was the victim." *See Paguirigan*, 286 F. Supp. 3d at 441; (*see also* Compl. ¶ 157 (describing an April 10, 2020 email in which Zachary forwarded to Defendant a screenshot of an email sent by Plaintiff, and explained: "I decided to send the email in this format rather than forward. Did not want you to be accidentally looped in on any correspondence.").)   The Complaint sufficiently pleads that Defendant used his control of QB Wash to commit wrongdoing resulting in the complained-of injury to Plaintiff — in particular, an organized "steady drain of funds from [QB Wash's] coffers" that impaired QB Wash's "ability to meet its substantial contractual obligations" to Plaintiff, and caused Plaintiff to suffer

22

financial damages.  *See Fed. Nat. Mortg. Ass'n,* 724 F. Supp. 2d at 320; *see also CBF Industria de Gusa S/A,* 316 F. Supp. 3d at 649 ("The facts, as alleged by Plaintiffs, demonstrate that a jury could find that Defendants, acting on behalf of [the dominated corporation], sought to make [the dominated corporation] judgment proof as a means of evading its obligations under the Contracts.").

In sum, at the motion to dismiss stage, these indicia of fraud or wrongdoing "are enough to support the plausible inference" that QB Wash's "corporate form was abused to facilitate" the alleged schemes.  *See United States v. Lax*, 414 F. Supp. 3d 359, 368 (E.D.N.Y. 2019).  Defendant is not the first to argue that, were the alleged facts in his case found sufficient to state a plausible theory of alter ego liability, such would "beckon the end of the limited liability for small business owners."  (Def. Mem. at 12 (citation omitted)).  Assessment of this Complaint, however, presents no such close call, and it is well-established that it is "inappropriate at this stage of the pleadings to attempt to evaluate the evidence or to determine whether [plaintiffs] will ultimately succeed in supporting their allegations." *See A Partner Ltd.,* 2017 WL 10221325, at *4 (internal quotation and citation omitted).  Accordingly, the Complaint has sufficiently alleged the piercing of QB Wash's corporate veil to reach Defendant.

## II.   Tortious Interference with Contract

### A. Legal Standard

Under New York law, the elements of a tortious interference with contract claim are: "(i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). Defendant here presents two arguments to support his motion to dismiss: (1) that the Complaint does not allege sufficient facts to establish that he was the but-for cause of Plaintiff's injuries, and (2) assertion of the "economic interest" defense.

### B. Causation

By Defendant's own admission, his causation argument here largely repeats his argument against piercing the corporate veil — that, "even if [Defendant] had not done anything at all, QB Wash would still most likely not have paid Plaintiff, because QB Wash did not have the money to pay its creditors." (Def. Mem. at 16.)

Plaintiff disputes Defendant's characterization of the causation issue, and instead argues that "absent Defendant's actions, QB Wash would not have breached the Lease by holding over, and so would not have caused Plaintiff to incur the large majority

of its damages." (Pl. Opp. at 25.)  As Plaintiff notes, for its tortious interference of contract claim it "seeks only the damages – lost rent, water charges and attorneys fees – that flowed from" the allegedly "unlawful holdover caused by Defendant's interference," as demonstrated by Plaintiff's myriad of specific allegations regarding Defendant's interfering conduct. (*See* Pl. Opp. at 26; *see also, e.g.,* Compl. ¶¶ 149-80, 220-21.)

In vacating and remanding the district court's decision to deny a motion to amend on the basis of futility, the Second Circuit determined in *Key Items, Inc. v. Glob. Jewellery Sols., Ltd.* that the plaintiff's allegations that a defendant "shifted assets from" an old entity to a new one "thereby causing [the old entity] to breach its contractual obligations . . . *sufficiently plead causation.*" 514 F. App'x 40, 41 (2d Cir. 2013) (emphasis added) (summary order).[5] As recounted above, Plaintiff has pleaded extensive allegations as to Defendant's involvement in, *inter alia*, diverting QB Wash's assets into entities he is alleged to have controlled.  For the purposes of assessing a motion to dismiss, therefore, such allegations sufficiently plead causation.

### C. Defendant's Economic Interest Defense

A party may assert an economic interest defense to a claim of tortious interference of contract, under which "procuring

---

[5] Defendant appears to have erroneously cited the Second Circuit's order in *Key Items* as "reversed on other grounds" (Def. Mem. at 16), even though the Circuit's analysis appears directly relevant to the issue in the instant action.

the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong." *Foster v. Churchill*, 665 N.E.2d 153 (N.Y. 1996), *cited by, White Plains Coat & Apron Co. v. Cintas Corp.,* 460 F.3d 281, 286 (2d Cir. 2006).

A plaintiff may overcome the defense with a showing "of either malice on the one hand, or fraudulent or illegal means on the other." *White Plains Coat & Apron Co.*, 460 F.3d at 286 (quotations and citation omitted). Even assuming, *arguendo*, that Plaintiff's allegations establish that Defendant "acted to protect [his] own legal or financial stake in the breaching party's business," *White Plains Coat & Apron Co. v. Cintas Corp.,* 867 N.E.2d 381, 383 (N.Y. 2007), Plaintiff has alleged facts sufficient to overcome the defense.

As stated *supra*, Plaintiff alleges that "absent Defendant's actions, QB Wash would not have breached the Lease *by holding over,* and so would not have caused Plaintiff to incur the large majority of its damages." (Pl. Opp. at 25 (emphasis added).) Plaintiff pleaded a host of allegations as to the "fraudulent or illegal means" by which Defendant interfered with and induced QB Wash's breach of its contract with Plaintiff, including conducting fraudulent transfers of assets from QB Wash (the breaching party) into entities that Defendant controlled, and strategizing and executing an abusive litigation strategy against Plaintiff with

the objective of imposing "financial injury on Plaintiff, and coerc[ing] its owners economically." (Compl. ¶¶ 97-127.) Such allegations are sufficient to allow a factfinder to make the plausible inference that Defendant engaged in "fraudulent or illegal means" in relation to QB Wash's extended holdover. *See EPAC Techs. Ltd. v. Interforum S.A.*, 2023 N.Y. Slip Op. 03543, 2023 WL 4239622, at *1 (N.Y. App. Div. June 29, 2023) (reinstating a claim for tortious interference with contract against two defendants who allegedly instructed the breaching parties "to employ fraudulent or illegal renegotiation tactics" and furthermore, "demonstrated malice by instructing nonpayment of monies duly owed").

Finally, Defendant argues that "the demand for punitive damages should . . . be dismissed." (Def. Mem. at 15.) It is well-established that "[b]ecause punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is procedurally premature." *Hunter v. Palisades Acquisition XVI, LLC*, No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017) (quotations and citation omitted); *see also, e.g., Belyea v. City of Glen Cove,* No. 20-CV-5675 (MKB), 2022 WL 3586559, at *30 (E.D.N.Y. Aug. 22, 2022) (collecting cases).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss is DENIED in its entirety.  Parties are again encouraged to enter mediation or settlement discussions in good faith.

**SO ORDERED.**

_____
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

Dated:    July 17, 2023
          Brooklyn, New York