

733 Third Avenue
New York, New York 10017
212.867.6000
Fax 212.551.8484
www.rosenbergestis.com

Eric S. Askanase
+1 (212) 551-1267
easkanase@rosenbergestis.com

August 3, 2023

**By ECF**
Hon. Marcia M. Henry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *138-77 Queens Blvd LLC v. Silver*, No. 22-cv-5155-KAM-MMH

Dear Judge Henry:

We represent the plaintiff, 138-77 Queens Blvd LLC ("Plaintiff").  By this letter, Plaintiff moves to amend the complaint in this action to add new claims against the defendant, Scott Silver ("Defendant").  The parties have met-and-conferred and Defendant has advised he opposes leave to amend.

<u>Background and the Proposed Amendments</u>

In this action, Plaintiff, a commercial landlord, asserts state law claims arising out of breach of a lease (the "Lease") for Plaintiff's carwash property by QB Wash LLC ("QB Wash"), a tenant entity controlled by Defendant and managed by his son, Zachary Silver ("Zachary").

Discovery has now revealed that Defendant fraudulently induced Plaintiff's predecessor-in-interest, Bert Wohl ("Bert"), to consent to the assignment of the Lease to QB Wash and accept a personal guaranty from Zachary by arranging for funds to be briefly transferred into a brokerage account belonging to Zachary, thereby deceiving Bert and his representative Ethan Wohl ("Ethan") regarding Zachary's compliance with the minimum net worth requirement imposed under the Lease.  Shortly after Zachary provided documentation of his putative net worth to Ethan, Defendant arranged for the funds to be returned to the account from which they had been transferred.  Based on Zachary's testimony at his deposition on July 10, 2023, his true net worth at the time was less than one-tenth the amount required by the Lease.

The new claims and supporting allegations (collectively, the "Proposed Amendments") are set forth in detail in the proposed amended complaint submitted herewith as **Appendix A**, which has been redlined against the original, now-operative complaint [ECF 1].

Hon. Marcia M. Henry
August 3, 2023
Page 2

<u>Relevant Procedural History</u>

This action was filed on August 30, 2022.  Defendant moved to dismiss; and by Memorandum &
Order dated July 17, 2023 [ECF No. 46], the District Court, the Honorable Kiyo A. Matsumoto,
denied Defendant's motion in its entirety.

Fact discovery is ongoing, and pursuant to Your Honor's Order entered July 10, 2023, the fact
discovery cutoff is now September 15, 2023.

The operative Discovery Plan/Scheduling Order [ECF No. 41] provided that the deadline for
motions to amend pleadings was April 3, 2023.

We provided a copy of the proposed amended complaint to defense counsel on July 21, 2023, and
met-and-conferred on July 27, 2023.  Defense counsel advised that they had "determined that the
new allegations do not state a claim for fraud" and "[f]or this reason, we cannot consent to the
amendment."  On the parties' meet-and-confer call, defense counsel clarified that they intend to
oppose on the grounds that the Proposed Amendments fail to adequately plead a false statement,
reasonable reliance, proximate cause or damages.

<u>Legal Standard</u>

The legal standard applicable to the present motion was set forth at length in two recent decisions
by the District Court, *Porter v. MooreGroup Corp.*, No. 17-CV-07405 (KAM) (VMS), 2020 WL
32434 (E.D.N.Y. Jan. 2, 2020), and *Pino v. Harris Water Main & Sewer Contractors Inc.*, No. 17-
CV-5910 (KAM) (RER), 2020 WL 5708889 (E.D.N.Y. Sept. 23, 2020).  In *Porter*, Judge
Matsumoto explained as follows (citations, other than to court rules, have been omitted):

> In the Second Circuit, "[l]eave to amend should be denied only because of
> undue delay, bad faith, futility or prejudice to the non-moving party, and the
> decision to grant or deny a motion to amend rests within the sound
> discretion of the district court."  Using this guiding principle, the court
> considers whether or not to grant the Motion.
>
> a. <u>Liberal Standard under Rule 15</u>
>
> Motions to amend pleadings are governed by Rule 15(a). In cases where a
> party is not entitled to amend its complaint as a matter of course, "a party
> may amend its pleading only with the opposing party's written consent or
> the court's leave." *See* Fed. R. Civ. P. 15(a)(2). Motions to amend are to be
> "liberally granted absent a good reason to the contrary," as Rule 15(a)(2)
> provides that "court[s] should freely give leave when justice so requires,"
> Fed. R. Civ. P. 15(a)(2). . . .

Hon. Marcia M. Henry
August 3, 2023
Page 3

    b. <u>"Good Cause" under Rule 16</u>

Where a court has set a scheduling order with a deadline for amended pleadings, however, "the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" The purpose of Rule 16(b) is to create certainty in pretrial proceedings. Therefore, to consider only Rule 15(a) without taking Rule 16(b)'s good cause standard into account "would render scheduling orders meaningless." Accordingly, a party seeking to amend the complaint after the Rule 16(b) scheduling order deadline has passed must first demonstrate good cause to modify the scheduling order deadline before the court addresses the proposed amendment under the Rule 15(a) standard.

In order to demonstrate good cause under Rule 16(b), the movant generally must establish diligence. Courts have declined to find good cause where the movant was aware of facts giving rise to the claim, or where such information was available to the movant, at the time the movant commenced the action. . . .

    c. <u>Prejudice</u>

In deciding whether there would be prejudice, courts typically consider whether the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial . . . [and] (ii) significantly delay the resolution of the dispute." Courts may find prejudice if the amendments would require significant discovery or cause delays on the eve of trial.

"Any prejudice which the non-movant demonstrates must be balanced against the court's interest in litigating all claims in a single action and any prejudice to the movant which would result from a denial of the motion."

    d. <u>Futility</u>

A proposed amended complaint must "contain enough allegations of fact to state a claim for relief that is 'plausible on its face.'" An amendment is futile if it cannot survive a Rule 12(b)(6) motion to dismiss. The court is "required to accept the material facts alleged in the amended complaint as true and draw reasonable inferences in the plaintiff's favor."

2020 WL 32434, at \*4-5. *See also Pino*, 2020 WL 5708889, at \*4-5.

Hon. Marcia M. Henry
August 3, 2023
Page 4

<u>Argument</u>

1.   <u>Plaintiff Has Shown Good Cause to Allow the Proposed Amendments</u>

As noted above, "[w]hether good cause exists to amend after the Rule 16(b) deadline turns on 'the diligence of the moving party.' " *Speedfit LLC v. Woodway USA, Inc.*, No. 13-CV-1276 (KAM) (AKT), 2015 WL 6143697, at *3 (E.D.N.Y. Oct. 19, 2015) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)).   In evaluating diligence, courts look to whether amendments are based on information available to the movant "at the time the movant commenced the action," *Porter*, 2020 WL 32434, at *5, and they recognize that "discovery often justifies a subsequent amendment to the complaint" and that "[e]ven [if] it is predicated upon a different theory, an amendment should be permitted in the absence of the injection of any new issues requiring new and extensive preparation detrimental to the speedy resolution of the case and prejudicial to the defendant." *Pino*, 2020 WL 5708889, at *8 (quoting *Rodriguez v. Ridge Pizza Inc.*, No. 16-CV-254 (DRH) (AKT), 2018 WL 1335358, at *11 (E.D.N.Y. Mar. 15, 2018)).

Here, Plaintiff learned of the new claims set forth in the Proposed Amendments through discovery in this action.   At Zachary's deposition on July 10, 2023, Plaintiff obtained testimony establishing the last factual element needed to assert the new claims – Zachary's lack of other assets that could have satisfied the net worth requirement in the Lease.   Plaintiff thereafter acted expeditiously, tendering the Proposed Amendments to Defendant the following week.

Accordingly, good cause exists to modify the operative Discovery Plan/Scheduling Order [ECF No. 41] and deem this motion timely.

2.   <u>The Proposed Amendments Would Not Prejudice Defendant</u>

Defendant has not sought to argue, and he would have no valid basis to contend, that Defendant would suffer prejudice from the Proposed Amendments.   Unlike situations where a proposed amendment would require significant additional discovery or delay the case, Plaintiff anticipates seeking no additional document discovery from Defendant in support of the Proposed Amendments, and does not seek any alteration of the operative scheduling order.   We are also unaware of any additional discovery that Defendant would need to defend the new claims.

Judicial efficiency also argues strongly in favor of granting leave to amend.   The same facts that support Plaintiff's new claims also support Plaintiff's existing claims, as they show Defendant's plenary control over QB Wash and its interactions with Plaintiff and its predecessor.   As Judge Matsumoto noted in *Speedfit*, a decision that granted leave to file a third amended complaint more than two years after the case was filed and after the close of fact discovery, "the court has a substantial interest in adjudicating this entire dispute in one action. If a separate action were brought for the new claims, . . . it would require the parties and the court to duplicate their efforts. The parties and the court should not be put to the burden of litigating two separate cases with identical or overlapping factual predicates." 2015 WL 6143697, at *4.   Likewise, here, this action should allow a full and final adjudication of all disputes between the parties.

Hon. Marcia M. Henry
August 3, 2023
Page 5


Accordingly, there is no basis to find any prejudice from the Proposed Amendments.

3.   The Proposed Amendments on Their Face State a Claim
     <u>and Further Merits Briefing Now Is Not Warranted</u>

As set forth below, the Proposed Amendments comprehensively plead each element of the new claims, and allege fraud with the particularity required by Fed. R. Civ. P. 9(b).  Citations to paragraphs of the proposed amended complaint are set forth below in the format "(¶ ___)".

We submit that Plaintiff has thereby demonstrated that it has adequately pled the new claims, and that in the interests of judicial efficiency, further merits briefing now is not warranted.  Fact discovery is presently close to completion, and briefing any legal challenge to the new claims should be conducted on a full record as part of the summary judgment motion that Defendant has indicated he intends to file.  At that point, the Court can look beyond the four corners of the complaint and comprehensively address all arguments by Defendant that the new claims should not proceed to trial.

The procedural posture of the present motion also supports deferring further merits briefing: Plaintiff will have the opportunity to respond to Defendant's arguments only if the Court grants leave to file a reply, Individual Practice Rule § V.B.2.a; and, if Plaintiff is given leave to reply, Defendant will have the opportunity to respond to Plaintiff's arguments only if the Court grants leave to file a sur-reply.

For similar reasons, other courts have recognized that merits briefing and a full adjudication of the legal sufficiency of proposed amendments can properly be deferred when deciding a motion for leave to amend.  *See*, *e.g.*, *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury*, No. 20-CV-5081 (DRH) (ARL), 2021 WL 4472852, at *19 (E.D.N.Y. Sept. 30, 2021) (Hurley, J.) (declining to rule on whether the amendment would be futile and permitting the defendant to "re-raise these arguments in their FRCP 12(b)(6) motion"); *SEC v. Rayat*, No. 21-CV-4777 (LJL), 2022 WL 3656314, at *12 (S.D.N.Y. Aug. 24, 2022) (allowing amendment and holding that the court would address futility "when, and if, a motion to dismiss or for judgment on the pleadings is made"); *Intercloud Sys., Inc. v. Integration Partners Corp.*, No. 17-CV-1628 (GHW), 2017 WL 11570456, at *1 (S.D.N.Y. July 31, 2017) (same, collecting cases).

The Proposed Amendments add three new claims: fraud (Third Claim, ¶¶ 260-63), aiding and abetting fraud (Fourth Claim, ¶¶ 264-68), and conspiracy to commit fraud (Fifth Claim, ¶¶ 269-72).

Hon. Marcia M. Henry
August 3, 2023
Page 6


The elements of these claims are as follows:

"To state a cause of action for fraudulent inducement under New York law, a plaintiff must plead: '(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to plaintiff.'" *ADL, LLC v. Tirakian*, No. 06-CV-5076, 2010 WL 3925131, at *13 (E.D.N.Y. Aug. 26, 2010) (Go, M.J.) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)), *report and recommendation adopted*, 2010 WL 3926135 (E.D.N.Y. Sept. 29, 2010).

"In order to state a claim for aiding and abetting fraud [under New York law], a plaintiff must allege: '(1) the existence of a fraud; (2)[the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *ADL*, 2010 WL 3925131, at *17 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)).

"To adequately plead a claim for conspiracy to commit fraud under New York law, in addition to pleading the underlying fraud, a plaintiff must demonstrate: '(1) an agreement among two or more parties; (2) a common objective; (3) acts in furtherance of the objective; and (4) knowledge.'" *ADL*, 2010 WL 3925131, at *18 (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005)).

Here, the Proposed Amendments (¶¶ 91-106) set forth in detail (1) Defendant's actions in arranging the transfer of funds from his wife's account into Zachary's account after learning that the Lease required a personal guaranty from an individual with a $1 million net worth, (2) Defendant's delivery of a fraudulently inflated account statement to Zachary with the intention it be provided to Ethan and Bert to induce their consent to assignment of the Lease, and (3) Defendant's subsequent actions in arranging the return of the funds to his wife.

The Proposed Amendments then plead, in the alternative, that (1) if the fact finder concludes Zachary was an unwitting participant in the fraud, then Defendant committed fraud by delivering the fraudulently inflated account statement to Zachary with the intention it be provided to Ethan (¶¶ 107-12, 260-63), and (2) if the fact finder concludes Zachary was a knowing participant in the fraud, then Defendant aided and abetted fraud and conspired to commit fraud (¶¶ 107-11, 113-15, 264-72).

If the fact finder concludes Zachary was an unwitting participant in the fraud, then Defendant (i) made a misrepresentation of material fact, (ii) which he knew to be false, (iii) with the intention of inducing reliance, by delivering the fraudulently inflated account statement to Zachary with the intention it be provided to Ethan (¶¶ 111-12, 261). *See Ostano Commerzanstalt v. Telewide Sys., Inc.*, 794 F.2d 763, 765-66 (2d Cir. 1986) ("Since the leading case of *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931), a fraudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party.").

Hon. Marcia M. Henry
August 3, 2023
Page 7

If the fact finder concludes Zachary was a knowing participant in the fraud, then Zachary (i) made a misrepresentation of material fact, (ii) which he knew to be false, (iii) with the intention of inducing reliance, by delivering the fraudulently inflated account statement to Ethan (¶¶ 113, 265, 270).

If the fact finder concludes Zachary was a knowing participant in the fraud, then Scott aided and abetted the fraud because he (i) had knowledge of the fraud, and (ii) provided substantial assistance in its commission (¶¶ 111, 114, 266).

If the fact finder concludes Zachary was a knowing participant in the fraud, then Scott also conspired with Zachary to commit fraud because they (i) had an agreement, (ii) shared a common objective, (iii) acted in furtherance of the objective, and (iv) both had knowledge of the fraud (¶¶ 111, 115, 271).

Whether or not Zachary was a knowing participant in the fraud, Ethan and Bert reasonably relied on the fraudulently inflated account statement (¶¶ 108-10, 262, 267, 270), and Plaintiff suffered injury as a direct and foreseeable result (¶¶ 118-19, 263, 268, 272).

All claims are timely under New York's "discovery rule," N.Y. C.P.L.R. 213(8), because the new claims are being asserted within "two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." This limitations period applies equally to the claim for fraud and the claims for aiding and abetting fraud and conspiracy to defraud. *ADL*, 2010 WL 3925131, at *5. Plaintiff affirmatively pleads application of the "discovery rule" (¶ 120).

For the foregoing reasons, leave to file the proposed amended complaint should be granted. If the Court determines to now entertain full merits briefing regarding whether the Proposed Amendments state a claim for relief, then Plaintiff also hereby moves for leave to file a reply.

Respectfully submitted,

Eric S. Askanase

cc: All counsel of record (via ECF)

# APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :

138-77 QUEENS BLVD LLC,                       :

                             Plaintiff,     :       Case No. ~~: 1:~~ 22-~~cv~~CV-5155-KAM-MMH

                  - against -        :

SCOTT E. SILVER,                    :       <u>JURY TRIAL DEMANDED</u>

                           Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>AMENDED COMPLAINT</u>

Michael A. Pensabene, Esq.
~~Harris W. Davidson~~Eric S. Askanase, Esq.
ROSENBERG & ESTIS, P.C.
733 Third Avenue
New York, New York 10017
(212) 867-6000
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

PARTIES ................................................................................................................4

JURISDICTION AND VENUE ...........................................................................5

FACTS ...................................................................................................................6

    A.   Background and Litigation History ..........................................................6

        1.   The Premises.....................................................................................6

        2.   The Subject Lease and Personal Guaranty..................................~~6~~7

        3.   QB Wash's Troubled Operating History .....................................~~7~~8

        4.   The Rent Reset Process, QB Wash's Nonpayment of Rent, Other Lease Defaults, and Termination of the Lease...................~~10~~11

        5.   The Eviction Action and QB Wash's Bankruptcy Case ...............~~13~~14

    B.   Defendant Fraudulently Induced Consent to Assignment of the Lease to QB Wash by Arranging for His Son to Misrepresent His Net Worth to Plaintiff's Predecessor-in-Interest................................16

    ~~B~~C.   Defendant's Scheme to Coerce a Below-Market Rent or Discounted Sale of the Premises, Strip Assets from QB Wash, and Prevent Plaintiff from Collecting on the Personal Guaranty .........................~~15~~23

    ~~C~~D.   Tortious and Illegal Acts in Furtherance of Defendant's Coercion Scheme ..........~~17~~25

        1.   Defendant's Formation of Wash Funding and Fraudulent Transfers to Shield His Son's Assets and Prevent Collection on the Personal Guaranty.........................~~18~~25

        2.   Fraudulent Transfers of Cash from QB Wash Benefitting Defendant...........~~20~~28

        3.   Defendant's Legal Pressure Campaign, Premised on Perjury and Frivolous, Sanctionable Legal Arguments......................~~21~~29

        4.   Additional Perjury in the Bankruptcy Court................................~~25~~32

    ~~D~~E.   Breaches of the Lease and Plaintiff's Resulting Damages .....................~~25~~33

        1.   Nonpayment of Rent.......................................~~26~~33

        2.   Unpaid Water Charges....................................~~26~~34

        3.   Damages from the Oil Spill ............................~~27~~34

        4.   Damages from Municipal Violations..............~~27~~35

5.   Lease Termination Damages.................................................................2835

6.   Contractual Damages for Attorneys' Fees .........................................2936

E.F.   Allegations Concerning Veil Piercing – Defendant's Domination and Control of QB Wash and Use Thereof to Perpetrate Wrongs Against Plaintiff .................................................................................................2937

1.   Domination and Control of QB Wash by Defendant......................2937

2.   Defendant's Use of His Domination and Control of QB Wash to Perpetrate Wrongs Injuring Plaintiff..............................................3644

F.G.   Allegations Concerning Tortious Interference, the Economic Interest Defense and Causation.................................................................................3745

1.   Defendant Engaged in Tortious Interference with the Lease..........3745

2.   The Economic Interest Defense Is Unavailable Because Defendant Served His and His Son's Interests, Not the Interests of QB Wash .............3745

3.   The Economic Interest Defense Is Also Unavailable Because Defendant Directly and Indirectly Engaged in Multiple Independent Torts and Other Unlawful Acts.................................................3845

4.   Defendant's Actions Were the "But For" Cause of the Damages Resulting from His Economic Coercion Scheme ...........................3846

G.H.   Conduct Supporting an Award of Punitive Damages Against Defendant..............3846

CLAIMS FOR RELIEF ........................................................................................4148

FIRST CLAIM FOR RELIEF – For Breach of Lease Based on Piercing the Corporate Veil ..4148

SECOND CLAIM FOR RELIEF – For Tortious Interference with Contract .........................4249

THIRD CLAIM FOR RELIEF – For Fraud ...............................................................50

FOURTH CLAIM FOR RELIEF – For Aiding and Abetting Fraud..........................................51

FIFTH CLAIM FOR RELIEF – For Conspiracy to Commit Fraud ...........................................52

JURY DEMAND .................................................................................................4253

PRAYER FOR RELIEF ........................................................................................4353

Plaintiff 138-77 Queens Blvd LLC ("Plaintiff"), by its attorneys, Rosenberg & Estis, P.C., as and for its Complaint against defendant Scott E. Silver ("Defendant" or "Scott"), alleges as follows:

## INTRODUCTION

1.      This action seeks damages arising from breaches of a commercial lease (the "Lease") for premises in Briarwood, Queens owned by Plaintiff (the "Premises") at which Scott's son, Zachary Silver ("Zachary"), operated a carwash and automotive lube business (the "carwash and lube business") financed by Scott.

2.      As a result of breaches of the Lease by Scott and Zachary (together, the "Silvers"), Plaintiff suffered out-of-pocket losses of over $600,000, creating severe financial hardship for Plaintiff's principal owner, a 93-year-old widow who had relied on rent from the Premises for the majority of her income prior to the Silvers' breaches.

3.      At the inception of the parties' relationship, Scott fraudulently induced Plaintiff's predecessor-in-interest to consent to the assignment of the Lease to the tenant entity owned and controlled by the Silvers, QB Wash LLC ("QB Wash"), and accept a personal guaranty from Zachary, by arranging for $999,500 to be briefly transferred into Zachary's brokerage account, enabling him to provide documentation purporting to show a net worth in excess of $1 million, as required by the Lease.  Shortly after Zachary provided documentation of his putative net worth, Scott arranged for the funds to be withdrawn and returned to the account that had supplied them. Zachary's true net worth at the time was less than one-tenth of the amount required by the Lease.

4.      3. Starting shortly after Zachary took over management in January 2016, the carwash and lube business began experiencing operational problems and financial losses, and the Silvers began continually paying the rent late in the summer of 2018.

5. ~~4.~~ In March 2020, with the onset of the COVID-19 pandemic, the Silvers ceased all rental payments.

6. ~~5.~~ In June 2020, Plaintiff offered to waive two months of back rent in light of the pandemic, and alternatively offered to accept surrender of the Premises and waive all claims arising from the Lease.  The Silvers refused both offers.  Instead, they retained possession of the Premises, continued to withhold all rent, and offered alternatively to purchase the Premises for $2 million in cash (roughly half their market value), or pay a rent far below market rate.

7. ~~6.~~ Plaintiff rejected these terms and commenced an ejectment action in Queens County Supreme Court in September 2020 (the "Eviction Action") against ~~the tenant entity owned by the Silvers,~~ QB Wash ~~LLC ("QB Wash")~~.

8. ~~7.~~ The Silvers answered the complaint and opposed a motion by Plaintiff for use and occupancy *pendente lite*, arguing that QB Wash's business had faced a prolonged closure and was suffering ongoing harm from the pandemic that relieved them of any obligation to pay rent.

9. ~~8.~~ In January 2021, Queens County Supreme Court entered an Order granting Plaintiff's motion for use and occupancy.  Rather than comply with the Order, the Silvers then placed QB Wash into Chapter 7 bankruptcy.

10. ~~9.~~ Discovery in the bankruptcy case revealed that the Silvers had withheld rent and refused to surrender the Premises as part of a deliberately planned strategy to recoup Scott's losses from their failed business venture.  By refusing to pay rent, they intended to economically coerce Plaintiff either to sell Scott the Premises for a price far below market or to accept a deeply discounted rent.   In addition, continuing to operate the carwash and lube business while withholding rent enabled Scott to extract tens of thousands of dollars in cash from QB Wash.  Scott

also orchestrated a series of fraudulent transfers to insulate Zachary from liability on his personal guaranty of the Lease (the "Personal Guaranty").

11.   ~~10.~~ Zachary made the Silvers' stratagem explicit in a June 18, 2020 email, copying Scott, in which he explained that he was "using the eviction/fee moratorium as a tool to leverage a better lease deal."

12.   ~~11.~~ Disclosure of QB Wash's financial records revealed the extent of the Silvers' efforts to unlawfully maximize that leverage.  They show that the carwash and lube business was closed for only about seven weeks between March and May 2020, and that upon reopening, the business had thrived, enjoying some of its highest-grossing months ever.  Zachary's sworn statements in state Supreme Court in late 2020, that "the Property was closed and made unusable for the better part of the year," that "QB Wash has not been able to resume normal operations," that "major portions of QB Wash's business have been lost, and the status quo is not expected to change," and multiple similar allegations, were all entirely false and perjurious.  The legal arguments on which the Silvers based their defenses and counterclaims in the Eviction Action were also frivolous and sanctionable.

13.   ~~12.~~ At the same time as the Silvers were defending the Eviction Action on false and frivolous grounds, Scott supervised the looting of QB Wash, diverting more than $50,000 to family trusts he controlled while withholding all rent from Plaintiff.

14.   ~~13.~~ During the period the Silvers were withholding rent, Scott also formed a new Delaware entity, Wash Funding LLC ("Wash Funding"), which took liens on substantially all of Zachary's assets to render him judgment-proof and insulate him from any claims on the Personal Guaranty.

15.   14. Substantial evidence, detailed below in paragraphs 149184 to 180215, establishes that Scott personally planned and directed the Silvers' asset diversion and economic coercion scheme.  He was well-equipped to do so – and fully aware of the tortious and wrongful nature of his actions – because he is the general counsel of one of the largest consumer debt collection firms in the nation.

16.   15. Scott's domination and control of QB Wash and use of QB Wash to perpetrate wrongs against Plaintiff for his own benefit warrants piercing QB Wash's corporate veil to hold him personally liable for QB Wash's debts to Plaintiff (First Claim for Relief).

17.   16. Scott's conduct in planning, directing and executing the coercive breach of the Lease by QB Wash also constitutes tortious interference with contract (Second Claim for Relief).

18.   The deception regarding Zachary's net worth that Scott engineered in 2015 constitutes common-law fraud (Third Claim for Relief), or, alternatively, aiding and abetting fraud (Fourth Claim for Relief) and conspiracy to commit fraud (Fifth Claim for Relief).

19.   17. Scott's actions manifest a brazen disregard for the rights of Plaintiff and its owners that warrants an award of punitive damages.  The torts and other wrongs committed in furtherance of the scheme –fraudulent transfers, tortious interference with contract, perjury, and plainly frivolous litigation, all in furtherance of the abusive goal of applying economic pressure to obtain an unfair rent or below-market sale of the Premises – reflect an extraordinary level of moral culpability.  The conduct was extensively and deliberately planned, by an individual with special expertise in the relevant law.  It was directed at an elderly, financially vulnerable individual who had been widowed months earlier.  It sought to exploit a national health and economic crisis for personal gain.  This conduct must not escape sanction.

## PARTIES

20.    18. Plaintiff is a limited liability company organized under the laws of the State of New York with a principal office at 797 Flanders Drive, Valley Stream, New York.  Its sole asset is the Premises. Plaintiff is beneficially owned 50% by Maureen Wohl ("Maureen"), age 93, whose interest is held in a marital trust created under her deceased husband's will (the "Marital Trust"). The remaining 50% interest in Plaintiff is held directly by Maureen's two adult children, Ellen Vaknine ("Ellen") and Ethan Wohl ("Ethan"), 25% each.  For Maureen, her 50% interest in Plaintiff is her largest asset and provided the majority of her income before the breaches of the Lease giving rise to this action.

21.    19. According to public records, Defendant's principal residence is 95 Lenwood Boulevard, Charleston, South Carolina and his principal business address is 206 Meeting Street, Suite 206, Charleston, South Carolina.  At all relevant times, Scott was employed as the general counsel of Sherman Financial Group ("Sherman Financial"), one of the largest consumer debt collection firms in the country.

## JURISDICTION AND VENUE

22.    20. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant, and as pled below in paragraphs 131166 to 147182, the amount in controversy exceeds the jurisdictional minimum of $75,000, exclusive of interest and costs.

23.    21. Because Plaintiff is a limited liability company, its citizenship is determined by the citizenship of its members.

24.    22. The Marital Trust, Ellen and Ethan are Plaintiff's only members.

25.   23. The Marital Trust is a traditional trust whose citizenship is determined by the citizenship of its trustee, Maureen.  Maureen is domiciled in Nassau County, New York, where she has lived since 2019.  She accordingly is a New York citizen.

26.   24. Ellen is domiciled in Nassau County, New York, where she has lived since 2007.  She is accordingly a citizen of New York.

27.   25. Ethan is domiciled in Essex County, New Jersey, where he has lived since 2008. He is accordingly a citizen of New Jersey.

28.   26. The Defendant has maintained his principal residence and principal business address in Charleston, South Carolina since in or about 2017.  He is accordingly a domiciliary and citizen of South Carolina.

29.   27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims pled herein occurred in this District and because the Premises are located in this District.  In addition, the Lease (rider ¶ 48), provides that "[a]ll actions or proceedings relating, directly [or] indirectly, to this Lease shall be litigated only in courts located within the County of Queens or a judicial district of which the County of Queens is a part."

## **FACTS**

A.   **Background and Litigation History**

   1.   **The Premises**

30.   28. The Premises are located at 138-77 Queens Boulevard and an adjacent address, 138-11 87th Avenue, and comprise tax lots 11 and 110 in block 9645, County of Queens.  They occupy a full blockfront on Queens Boulevard in Briarwood, between 86th Road and 87th Avenue. They have been continuously operated as a car wash and lube shop since at least the 1970s.

31.   ~~29.~~ Bert Wohl ("Bert"), Maureen's husband and Ellen and Ethan's father, held title individually and as trustee of a family trust from the early 1980s until his passing in March 2019. The Premises were then conveyed to Plaintiff from Bert's estate and the family trust in January 2020.  No change in beneficial ownership resulted from the conveyance to Plaintiff.  For simplicity, references herein to Plaintiff include Bert, his estate, and the family trust, as predecessor owners of the Premises.

2.     **The Subject Lease and Personal Guaranty**

32.   ~~30.~~ In 2010, Bert entered into the Lease, dated as of June 2, 2010, with an entity named Blvd Wash & Lube Ltd.

33.   ~~31.~~ The Lease had a 25-year term and was structured as a "triple net" lease that required the tenant, in addition to paying base rent, to reimburse the landlord for real estate taxes and insurance and take full responsibility for maintenance and repairs.  Lease rider ¶¶ 51 52, 59.

34.   ~~32.~~ After an initial discounted rent period, the Lease provided for fixed annual rent increases yearly until June 2020, when the base rent was scheduled to reset to market rate (the "Rent Reset").  If the parties were unable to reach agreement on the new rent, the Lease set forth a detailed procedure involving the appointment of appraisers to determine the new rent.  Lease rider ¶ 50.

35.   ~~33.~~ In March 2011, the original tenant, Blvd Wash & Lube Ltd., sold its business and assigned the Lease to LB One, LLC ("LB One").

36.   ~~34.~~ In ~~January 2016~~late 2015, LB One ~~sold~~proposed to sell its business and ~~assigned~~assign the Lease to QB Wash, a New York limited liability company owned and controlled by the Silvers.

37.   As a precondition to granting consent to the assignment to QB Wash, Bert required execution of a guaranty by an individual with a net worth in excess of $1 million, as specified in

the assignment provision of the Lease, rider ¶ 73.  Zachary provided documentation of assets in excess of this amount, and Bert accordingly consented to the assignment to QB Wash.

38.     The assignment of the Lease and closing of the sale of LB One's business to QB Wash then occurred in January 2016.

39.     ~~35.~~ Under the Contract of Sale of Business between LB One and QB Wash, QB Wash purchased the business for $1.2 million in cash and a $1.33 million promissory note payable to LB One (the "LB One Note"), under which QB Wash was required to make monthly payments of $9,790[1] for 19 years.

40.     ~~36.~~ The cash for the purchase was provided by Scott and/or a family trust controlled by him.

41.     ~~37.~~ In connection with the assignment of the Lease to QB Wash, Zachary executed an Agreement for the Personal Guarantee of Lease dated as of January 8, 2016 (the Personal Guaranty), pursuant to which he guaranteed QB Wash's performance under the Lease.

### 3.     QB Wash's Troubled Operating History

42.     ~~38.~~ Zachary assumed day-to-day management of the carwash and lube business upon its sale to QB Wash in January 2016.  Within a few months, the business began encountering financial and operational difficulties.

43.     ~~39.~~ Starting with a violation in March 2016, QB Wash was fined repeatedly by the New York City Fire Department (the "Fire Department") for significant violations related to machinery and materials handling, accruing over $7,800 in fines in 2016-19.  By contrast, the prior tenants in the Premises did not incur any Fire Department fines in the prior 15 years or more.  In

---

[1]  For clarity, cents are omitted from all amounts stated herein.

the case of a number of the violations, QB Wash defaulted, and Zachary resolved the violations only after Plaintiff's representatives pressed him to do so.

44.   40. Starting in late 2016, QB Wash began intermittently making late rental payments, paying each of November 2016, December 2016 and February 2017 after the grace period provided in the Lease.

45.   41. In April 2017, after making 14 monthly payments on the LB One Note, QB Wash stopped paying LB One and the Silvers then alleged that they had been deceived by LB One regarding the carwash and lube business when they acquired it, over a year earlier.

46.   42. In June 2017, LB One and QB Wash entered into a settlement whereby the Scott Silver Family Trust paid $967,500 to satisfy the LB One Note – a discount of roughly 25% from the full amount then due.

47.   43. The settlement with LB One eliminated the obligation to make monthly payments on the LB One Note, but within a year, in the summer of 2018, QB Wash again began paying the rent for the Premises late.

48.   44. In late 2018 and 2019, Plaintiff agreed to accept payment of the insurance and real estate tax reimbursements required under the Lease in deferred installments to accommodate QB Wash's apparent cash flow difficulties.

49.   45. Starting in January 2019, Scott began a series of wire transfers to QB Wash to cover its operating deficits, contributing a total of $165,000 in the 13 months between January 2019 and February 2020.

50.   46. Despite the cash infusions, QB Wash's payment performance under the Lease continued to deteriorate.  Beginning in March 2019, QB Wash began making incomplete rent payments, with portions of the rent due arriving more than 30 days late.

51. ~~47.~~ After accepting late payments without charging late fees or interest for nearly a year, Plaintiff's representatives advised Zachary in July 2019 that Plaintiff would begin imposing the late charges provided in the Lease.  He responded in a July 24, 2019 email, "OK I understand. Times have been very hard. Thank you so much for your leniency up to this point."

52. ~~48.~~ QB Wash continued to pay progressively later, however, and never made a timely payment of monthly rent after the summer of 2018.

53. ~~49.~~ Over the period that Zachary managed the carwash and lube business at the Premises, the business also experienced other operational problems.

54. ~~50.~~ In April 2018, a worker suffered a grievous injury resulting in the amputation of his leg while working at the Premises, according to his attorneys.  He later sued QB Wash, as well as Plaintiff and a number of other parties for his injuries.  *See Luis Coj-Carillo v. 138-77 Queens Blvd LLC*, No. 714151/2020 (Sup. Ct. Queens Cnty.).

55. ~~51.~~ Plaintiff later discovered that QB Wash had also spilled hundreds of gallons of motor oil in the cellar of the Premises, and had failed to report or remediate it.

56. ~~52.~~ QB Wash also substantially underreported its business revenue in its sales tax filings with the New York State Department of Taxation and Finance (the "NYS Tax Department"), apparently over a period of years.  The NYS Tax Department assessed a sales tax deficiency of $125,468 for the fiscal quarter ended November 30, 2019, reflecting unreported sales of more than $1.4 million through that date, plus interest and penalties.

57. ~~53.~~ In July 2020, the New York City Department of Environmental Protection ("DEP") made findings that a DEP water meter had been illegally removed without a permit and unmetered water service had been installed at the Premises.

58. 54. QB Wash also received scathing customer reviews.  On the Google Maps website, as of October 2020, its business was rated 3.1 stars based on 278 reviews, one of the five lowest ratings among the first 60 listings for "Car wash in Queens NY" in Google Maps.

### 4. The Rent Reset Process, QB Wash's Nonpayment of Rent, Other Lease Defaults, and Termination of the Lease

59. 55. In February 2020, pursuant to the Rent Reset procedure in the Lease, Zachary met twice with Plaintiff's representatives, Ellen and Ethan.[2]  These meetings occurred before COVID-19 was declared a pandemic and perceived as a threat in the New York City area.  At the first meeting, on February 6, 2020, Zachary stated that the rent was "unsustainable" and "excessive" and that he would need a rent reduction to continue in the Premises.

60. 56. At the parties' second meeting, on February 27, 2020, Zachary reiterated that he would need a substantial rent reduction, but also stated that he had the funds to purchase the Premises and was prepared to pay $2 million "all cash" to acquire them, roughly half of the amount for which they had been appraised in 2019.

61. 57. Plaintiff declined to entertain a sale, and following the parties' February 27, 2020 meeting, the Silvers ceased to make further rental payments.

62. 58. On March 20, 2020, the Governor ordered the closure of non-essential businesses in response to the COVID-19 pandemic, effective March 22, 2020.  QB Wash's automotive lube business, which had historically accounted for roughly one-third of the tenant's revenue, was categorized as an essential business and was unaffected by the shutdown. https://esd.ny.gov/guidance-executive-order-2026 (deeming "auto repair and maintenance" to be

---

[2]  Unless otherwise indicated, all meetings and communications discussed herein were conducted by Ethan and Ellen on behalf of Plaintiff and Zachary on behalf of QB Wash.

an essential service).  The car wash business was deemed non-essential and was therefore subject to closure.  *See id.*

63.  ~~59.~~ While the Governor's closure order continued to apply to non-essential businesses in New York City until June 22, 2020, *see* https://gothamist.com/news/everything-you-need-know-about-phase-2-reopening-nyc, financial and water usage records show that QB Wash resumed carwash operations on or about May 9, 2020, approximately seven weeks after their closure.

64.  ~~60.~~ Meanwhile, the parties designated appraisers for the Rent Reset process in March 2020 and exchanged appraisals in late May 2020.  The party appraisers' divergent valuations triggered appointment of a third, neutral appraiser, and in July 2020, Plaintiff accepted the Silvers' proposal to appoint Steven Schleider, a prominent MAI appraiser in New York City. *See* https://www.mvsappraisal.com/company/.

65.  ~~61.~~ The parties also addressed the Silvers' ongoing non-payment of rent in a series of negotiations in May and June 2020.  Plaintiff offered to waive two months' base rent and associated late fees and defer payment of roughly one-third of the base rent coming due over the summer.  Alternatively, Plaintiff offered the Silvers the option of terminating the Lease and surrendering the Premises without liability for the accumulated rent arrears, then over $80,000.

66.  ~~62.~~ The Silvers rejected these offers, retaining possession but continuing to withhold all rent, including real estate tax and insurance reimbursements.  The Silvers also ceased paying for the water used in the carwash business at the Premises, accruing more than $37,000 in unpaid water and sewer charges over the following eight months.

67.  ~~63.~~ Following the Silvers' rejection of Plaintiff's offers, Plaintiff drew down the one-month security deposit it was holding, and sent QB Wash several demands to replenish the

security deposit.  Plaintiff also subsequently issued notices to cure various Lease violations, including an unpaid water bill, a Fire Department violation, and a Determination of Theft of Services and Cease and Desist Notice (the "Theft of Services Violation") issued by DEP.

68. 64. On August 14, 2020, the neutral appraiser, Steven Schleider, rendered his Rent Reset determination, finding the fair market base rent for the Premises to be $21,729 per month, a 25% increase over the prior base rent.

69. 65. Thereafter, Ethan and Ellen conferred with Zachary, and he again offered to purchase the Premises for $2 million.  Alternatively, he offered to pay $14,500 per month base rent – a 1/3 discount to the fair market rent determined by the neutral appraiser the Silvers had selected.  Plaintiff refused both offers.

70. 66. Several days later, Ethan emailed Zachary: "We have given further thought to how to move forward here and would like to discuss an approach that lets you walk away without liability for the back rent here. Please let us know when you are available to speak again."  Zachary did not respond to that email, or to a followup email again proposing a conversation.

71. 67. The Silvers then allowed two pending cure notice periods to lapse without corrective action, and Plaintiff then sent a Lease cancellation notice on August 27, 2020, terminating the Lease effective September 3, 2020.

72. 68. After sending the Lease cancellation notice, Ethan then sent a third email, urging a conversation prior to the start of eviction proceedings, copying both Scott and the attorney who had represented QB Wash in the Rent Reset process, Michael Wood ("Wood"), a partner with the law firm Cermele & Wood LLP.

73. 69. Wood responded with an email inviting a call to discuss a resolution and subsequently spoke with Ethan.  On the call, Wood repeated the Silvers' previous offer: they would

pay a base rent of $14,500 per month or, alternatively, were prepared to purchase the Premises for $2 million – the third time the Silvers had offered to purchase the Premises.  Wood advised that absent Plaintiff's agreement, QB Wash would remain in possession and continue to operate its business.  Plaintiff again refused these terms.

### 5.       The Eviction Action and QB Wash's Bankruptcy Case

74. 70. On September 4, 2020, Plaintiff commenced the Eviction Action in Queens County Supreme Court, captioned *138-77 Queens Blvd LLC v. QB Wash LLC*, No. 715071/2020.

75. 71. In October 2020, QB Wash responded with an answer and counterclaims, asserting that it had suffered severe financial harm from COVID-19 and that the pandemic wholly excused its obligation to pay rent or perform its other obligations under the Lease.  QB Wash further asserted that Plaintiff had breached the Lease and violated the New York City commercial tenant anti-harassment statute by serving default notices and seeking to terminate the Lease. Eviction Action, NYSCEF No. 13.

76. 72. Plaintiff then moved for an order directing payment of use and occupancy *pendente lite*, and QB Wash opposed the motion, again alleging that COVID-19 had severely impacted its business.  Eviction Action, NYSCEF No. 50.

77. 73. On January 15, 2021, the state Supreme Court, the Honorable Robert J. McDonald, J.S.C., entered an Order (the "U&O Order"), finding that "permitting tenant to remain in possession of the subject premises without paying for its use would be 'manifestly unfair' " and directing QB Wash to pay prospective use and occupancy, post a bond for the rent arrears, and pay the water and sewer arrears.

78. 74. In late January 2021, a senior bankruptcy partner at a major law firm, McDermott Will & Emery, contacted Plaintiff's undersigned counsel on behalf of the Silvers to explore a settlement.  To induce Plaintiff to release all claims against Zachary, he provided a list

of Zachary's assets, and explained that Zachary's principal asset, a brokerage account at Wells Fargo holding $398,000 (the "the Wells Fargo Brokerage Account"), which then held $398,000, "was pledged to QB Wash's lender in connection with financing the acquisition of QB Wash and is subject to a deposit account control agreement."

79. 75. Plaintiff refused to release its claims, and on February 8, 2021, shortly after the U&O Order's deadline for posting a bond, QB Wash filed for bankruptcy under Chapter 7 of the Bankruptcy Code, Case No. 1-21-40301-ess (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

80. 76. The filing of the Bankruptcy Case automatically stayed the Eviction Action.

81. 77. A Bankruptcy Trustee was appointed, and Plaintiff thereafter entered into a stipulation with him under which he agreed to surrender possession of the Premises to Plaintiff (the "Surrender Stipulation").

82. 78. Upon inspection of the Premises on March 11, 2021 pursuant to the Surrender Stipulation, Plaintiff discovered a substantial oil spill in the cellar at the Premises, where motor oil and waste oil tanks used in the automotive lube business were located (the "Oil Spill").

83. 79. Plaintiff immediately engaged an environmental consultant, who duly reported the Oil Spill to the New York State Department of Environmental Conservation ("DEC") (Spill Number 2010037).

84. 80. Plaintiff then arranged remediation by a licensed contractor, and over 300 gallons of oily waste was subsequently removed from the cellar.  Inspection revealed that (1) tanks for collecting waste oil had been allowed to overfill, and (2) one of the tanks holding motor oil was corroded and had likely leaked.  Following full remediation and submission of a report by Plaintiff's consultant, DEC noted the Oil Spill as resolved.

85. ~~81.~~ On March 16, 2021, the Bankruptcy Court approved the Surrender Stipulation, and Plaintiff thereupon resumed possession of the Premises.

86. ~~82.~~ On April 15, 2021, Plaintiff entered into a new lease for the Premises (the "2021 Lease") with an experienced car wash operator who was the original tenant under the Lease executed in 2010. The 2021 Lease provides three years of discounted rent, with a market-rate base rent of $22,000 starting in May 2024, or upon the sooner assignment of the 2021 Lease.

87. ~~83.~~ The Bankruptcy Trustee conducted an investigation of QB Wash's affairs, and obtained documents from QB Wash and the Silvers, which he provided to Plaintiff. Plaintiff also moved for disclosure in the Bankruptcy Court and obtained additional documents and information from QB Wash and the Silvers.

88. ~~84.~~ The Bankruptcy Trustee ultimately entered into settlements with the Scott Silver Family Trust and Deirdre Silver Family Trust (together, the "Silver Family Trusts"), Wash Funding and Zachary under which the Bankruptcy Estate received a total of $132,840 to settle claims for monies they had received from QB Wash. None of these funds were ultimately paid to Plaintiff, however, because claims by the NYS Tax Department for unpaid sales taxes and by the NYS Department of Labor for unpaid unemployment insurance contributions were entitled to priority under the Bankruptcy Code and fully consumed the net settlement proceeds.

89. ~~85.~~ On August 22, 2022, the Bankruptcy Court closed the Bankruptcy Case.

**B.** **Defendant Fraudulently Induced Consent to Assignment of the Lease to QB Wash by Arranging for His Son to Misrepresent His Net Worth to Plaintiff's Predecessor-in-Interest**

90. Scott fraudulently induced Plaintiff's predecessor-in-interest, Bert, to consent to the assignment of the Lease to QB Wash by arranging for funds to be briefly transferred into a brokerage account belonging to Zachary, thereby deceiving Bert, and his representative Ethan, regarding Zachary's compliance with the net worth requirement imposed under the Lease.

91.     The Lease contained an assignment provision, rider ¶ 73, which governed the assignment of the Lease from the prior tenant, LB One, to QB Wash.  The assignment provision required that a proposed assignee, or one of its principals, have a net worth of at least $1,000,000 (the "Net Worth Requirement").  Lease rider ¶ 73 provided, in relevant part, that:

> Tenant may . . . assign this Lease, with [the landlord's] prior written consent which shall not be unreasonably withheld or delayed, provided that: . . .
>
> (c)  The proposed assignee (and/or one or more of its principals) is reasonably financially responsible, as evidenced by (i) a net worth of not less than one million dollars ($1,000,000) and (ii) has [sic] no history of bankruptcies; . . . . .

92.     The requirement of a personal guaranty of the Lease was raised by LB One's attorney during the purchase negotiations when he emailed the Silvers' counsel on November 15, 2015[3]:

> I sent you the lease and the personal guarantee required by the landlord
>
> You have told me that your clients will not sign a PG [personal guaranty] for the note
>
> If that is their position regarding the lease then this deal will not get done
>
> Please discuss w your client

93.     The Silvers' attorney then forwarded this email to Scott and Zachary.  Scott responded to the attorney, and they exchanged three emails in the same thread over the next day, the contents of which have been redacted based on attorney-client privilege.

94.     One minute after the final email in this thread from Scott, the Silvers' attorney replied to LB One's attorney that "I have conversed with my client and they are willing to have Zachary Silver (the person who will operate the car wash post-closing) sign a guarantee for the benefit of the landlord."

---

[3] Bates numbers for documents produced in this action are set forth in brackets.

95.     At this time, however, Zachary's net worth was below $100,000 – less than one-tenth the minimum net worth required under the Lease.

96.     Two weeks later, on November 30, 2015, Scott emailed a banker at Wells Fargo a document signed by his wife Deirdre Silver, Zachary's mother, directing the transfer of $999,500 from her account to Zachary's account at Wells Fargo (the "Wells Fargo Brokerage Account").

97.     Two weeks after the $999,500 transfer into the Wells Fargo Brokerage Account, on December 14, 2015, Ethan wrote to Zachary on behalf of his father Bert:

> Zachary,
>
> Following up our call last week, I am attaching a consent form for a background check. Just to confirm, you will be signing the personal guaranty?  If so, can you have your accountant send a net worth letter or provide other documentation of net worth? (If someone else will be doing the guaranty, we'd want the background check and net worth documentation from them.)

98.     Zachary immediately forwarded this email to Scott.

99.     Less than an hour later, Scott sent Zachary an email attaching an account statement from the Wells Fargo Brokerage Account showing a total balance of $1,075,829, which included the $999,500 transfer from Zachary's mother (the "Inflated Account Statement"), and directed Zachary to "[c]ome in to discuss."

100.    Twenty minutes later, Zachary replied to Ethan's email.  He attached the Inflated Account Statement that Scott had provided and stated:

> Thanks for getting back. To confirm, I will be signing the personal guarantee.
>
> Attached to this email:
>
> - Completed consent form for a background check
>
> - Proof of funds in excess of one million dollars
>
> Account total- $1,075,829
>
> $1,015,525 (Cash)
>
> $60,304 (Market)

101.    Zachary then forwarded to Scott the email he had just sent to Ethan.

102.    In reliance on the accuracy of the Inflated Account Statement provided by Zachary and his accompanying email, Ethan advised Bert to consent to the assignment to QB Wash and accept a personal guaranty from Zachary, and Bert did so.

103.    On January 8, 2016, the sale from LB One to QB Wash closed and the assignment of Lease to QB Wash became effective.

104.    Approximately two months later, on March 17, 2016, Scott emailed to a banker at Wells Fargo a document signed by Zachary requesting that $999,500 – the same amount transferred into his account in November 2015 – be transferred back to his mother's account.

105.    There is no evidence in the record that following the March 2016 transfer, the value of the Wells Fargo Brokerage Account ever reached even half of the amount Zachary represented it held in December 2015.  The next statement for the Wells Fargo Brokerage Account produced to Plaintiff, for September 2017, showed an account balance of less than $150,000.  As of February 2021, shortly before Scott arranged for the funds in the Wells Fargo Brokerage Account to be transferred to Wash Funding, the value of the account was approximately $398,000.

106.    At his deposition in this matter, held on July 10, 2023, Zachary disclaimed any recollection of funds being transferred into or out of his Wells Fargo Brokerage Account in late 2015 and early 2016.  He confirmed, however, that he did not have other assets around this time that could have satisfied the Net Worth Requirement.

107.    By using funds briefly placed into the Wells Fargo Brokerage Account to lead Ethan and Bert to believe (1) that Zachary's net worth was many times higher than its true amount and (2) that Zachary owned assets that satisfied the Net Worth Requirement, Scott and Zachary made a material misrepresentation (the "Net Worth Misrepresentation").

108.    Ethan reasonably relied on the Net Worth Misrepresentation in advising Bert to approve assignment of the Lease to QB Wash and accept delivery of a personal guaranty from Zachary in connection therewith.  Bert reasonably relied on the Net Worth Misrepresentation in acting on Ethan's advice to approve assignment of the Lease to QB Wash and accept a personal guaranty from Zachary in connection therewith.

109.    As a result of the Net Worth Misrepresentation, Ethan reasonably believed (1) that Zachary, as guarantor, had substantial assets that would be available to pay a judgment in the event QB Wash breached the Lease, (2) that Zachary's possession of substantial assets demonstrated his family's confidence in his judgment and competence in business affairs, and (3) that Zachary's possession of substantial assets would lead him to act with due care to avoid causing losses to the landlord under the Lease, because such assets would be placed at risk by such losses.

110.    In reality, however, (1) Zachary lacked substantial assets that would be available to pay a judgment in the event QB Wash breached the Lease, (2) Zachary's family did not have, and had strong reason to doubt, his judgment and competence in business affairs in light of his very limited employment history, which consisted of working as a valet parking attendant, and (3) Zachary's lack of substantial assets left the Silvers free to act in a manner that would cause losses to the landlord under the Lease without placing substantial assets at risk.

111.    Scott acted with intent to defraud by arranging for funds to be temporarily transferred into the Wells Fargo Brokerage Account and providing Zachary with the Inflated Account Statement with the expectation it would be provided to Ethan and Bert and would deceive them as to Zachary's net worth, cause them to wrongly believe that Zachary had assets that satisfied the Net Worth Requirement, and lead them, respectively, to recommend and approve

assignment of the Lease to QB Wash and acceptance of a personal guaranty from Zachary in connection therewith.

112.    If the finder of fact at the trial of this matter concludes Zachary was an unwitting participant in the Net Worth Misrepresentation, then Scott committed common law fraud by engaging in the acts described in paragraph 111 above.

113.    In the alternative, if the finder of fact at the trial of this matter concludes Zachary was aware of the Net Worth Misrepresentation, then Zachary committed common law fraud by delivering the Inflated Account Statement to Ethan with knowledge of its falsity and with the intent that it would deceive Ethan and Bert as to Zachary's net worth, cause them to wrongly believe that he had assets that satisfied the Net Worth Requirement, and lead them, respectively, to recommend and approve assignment of the Lease to QB Wash and acceptance of a personal guaranty from Zachary in connection therewith, and Scott aided and abetted fraud by Zachary and conspired to commit fraud with Zachary by engaging in the acts described in paragraph 111 above.

114.    If Zachary was aware of the Net Worth Misrepresentation, then Scott provided substantial assistance in the commission thereof by engaging in the acts described in paragraph 111 above and Plaintiff's injury was a direct and reasonably foreseeable result of Scott's conduct, as further pled in paragraph 119 below.

115.    If Zachary was aware of the Net Worth Misrepresentation, then his delivery of the Inflated Account Statement to Ethan establishes an agreement with Scott to deceive Ethan and Bert and constitutes an overt act pursuant to that agreement in furtherance of a common plan to deceive Ethan and Bert as to Zachary's net worth, cause them to wrongly believe that Zachary had assets that satisfied the Net Worth Requirement, and lead them, respectively, to recommend and

approve assignment of the Lease to QB Wash and acceptance of a personal guaranty from Zachary in connection therewith.

116.    But for the Net Worth Misrepresentation, Ethan would not have recommended, and Bert would not have approved, assignment of the Lease to QB Wash and acceptance of a personal guaranty from Zachary in connection therewith.  Had Scott and Zachary disclosed Zachary's true net worth, then Ethan would have recommended, and Bert would have required, pursuant to Lease rider ¶ 73, a personal guaranty from Scott or another individual who satisfied the Net Worth Requirement, and in the absence of such a personal guaranty, would have refused to consent to the assignment of the Lease to QB Wash.

117.    As a result of making, or aiding and abetting, or conspiring to make, the Net Worth Misrepresentation, Defendant is liable to Plaintiff, as Bert's successor-in-interest, for the actual pecuniary loss sustained as a direct and foreseeable result of such misrepresentation.

118.    As a direct and foreseeable result of the Net Worth Misrepresentation, Plaintiff suffered actual pecuniary losses consisting of (1) unpaid rent and additional rent and the other losses resulting from the breaches of the Lease pled below, and (2) attorneys fees and costs incurred in recovering possession of the Premises through the Eviction Action and the Bankruptcy Case, and (3) attorneys fees and costs incurred in collecting damages resulting from breach of the Lease.

119.    The foregoing damages suffered by Plaintiff were proximately caused by the Net Worth Misrepresentation because such losses resulted from (1) Zachary, as guarantor, lacking substantial assets to pay a judgment resulting from QB Wash's breach of the Lease, (2) Zachary lacking the judgment and competence in business affairs to effectively manage the business at the Premises, (3) the absence of any individual with substantial assets standing as guarantor of the

obligations of QB Wash under the Lease, and (4) the Silvers' belief that they could cause losses to Plaintiff without placing substantial assets belonging to Zachary, Scott or any other individual at risk.

120.   Applicability of the Discovery Rule.  Plaintiff's claims for fraud (Counts Three, Four and Five) are timely pursuant to N.Y. C.P.L.R. 213(8) because Plaintiff did not discover the fraud alleged herein, and could not with reasonable diligence have discovered it, earlier than March 2023, when documents revealing the fraud were produced in this action.

### C.   ~~B.~~ Defendant's Scheme to Coerce a Below-Market Rent or Discounted Sale of the Premises, Strip Assets from QB Wash, and Prevent Plaintiff from Collecting on the Personal Guaranty

121.   ~~86.~~ In early 2020, Scott faced a serious problem: the carwash and lube business was losing money and he had been forced to contribute $165,000 in cash over the preceding 13 months to keep the business afloat.

122.   ~~87.~~ With the arrival of the COVID-19 public health and economic crisis, however, Scott saw an opportunity, and he devised a strategy: the Silvers would withhold all rent, exploit New York State's moratorium on evictions and the court delays resulting from the pandemic to force Plaintiff's principals to pay hundreds of thousands of dollars out of pocket for real estate taxes, legal fees, insurance, water charges, and other property expenses, and use the resulting economic pressure to compel them to sell the Premises at a deep discount or accept a rent far below market rate.

123.   ~~88.~~ By withholding all rent and allowing water charges to accrue unpaid, the carwash and lube business' monthly expenses would be reduced by $30,000-$35,000 per month, generating enough cash to fund the litigation with Plaintiff and also enable Scott to recoup some of his losses by siphoning funds out of the business.

124. 89. Scott also planned for the possibility that Plaintiff's principals would not capitulate.  To insulate Zachary from liability under the Personal Guaranty and deter any collection suit by Plaintiff, Scott formed Wash Funding and caused it to take a pledge of Zachary's principal asset, the Wells Fargo Brokerage Account, which then held approximately $400,000336,000.

125. 90. Scott had good reason, however, to believe his pressure campaign would succeed.  As the Silvers later disclosed in litigation with Plaintiff, they had conducted a nationwide search for assets owned by Maureen and her late husband Bert, and correctly determined that they owned only two other income properties – a dollar store in Queens and a small retail strip in Fort Lauderdale, Florida – both much less valuable than the Premises.  Through their in-depth research, the Silvers had also discovered that the Florida property was vacant and undergoing major renovations, requiring significant cash investments and leaving Maureen with just one other property to provide her income.

126. 91. Scott also knew that by withholding all payments for real estate taxes, insurance, and even the water used in the carwash operations, and by imposing litigation costs to recover possession of the Premises, he would not only deprive Maureen of her principal source of income but would also impose on her and her children hundreds of thousands of dollars in out-of-pocket expenses.

127. 92. In fact, in 2020 alone, Plaintiff's unreimbursed out-of-pocket costs for real estate taxes, insurance and legal fees totaled over $100,000.

128. 93. In 2021, Plaintiff's unreimbursed out-of-pocket costs for real estate taxes, water and sewer charges, legal fees, and cleanup of the Oil Spill totaled an additional nearly $200,000.

129. 94. Scott's plan to impose severe financial costs on Maureen thus achieved its goal. As discussed below (¶ 201236), the loss of income from the carwash and out-of-pocket costs associated with it reduced Maureen's income in both 2020 and 2021 by more than two-thirds.

130. 95. Scott also knew that Maureen, then age 91, would be particularly susceptible to a pressure campaign because she had lost her husband of 52 years just months earlier, in March 2019.

## D. C. Tortious and Illegal Acts in Furtherance of Defendant's Coercion Scheme

131. 96. In furtherance of Scott's scheme, the Silvers committed multiple torts and illegal acts, including perjury in both state Supreme Court and the Bankruptcy Court, numerous unlawful fraudulent transfers, the assertion of frivolous and sanctionable arguments and counterclaims in the Eviction Action, and malicious prosecution of the Eviction Action counterclaims.

### 1. Defendant's Formation of Wash Funding and Fraudulent Transfers to Shield His Son's Assets and Prevent Collection on the Personal Guaranty

132. 97. In April 2020, Scott launched his strategy by forming a new Delaware limited liability company, Wash Funding.

133. 98. There was no valid reason to form Wash Funding; its only role was to conceal the related-party nature of the insider debt Scott later transferred to it. As discussed below in Point CD.4 (¶ 129164), the Silvers later affirmatively misrepresented Wash Funding to be an unrelated party in the Bankruptcy Court.

134. 99. In May 2020, Scott and Zachary jointly consulted with an attorney at Foley & Lardner, a major law firm retained by Scott, for legal advice related to the Premises. Scott had

previously retained Foley & Lardner for a large transaction conducted by the firm where he is general counsel, Sherman Financial.

135. ~~100.~~ Thereafter, in June 2020, the Silver Family Trusts transferred to Wash Funding two promissory notes that Zachary had ostensibly executed in 2016 and 2017 in connection with the acquisition of the carwash and lube business.  Wash Funding then filed a UCC-1 Financing Statement with the New York Secretary of State, purporting to perfect a security interest in "all assets" belonging Zachary.[34]

136. ~~101.~~ According to the Silvers' counsel at McDermott Will & Emery (a second prominent law firm that Scott later engaged to advise on placing QB Wash into bankruptcy), Wash Funding also took a pledge of the Wells Fargo Brokerage Account, which then held approximately $~~400,000~~336,000 and represented substantially all of Zachary's assets.

137. ~~102.~~ The foregoing liens on Zachary's assets (the "Voidable Liens") constituted unlawful fraudulent transfers that violated the New York Debtor and Creditor Law (the "DCL").

138. ~~103.~~ First, the Voidable Liens violated DCL § 273(a), which prohibits transfers made "with actual intent to hinder, delay or defraud" creditors.

139. ~~104.~~ As set forth above, the Voidable Liens were part of a scheme to financially coerce Plaintiff by breaching the Lease, and were executed for the purpose of shielding Zachary from liability on the Personal Guaranty.

140. ~~105.~~ In addition, they reflect many of the "badges of fraud" enumerated in DCL § 273(b):

---

[34] Contemporaneously, Wash Funding also filed a second UCC-1 Financing Statement with respect to "[a]ll items of Personal Property, Fixtures and Equipment" owned by QB Wash – another fraudulent transfer, which the Bankruptcy Trustee later ~~voided~~avoided.

(a)      The Voidable Liens were given by the debtor, Zachary, to an insider, Wash Funding, which was controlled by his father, Scott, and owned by family trusts (DCL § 273(b)(1));

(b)      Zachary retained possession and control of the property subject to the Voidable Liens after they were given (DCL§ 273(b)(2));

(c)      the related-party nature of the Voidable Liens was concealed (DCL § 273(b)(3));

(d)      at the time the Voidable Liens were made, QB Wash was in default under the Lease and Zachary faced the likelihood of being sued on the Personal Guaranty – indeed the Voidable Liens were executed within days after the Silvers had rejected Plaintiff's offers of a rent abatement or surrender of the Premises without liability (DCL § 273(b)(4));

(e)      the Voidable Liens covered substantially all of Zachary's assets (DCL § 273(b)(5));

(f)      as further discussed below (¶ ~~107~~142), no value was given in exchange for the Voidable Liens (DCL § 273(b)(8));

(g)      QB Wash was insolvent at the time the Voidable Liens were made, and they left Zachary with insufficient assets to satisfy his and QB Wash's joint liabilities to Plaintiff (DCL § 273(b)(9)); and

(h)      the Voidable Liens were made at a time when QB Wash and Zachary were incurring a growing liability to Plaintiff by withholding all payments of rent under the Lease (DCL § 273(b)(10)).

141. ~~106.~~ The Voidable Liens also violated DCL § 274(a) and/or DCL § 273(a)(2), which prohibit transfers made "without receiving a reasonably equivalent value in exchange for the transfer" at a time that the transferor was insolvent or expected to incur debts beyond the transferor's ability to pay.

142. ~~107.~~ The value putatively given for the Voidable Liens consisted of funding provided by the Silver Family Trusts between three and four years earlier, in 2016 and 2017, to finance the purchase of the lube and carwash business.  In the QB Wash Bankruptcy Case, however, the Silvers admitted that they had no contemporaneous communications or documentation establishing when the loan documents were actually executed.  There is thus no evidence that the promissory notes were given as part of a contemporaneous exchange of value, and substantial reason to believe that they were created later and backdated as part of Scott's asset diversion scheme.

### 2. Fraudulent Transfers of Cash from QB Wash Benefitting Defendant

143. ~~108.~~ Between April and December 2020, while the Silvers were refusing to pay rent to Plaintiff, they made a series of cash payments from QB Wash to Wash Funding and the Silver Family Trusts totaling nearly $40,000.

144. ~~109.~~ These payments constituted additional fraudulent transfers in violation of Article 10 of the DCL.  Specifically, they violated DCL §273(a)(1) because they were made with actual intent to hinder, delay or defraud Plaintiff and other creditors of QB Wash; and violated DCL § 274(a) because they were made at a time when QB Wash was insolvent and QB Wash did not receive a reasonably equivalent value in exchange for such transfers.  In addition, they violated DCL § 274(b), which prohibits payments to insiders on pre-existing debt if the payee had reason to believe the payor was insolvent.

145. ~~110.~~ In late 2020, QB Wash made over $12,500 in additional payments to attorneys and a surveying firm in connection with the purchase by a family trust controlled by Scott of a car wash property in Danbury, Connecticut operated by an unaffiliated tenant.  The Silvers thus wrongfully diverted funds from QB Wash to help Scott purchase another car wash property.  QB Wash received no benefit from these payments, which constituted additional unlawful fraudulent transfers in violation of DCL §§ 273(a)(1) and 274(a).

146. ~~111.~~ The Bankruptcy Trustee later settled the unlawful voidable transactions referenced in paragraphs ~~108~~143 and ~~110~~145 for payment of $82,840 from the Silver Family Trusts and Wash Funding.

### 3. Defendant's Legal Pressure Campaign, Premised on Perjury and Frivolous, Sanctionable Legal Arguments

147. ~~112.~~ Between June and September 2020, Scott and Zachary jointly corresponded more than 50 times with an attorney, Michael Wood, who represented QB Wash in connection with the Rent Reset and subsequently in the Eviction Action.  The Bankruptcy Trustee later waived privilege and produced communications between Wood and the Silvers to Plaintiff.

148. ~~113.~~ Zachary explained in an early email to Wood, copying Scott, that "I have not paid rent for the months of March, April, May, or June.  I am using the eviction/fee moratorium as a tool to leverage a better lease deal and need advice on how far (or not) to push it."

149. ~~114.~~ Between September 2020 and February 2021, the Silvers proceeded with the strategy Zachary described, adopting a litigating position in Plaintiff's Eviction Action that was premised entirely on the contention that the carwash and lube business operated by QB Wash had experienced an extended closure and was continuing to suffer ongoing harm from the COVID-19 pandemic.

150. ~~115.~~ Specifically, in a 30-page Answer and Counterclaims (the "Answer and Counterclaims"), verified under oath by Zachary and filed on October 26, 2020 in the Eviction Action, the Silvers made a series of specific allegations regarding the impact of COVID-19 on QB Wash's business:

> QB Wash is one of the numerous small shops renting commercial space in New York who have been subject to the irreparable financial hardship that this pandemic brought (¶ 4)
> . . .
> Between March 2020, and present [October 2020], QB Wash has not been able to resume normal operations at the Property (¶ 17)
> . . .
> QB Wash might not ever be able to resume operations as contemplated by the Lease (¶ 19)
> . . .
> [M]ajor portions of QB Wash's business have been lost, and the status quo is not expected to change for the foreseeable future (¶ 20)
> . . .
> QB Wash was forced to bring the Property to a complete shutter in or around March 2020 [and] [t]o date the Property remains un-tenantable (¶¶ 31-32)
> . . .
> To date, QB Wash's business operations are not fully operational at 100% capacity (¶ 35)
> . . .
> As a result of the COVID-19 pandemic and the ensuing Executive Orders, QB Wash has been deprived of the use of the Property as of February 2020, and is now operating at minimum capacity, subject to the Executive Orders' restrictions in place and social distancing that will be in effect for the foreseeable future (¶ 38)
> . . .
> the Property was closed and made unusable for the better part of the year (¶ 39).

151. ~~116.~~ Financial records and bank statements obtained in the Eviction Action and Bankruptcy Case establish that all of these statements were entirely false.

152. ~~117.~~ In fact, the carwash and lube business at the Premises had closed for *less than two months*, from approximately March 22 to May 9, 2020.

153. ~~118.~~ Following its reopening in May, the business thrived.  Far from suffering impairment, the business experienced some of its best months ever.  Over the four full months between the reopening in May 2020 and the filing of the Silvers' Answer and Counterclaims in October (i.e., June 2020-September 2020), QB Wash's revenue was *more than 10 percent higher* than in the same period a year earlier and was, in fact, QB Wash's *best performance over those months in any year on record*.

154. ~~119.~~ The legal arguments that the Silvers asserted in their Answer and Counterclaims were also wholly frivolous.

155. ~~120.~~ The Silvers argued that the pandemic excused QB Wash's obligation to pay rent or perform other obligations under the Lease based on frustration of purpose, impossibility of performance, and various provisions in the Lease.

156. ~~121.~~ In fact, even if the carwash and lube business had been impaired due to COVID-19 as the Silvers falsely alleged, there is no principle of law that would have entitled them to retain possession of the Premises and withhold rent. The remedy for frustration of purpose and impossibility of performance is *recission* – returning the keys and vacating the premises. No case allows a tenant to withhold rent on the grounds of frustration or impossibility while continuing to occupy the premises at issue.  Likewise, no provision in the Lease even colorably justified any rent reduction, let alone the total cessation of rent and utility payments to which the Silvers argued they were legally entitled.

157. ~~122.~~ Zachary again made objectively false statements in the Silvers' subsequent submissions in opposition to Plaintiff's motion for use and occupancy.  In an affidavit sworn to on December 9, 2020 (¶ 21), he stated:

> QB Wash was barred from operating the Property as a car wash, automotive lube and detail shop for at least five months. Now, as circulation has begun – although in a significantly slower pace – the

Property is being operated to a reduced capacity, subject to mandated masks, social distancing and added security protocols, which understandably, continue to keep customers away.

158. ~~123.~~ At the time Zachary executed this affidavit, QB Wash had just completed one of its best months – and its highest grossing November ever.

159. ~~124.~~ The false statements of material fact and frivolous legal arguments described above were wrongful and violated applicable law.

160. ~~125.~~ First, Zachary's knowing false statements under oath constitute perjury in the second degree in violation of N.Y. Penal Law § 210.10, which imposes liability when a person "swears falsely and when his false statement is (a) made in a subscribed written instrument for which an oath is required by law, and (b) made with intent to mislead a public servant in the performance of his official functions, and (c) material to the action, proceeding or matter involved."

161. ~~126.~~ Second, the false statements and frivolous arguments violated Part 130 of the Rules of the Chief Administrative Judge of the New York Courts.  22 N.Y.C.R.R. Section 130-1.1(c) deems conduct frivolous and sanctionable if:

> (1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
>
> (2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
>
> (3) it asserts material factual statements that are false.

162. ~~127.~~ The Silvers' litigation conduct meets all three definitions: (1) the legal arguments advanced were manifestly meritless, (2) the purpose of the filings was to delay the Eviction Action, impose financial injury on Plaintiff, and coerce its owners economically, and (3) the Silvers' claims and defenses were premised on materially false statements.

163. 128. Finally, the Silvers' assertion of meritless counterclaims also constitutes the common law tort of malicious prosecution: the causes of action they pled patently lacked merit; they were asserted for the improper purpose of economic coercion; Plaintiff suffered special damages by being deprived of possession of the Premises; and the action terminated in Plaintiff's favor after Plaintiff obtained all possible relief in the Bankruptcy Court.

### 4.     Additional Perjury in the Bankruptcy Court

164. 129. The Silvers also committed additional perjury in the Bankruptcy Court.  The bankruptcy petition, filed on behalf of QB Wash by a sole practitioner after the Silvers had consulted extensively with bankruptcy counsel at McDermott Will & Emery engaged by Scott, identified Wash Funding as a secured creditor.  The petition, executed by Zachary under penalty of perjury, however, falsely represented Wash Funding to be an unrelated party:

**Is the creditor an insider or related party?**
■ No
☐ Yes

### E.     D. Breaches of the Lease and Plaintiff's Resulting Damages

165. 130. QB Wash committed multiple breaches of the Lease, for which Defendant is liable.

### 1.     Nonpayment of Rent

166. 131. First, QB Wash failed to pay any rent for over a year, from March 1, 2020 through the date Plaintiff regained possession, March 16, 2021.

167. 132. QB Wash's failure to pay base rent, real estate tax reimbursements, and insurance reimbursements breached Article 1 of the Lease and paragraphs 48, 51 and 52 of the rider thereto, and holdover damages are payable from the date of Lease termination through the

date Plaintiff regained possession (September 3, 2020 to March 16, 2021) pursuant to Lease rider

paragraph 75.  In addition, late fees and interest are payable pursuant to Lease rider paragraph 77.

168. 133. The total base rent, holdover damages, real estate tax reimbursements,

insurance reimbursements, and late payment fees and interest due to Plaintiff (the "Rent

Nonpayment Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---|
| Base Rent (though September 2, 2020) | $66,636 |
| Holdover Damages | |
| (September 3, 2020 to March 16, 2021) | 280,283 |
| Real Estate Tax and Insurance Reimbursements | 95,757 |
| Late Payment Fees and Interest | 205,189 |
| Total | $647,865 |

## 2.  Unpaid Water Charges

169. 134. QB Wash also failed to pay any of the water and sewer charges it incurred

with respect to tax lot 110 from and after September 2019 and failed to pay any of the water and

sewer charges it incurred with respect to tax lot 11 from and after June 2020.

170. 135. QB Wash's failure to pay water and sewer charges breached Articles 6 and 12

of the Lease and paragraph 55 of the rider thereto.  Late fees and interest are payable pursuant to

Lease rider paragraph 77.

171. 136. The water and sewer charges not paid by QB Wash constituted a liability of

Plaintiff and a lien on the Premises.

172. 137. The total water and sewer charges, which have been paid by Plaintiff, together

with late payment fees and interest thereon (the "Water Charge Damages"), with interest through

August 15, 2022, are as follows:

| | |
|---|---|
| Water Charges | $38,242 |
| Late Payment Fees and Interest | 10,999 |
| Total | $49,241 |

3. **Damages from the Oil Spill**

173. 138. QB Wash also breached the Lease by allowing the Oil Spill to occur and by failing to report or remediate it.

174. 139. The occurrence of the Oil Spill breached Article 47 of the Lease, and QB Wash is accordingly liable for the costs of remediating the Oil Spill.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

175. 140. The total costs Plaintiff incurred to remediate the Oil Spill, together with late payment fees and interest thereon (the "Oil Spill Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---|
| Environmental Consultant | $11,645 |
| Testing and Remediation | 15,834 |
| Late Payment Fees and Interest | 7,835 |
| Total | $35,314 |

4. **Damages from Municipal Violations**

176. 141. QB Wash also breached the Lease by failing to comply with all laws, orders and governmental regulations, and specifically (a) the Theft of Services Violation issued by DEP, (b) violations issued by the Fire Department, and (c) a violation issued by the New York City Department of Sanitation (the "Sanitation Department").

177. 142. QB Wash's failure to remedy the Theft of Services Violation breached Articles 6 and 12 of the Lease.  QB Wash's failure to pay the violations issued by the Fire Department and Sanitation Department breached Article 6 of the Lease.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

178. 143. Plaintiff's costs to remedy the Theft of Services Violation and pay the fines imposed by the Fire Department and Sanitation Department, together with late payment fees and

interest thereon (the "Municipal Violation Damages"), with interest through August 15, 2022, are as follows:

| | |
|---|---:|
| Plumber Charge to Cure Theft of Services Violation | $750 |
| Payment of Fire Department Violations Nos. 011704060Y and 01170203J and Sanitation Department Violation No. 046443699M | 2,302 |
| Late Payment Fees and Interest | 961 |
| Total | $4,013 |

### 5.   <u>Lease Termination Damages</u>

<u>179.</u> ~~144.~~ QB Wash is also liable for damages resulting from the early termination of the Lease, from the date of surrender of the Premises, March 16, 2021, through the end of the term of the Lease, May 31, 2035.

<u>180.</u> ~~145.~~ Pursuant to Article 18 of the Lease, damages resulting from the early termination of the Lease (the "Lease Termination Damages") are calculated as the "deficiency between the rent hereby reserved and or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this lease." Deficiency damages accrue monthly over the remaining term of the Lease.  Late fees and interest are payable pursuant to Lease rider paragraph 77.

<u>181.</u> ~~146.~~ The total Lease Termination Damages and interest through August 15, 2022, are as follows:

| | |
|---|---:|
| Base Rent | $132,878 |
| Real Estate Tax Reimbursements | 637 |
| Late Payment Fees and Interest | 29,564 |
| Total | $163,079 |

<u>182.</u> ~~147.~~ Assuming the 2021 Lease is fully performed, the Lease Termination Damages through the original expiration date of the 2010 Lease, in 2035, will ultimately total approximately $500,000.

6. **Contractual Damages for Attorneys' Fees**

183. ~~148.~~ Pursuant to the Article 19 of the Lease and paragraph 61 of the rider thereto, QB Wash is obligated to pay the reasonable attorneys' fees, costs, expenses and disbursements incurred by Plaintiff as a result of QB Wash's breaches of the Lease, in an amount to be determined after trial of this matter (the "Attorneys' Fee Damages"). To date, Plaintiff has incurred over $250,000 in attorneys' fees and costs in connection with the Eviction Action, the Bankruptcy Case and the present action.

F. ~~E.~~ **Allegations Concerning Veil Piercing –
Defendant's Domination and Control of QB Wash
and Use Thereof to Perpetrate Wrongs Against
Plaintiff**

1. **Domination and Control of QB Wash by Defendant**

184. ~~149.~~ Extensive evidence establishes that Defendant dominated and controlled QB Wash, and that he planned and directed the economic coercion scheme and wrongful acts described in this complaint.

185. ~~150.~~ First, email communications between the Silvers in early 2020 show that Scott was intimately involved in QB Wash's strategic business decisions, and that Zachary sought Scott's direction and deferred to him.

186. ~~151.~~ Presented with an offer from a third party to purchase the carwash and lube business in January 2020, Zachary wrote: "What do you think? I think pass see how the year goes..." to which Scott replied "Yes, pass."

187. ~~152.~~ Emails in early February 2020 shows Scott heavily marking up Zachary's proposed talking points for the Rent Reset negotiation with Plaintiff, and other emails in March 2020 reflect Scott drafting correspondence for Zachary to send to Plaintiff.

188. ~~153.~~ In other emails in March and May 2020, Zachary requested direction from Scott whether to send various documents to Plaintiff in connection with the Rent Reset process.

189. ~~154.~~ Zachary's deference to Scott, as shown in these emails, reflects the nature of their relationship, Scott's role in providing funding, and his far greater business and legal experience.

190. ~~155.~~ First, Scott had financed the carwash and lube business, providing the capital to purchase the business in 2016 and pay off the seller's promissory note in 2017, and he then covered the operating deficits incurred by the business in 2019-2020.

191. ~~156.~~ Second, in addition to being Zachary's father, Scott was a highly experienced business lawyer.  Zachary, by contrast, was just 24 when he began operating the carwash and lube business, and was still in his twenties when the wrongful acts described in this complaint occurred.

192. ~~157.~~ The Silvers' email correspondence in early 2020 shows that they took conscious steps to conceal Scott's role.  In an email dated April 10, 2020, Zachary forwarded Scott a screenshot of an email sent by Plaintiff and explained that "I decided to send the email in this format rather than forward. Did not want you to be accidentally looped in on any correspondence."

193. ~~158.~~ Scott further hid his involvement by forming Wash Funding, which replaced the Scott Silver Family Trust and the Deirdre Silver Family Trust as putative creditors of QB Wash.

194. ~~159.~~ By directing communications with Plaintiff through others, initially Zachary and subsequently counsel for QB Wash, Scott succeeded in concealing his role – until revealed in the Bankruptcy Court though discovery obtained by the Bankruptcy Trustee and by Plaintiff.

195. ~~160.~~ The Silvers' total email production consisted of eight email chains from the period January to May 2020.  They represented in the Bankruptcy Case that all subsequent emails

between them concerning the Premises included counsel, and they withheld production on the basis of attorney-client privilege and common interest protection.

196.   ~~161.~~ Scott's assertion of privilege obscures the full extent of his involvement, but the privilege log the Silvers produced in the Bankruptcy Case further documents Scott's central role in planning and directing the Silvers' coercion strategy.  Between May 2020 and the filing of the Bankruptcy Case on February 8, 2021, the log shows Scott sending, receiving or being copied on over 80 emails with three law firms advising him and Zachary regarding the carwash and lube business, two of them major law firms retained by Scott himself, and the third engaged by QB Wash on the recommendation of another member of the Silver family.

197.   ~~162.~~ The fact that Scott asserted privilege on the basis of "common interest" with Zachary for more than 80 emails further establishes and concedes that he was acting on behalf of QB Wash over the course of planning and conducting its litigation with Plaintiff.

198.   ~~163.~~ Individual log entries further illustrate Scott's dominant role.  The log shows that the Silvers first consulted with counsel at one prominent law firm retained by Scott, Foley & Lardner.  In addition to asking "Questions regarding lease", the log shows that Scott forwarded to Zachary correspondence sent only to him by a partner at Foley & Lardner.

199.   ~~164.~~ In January 2021, after state Supreme Court entered the U&O Order, the log shows that Scott initiated contact with a partner at another leading law firm, McDermott Will & Emery, and obtained an introduction to its Global Co-Chair of Restructuring & Insolvency, who then personally provided legal advice regarding QB Wash's bankruptcy filing, represented the Silvers in negotiations with Plaintiff, and later represented them in negotiations with the Bankruptcy Trustee.

200. 165. Scott's professional experience made him particularly well suited to plan and direct the Silvers' asset diversion and economic coercion scheme. As the general counsel of Sherman Financial, which the Wall Street Journal has described as "one of the biggest and least-known companies" in the consumer debt collection industry, he is well-versed in both litigation and asset protection. Scott's strategic use of the pandemic to pressure Plaintiff mirrors the strategy he implemented at Sherman Financial. In April 2021, the Wall Street Journal reported that "[w]hen Covid-19 hit the economy, most debt collectors gave borrowers a break, cutting back on lawsuits amid lockdowns, closed courts and loan-forbearance initiatives." Sherman Financial, however, "did the opposite" and "filed more lawsuits to squeeze cash from people behind on their credit-card bills." Shane Shifflett & Justin Scheck, *Most Big Debt Collectors Backed Off During the Pandemic. One Pressed Ahead.*, Wall Street Journal, April 7, 2021, *available at* https://www.wsj.com/articles/most-big-debt-collectors-backed-off-during-the-pandemic-one-pressed-ahead-11617804180?st=w1zmut7kkemr1qt&reflink=desktopwebshare_permalink.

201. 166. Scott, through the Silver Family Trusts, was also the principal beneficiary of the Silvers' coercion scheme: while withholding rent from Plaintiff, the Silver Family Trusts extracted over $50,000 from QB Wash through the fraudulent transfers described above.

202. 167. A principal goal of the scheme – forcing Plaintiff's principals to sell the Premises at a below-market price – was also for Scott's benefit. Neither QB Wash nor Zachary had the means to complete the transaction; only Scott had the funds to do so.

203. 168. Scott's role as de facto owner of QB Wash is also shown by QB Wash's own financial records, which show Scott's cash contributions in 2019-2020 booked as "Shareholder Notes Payable."

204.  169. An examination of Zachary under oath in the Bankruptcy Case further demonstrates his deference to his father and passive role in executing the Silvers' scheme.  In response to questioning by the Bankruptcy Trustee's counsel, Zachary conveyed little knowledge of QB Wash's financing or the conduct of the litigation with Plaintiff.

205.  170. Asked about Wash Funding and the financing for QB Wash, Zachary disclaimed knowledge of all but the most basic facts:

> TRUSTEE'S COUNSEL:  . . . There is a secured creditor on your business, correct?
>
> ZACHARY:  As I understand.
>
> TRUSTEE'S COUNSEL:  Okay.  And who is that secured creditor?
>
> ZACHARY:  Wash Funding, LLC.
>
> TRUSTEE'S COUNSEL:  And are the principals of that family members of yours?
>
> ZACHARY:  I believe the principals are trusts.
>
> TRUSTEE'S COUNSEL:  Okay.  Now, are the trusts related to family members of yours?
>
> ZACHARY:  Yes.
>
> TRUSTEE'S COUNSEL:  . . . And when did the security interest come into place, do you know?
>
> ZACHARY:  No.  I believe the security interest went into place -- I don't know, I'm sorry.
>
> TRUSTEE'S COUNSEL:  Was it last year?
>
> ZACHARY:  Again, if I gave an answer, I would be making it up.  I don't know the exact intricacies of when the security interest went into place off the top of my head.
>
> TRUSTEE'S COUNSEL:  Okay.  When was the last time that lender advanced any money to the business?
>
> ZACHARY:  I don't know.
>
> TRUSTEE'S COUNSEL:  Was it last year?
>
> ZACHARY:  Possibly.
>
> TRUSTEE'S COUNSEL:  And who -- if those funds came in, who would they have come in from?
>
> ZACHARY:  I'm not sure.

206. ~~171.~~ Asked about QB Wash's litigation strategy in the Eviction Action, Zachary again disclaimed knowledge:

> TRUSTEE'S COUNSEL: Now, you were also -- you were in litigation with the landlord, correct?
>
> ZACHARY: Correct.
>
> TRUSTEE'S COUNSEL: And you retained a firm in White Plains to represent you?
>
> ZACHARY: Correct.
>
> TRUSTEE'S COUNSEL: At any point during your (indiscernible), did you have discussions with them about what's called a Yellowstone injunction?
>
> ZACHARY: I don't recall the exact conversations I had with my attorney.
>
> TRUSTEE'S COUNSEL: Well, did you ever have a conversation about trying to get any sort of stay or injunction at the beginning of the case?
>
> ZACHARY: Again, I just don't remember the exact conversations I had with my attorney.

207. ~~172.~~ Scott's dominant role in devising and executing the Silvers' scheme is further established by Zachary's prior behavior.  Zachary, who was just 24 when Scott bought the carwash and lube business for him, and in his late 20's when the wrongful acts at issue in this case occurred, showed himself to be a mild-mannered individual who clearly struggled with the demands of operating the carwash and lube business.

208. ~~173.~~ In June 2017, Zachary defaulted on a Fire Department violation and then assured Plaintiff he would attend the rescheduled hearing.  He then missed the rescheduled hearing and subsequently wrote to Plaintiff:

> I was unable to make the appearance regarding violation 011588437J due to an important obligation. . . .
>
> I understand that at the beginning of our relationship i made some mis-steps. I want to assure you guys that your property and in turn my business are in good hands.

209. ~~174.~~ Around the same time, QB Wash defaulted on a DEP hazardous materials violation. Zachary later explained in an October 11, 2017 email:

> I honestly had no idea about this (not that it is an excuse). Apparently it was a 500 dollar fine that defaulted automatically into 5K. I have retained some company that says they are going to reopen the case and I'll pay some nominal amount. Will keep you updated. Sorry about this. God forbid anything serious happens with it I have set aside the 5,000 to pay it before there is any real issue.

210. ~~175.~~ In October 2018, after a series of consecutive late rent payments, one of Plaintiff's principals met with Zachary and offered to allow reimbursement of certain property expenses in installments. Zachary then wrote to her:

> Hi Ellen,
>
> Meeting with you earlier this week was such a pleasure. Thank you for taking the time.
>
> I appreciate and agree to the terms you have offered. . . .
>
> I know this is not something you are not at all obligated to do- Thank you so much for working with me.
>
> I understand communication is very important to this relationship. I will be very diligent in maintaining it.

211. ~~176.~~ In a January 9, 2019 email responding to an offer by Plaintiff to allow payment of other expenses in installments, Zachary replied:

> I want to thank you for being so considerate and flexible with me over the past few months. With so many large payments ahead of me I feel it is probably better to take other money I have and pay all or most of what I owe to you; the way business is right now it will just to hard to manage those payments and will not be fair to you. If you could please give me no more than five days to see exactly how much I can get together. I think I will be able to pay the property taxes and insurance in full and maybe amortize one months rent over a couple months. You have been more than fair with me and it does not go un appreciated- after this things will be a lot smoother. Thank you for everything.

212. ~~177.~~ Finally, in a July 24, 2019 email, responding to correspondence advising that Plaintiff would begin imposing late fees after nearly a year of consistently late rent payments, Zachary wrote:

> OK I understand. Times have been very hard. Thank you so much for your leniency up to this point.

213. 178. These emails reflect the tenor of Plaintiff's principals' interactions with Zachary at all times before Scott devised the Silvers' coercive nonpayment strategy in early 2020.

214. 179. Based on Zachary's demonstrated prior conduct and demeanor, it is not credible that, in the absence of Scott's planning, direction and actions to shield his assets, Zachary would have elected to reject Plaintiff's offer in June 2020 to waive over $80,000 in back rent and let him walk away without liability. It is also not credible that Zachary would have himself decided to embark on litigation across multiple courts to gain strategic advantage, risking years of litigation on the Personal Guaranty and exposing his roughly $400,000 in assets to the probability of an adverse judgment.

215. 180. In sum, there is extensive evidence that Scott exercised plenary domination and control of QB Wash, that he planned and directed the scheme at issue in this complaint, and that the wrongful conduct described herein was primarily intended to serve his financial interests. Accordingly, he is properly treated as an equitable owner of QB Wash.

### 2.      Defendant's Use of His Domination and Control of QB Wash to Perpetrate Wrongs Injuring Plaintiff

216. 181. Scott wrongfully used his domination and control of QB Wash to perpetrate multiple wrongs against Plaintiff.

217. 182. Without any colorable legal grounds, he deprived Plaintiff and its owners of hundreds of thousands of dollars of income, and forced them to pay additional hundreds of thousands of dollars out-of-pocket to cover operating costs associated with the Premises.

218. 183. At the same time as he was imposing these costs, he used the fraudulent transfers detailed above in paragraphs 108143 and 110145 to unlawfully divert monies from QB Wash to family trusts he controlled, knowing that QB Wash was in arrears to Plaintiff and did not have the means to later make the payments due to it.

219. 184. He further used the fraudulent transfers detailed above in paragraphs 100135 and 101136 to insulate his son from liability on the Personal Guaranty for QB Wash's breaches.

220. 185. He forced Plaintiff to incur the expense and burden of prosecuting litigation to which QB Wash had no colorable defense.

221. 186. Finally, his objective in taking these actions was to deprive Plaintiff and its principals of the fair value of their property by coercing a below-market rent or discounted sale of the Premises – a wrongful and manifestly unjust objective.

222. 187. Scott's wrongful conduct warrants piercing QB Wash's corporate veil and holding him personally liable for QB Wash's debts to Plaintiff.

## G. F. Allegations Concerning Tortious Interference, the Economic Interest Defense and Causation

### 1. Defendant Engaged in Tortious Interference with the Lease

223. 188. Scott tortiously interfered with the Lease by (a) planning and directing QB Wash's breaches of the Lease, and (b) insulating Zachary from the financial consequences of QB Wash's breaches through the Voidable Liens.

### 2. The Economic Interest Defense Is Unavailable Because Defendant Served His and His Son's Interests, Not the Interests of QB Wash

224. 189. Scott had an economic interest in QB Wash but he may not assert a defense of economic interest because his interference primarily served his and Zachary's interests, rather than the interests of QB Wash.

225. 190. First, by acting to insulate Zachary from liability on the Personal Guaranty and therefore from the consequences of QB Wash's breaches of the Lease, Scott served Zachary's interests and his own interests as Zachary's father, rather than the interests of QB Wash.

226. 191. Second, Scott's strategy of causing QB Wash to breach the Lease by withholding rent served his own interests, rather than the interests of QB Wash, because it allowed him to extract tens of thousands of dollars from QB Wash and pay it to family trusts he controlled.

227. 192. Third, Scott's interference with the Lease served his own interests, rather than the interests of QB Wash, because they advanced the goal of pressuring Plaintiff to sell the Premises to him at a below-market price.

### 3. The Economic Interest Defense Is Also Unavailable Because Defendant Directly and Indirectly Engaged in Multiple Independent Torts and Other Unlawful Acts

228. 193. Scott is also barred from asserting the economic interest defense because he directly and indirectly employed multiple independent torts and other unlawful acts in connection with his tortious interference. As alleged above in Point CD (¶¶ 96-129131-164), Scott's unlawful acts consisted of personally executing or directing and benefitting from fraudulent transfers, sanctionable litigation conduct, perjury and the malicious prosecution of Plaintiff.

### 4. Defendant's Actions Were the "But For" Cause of the Damages Resulting from His Economic Coercion Scheme

229. 194. The facts and circumstances set forth in Point EF.1 above (¶¶ 149-180184-215) establish that but for Scott's wrongful conduct, QB Wash would not have engaged in its scheme to coerce Plaintiff and Plaintiff consequently would not have sustained the Rent Nonpayment Damages, the Water Charge Damages or the Attorneys' Fee Damages.

### H. G. Conduct Supporting an Award of Punitive Damages Against Defendant

230. 195. The scheme planned and directed by Scott manifests a conscious disregard for the rights of Plaintiff and its owners, Maureen, Ellen and Ethan.

231. 196. The torts and other wrongs committed in furtherance of the scheme – fraud, fraudulent transfers, tortious interference with contract, perjury and plainly frivolous litigation, all

to achieve the abusive goal of applying economic pressure to obtain an unfair rent or below-market sale of the Premises – reflect an extraordinary level of moral culpability, warranting substantial punitive damages.

232. ~~197.~~ Scott's actions collectively reflect a level of flagrant abuse that demands exemplary damages to further the strong public policy interest in deterring similar conduct.

233. ~~198.~~ First, the conduct at issue was extensively planned and highly intentional.  Far from reflecting a rash or isolated ill-considered action, Scott's asset diversion and economic coercion scheme was the result of careful planning, involving formation of a new Delaware entity to camouflage related-party transactions, execution and filing of multiple documents in furtherance of the scheme, receipt of wrongful cash payments from QB Wash spanning nearly a year, and the conduct of a frivolous court case, premised on numerous false statements contained in multiple submissions to the Court.  Scott's fraudulent inflation of Zachary's net worth in 2015 likewise reflected a series of carefully planned, intentional actions designed to deceive Plaintiff's predecessor-in-interest.

234. ~~199.~~ Second, Scott is an attorney who specializes in debtor-credit law and so was especially well-aware that the conduct at issue was wrongful.  The likelihood that he will have future opportunities to engage in similar misconduct makes the importance of deterrence particularly strong.

235. ~~200.~~ Third, the principal target of the asset diversion and economic coercion scheme was a then-91 year old widow who had just recently lost her husband of over 50 years and was dependent on the Premises for the majority of her household income.  Scott's scheme in fact deprived Maureen of the large majority of her income in both 2020 and 2021.

236.   201. In 2020, the scheme cost her approximately $120,000, reducing her income from around $170,000 to around $50,000.  In 2021, the scheme cost her approximately $165,000, reducing her income from above $220,000 to below $60,000.

237.   202. The injury to Maureen was hardly incidental; it was the point of the scheme, which was pursued with full knowledge of its financial impact on her.  Indeed, the Silvers had conducted a nationwide asset search that had identified her as holding only one other property that was then producing income, and Scott thus knew she was highly dependent on income from the Premises.

238.   203. Fourth, the sanction of punitive damages is particularly warranted because Scott's scheme was founded on exploiting a national health and economic crises for his private gain.  It is an affront to all New Yorkers who suffered genuine harm from the pandemic that the Silvers falsely claimed injury when in fact their business had thrived.

239.   204. Fifth, the goal of Scott's scheme – depriving Maureen and her children of a fair rent or pressuring them into a discounted sale – is inherently wrongful.  Scott's attempt to coercively misappropriate their income or asset constitutes theft, plain and simple.

240.   205. Finally, Scott carried out his scheme without any colorable legal or moral justification.

241.   206. He was not facing any financial distress that could help explain or excuse his conduct – he was in fact ready and able to invest an additional $2 million in cash to acquire the Premises at a discount.

242.   207. There was also no overreach by Plaintiff or hard bargaining on its part that could have possibly justified Scott's abusive and unlawful tactics.  In fact, Plaintiff dealt with the Silvers with restraint and decency throughout their business relationship, forbearing from charging

late fees and extending payment deadlines repeatedly in 2018-19, and then offering to waive rent for the entire period of QB Wash's pandemic-driven closure in March-May 2020, and alternatively offering to forgive all back rent, then totaling over $80,000, and drop all claims arising from the early Lease termination in exchange for the Silvers surrendering possession.

243. 208. Simply stated, Scott planned and directed the Silvers' coercion strategy with the brazen and unconscionable view that he was entitled to burden Plaintiff and its owners with whatever losses it was in his power to impose, regardless of contractual duty or the constraints imposed by law.  The Court must not allow this to stand.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### For Breach of Lease Based on Piercing the Corporate Veil

244. 209. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 208243 as if fully set forth herein.

245. 210. The Lease constituted a valid and enforceable contract between Plaintiff and QB Wash.

246. 211. QB Wash committed multiple breaches of the Lease, as set forth above in paragraphs 131166 through 148183.

247. 212. By reason of the foregoing breaches, Plaintiff suffered the Rent Nonpayment Damages, the Water Charge Damages, the Oil Spill Damages, the Municipal Violation Damages, the Lease Termination Damages, and the Attorneys' Fee Damages.

248. 213. Scott exercised complete domination and control over QB Wash, and accordingly should be deemed an equitable owner of QB Wash.

249. 214. Scott used his domination and control over QB Wash to commit multiple wrongs and injustices against Plaintiff.

250. 215. Scott's wrongful conduct warrants piercing QB Wash's corporate veil as to him.

251. 216. Scott is therefore liable to Plaintiff for the Rent Nonpayment Damages, the Water Charge Damages, the Oil Spill Damages, the Municipal Violation Damages, the Lease Termination Damages, and the Attorneys' Fee Damages.

**SECOND CLAIM FOR RELIEF**
**For Tortious Interference with Contract**

252. 217. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 216251 as if fully set forth herein.

253. 218. The Lease constituted a valid and enforceable contract between Plaintiff and QB Wash.

254. 219. Scott had actual knowledge of the Lease.

255. 220. Scott intentionally procured nonpayment of rent and water charges in breach of the Lease, as set forth above in paragraphs 131166 through 137172, and did so without justification.

256. 221. As a result of Scott's wrongful conduct, Plaintiff sustained the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages.

257. 222. While Scott had an economic interest in QB Wash, the economic interest defense does not apply because (a) Scott's interference primarily served his and his son Zachary's interests, rather than the interests of QB Wash, and (b) in connection with Scott's tortious interference, he directly and indirectly committed multiple independent torts and other unlawful acts.

258. ~~223.~~ But for Scott's wrongful conduct, QB Wash would not have breached the Lease through nonpayment of the rent and water charges, and Plaintiff would not have sustained the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages.

259. ~~224.~~ Scott is therefore liable to Plaintiff for the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages.

### THIRD CLAIM FOR RELIEF
### For Fraud

260. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 259 as if fully set forth herein.

261. If the finder of fact at the trial of this matter concludes that Zachary was an unwitting participant in the Net Worth Misrepresentation, then Scott made a material misrepresentation with knowledge of its falsity and intent to defraud by arranging for funds to be temporarily transferred into the Wells Fargo Brokerage Account and providing Zachary with the Inflated Account Statement with the expectation it would be provided to Ethan and Bert and would deceive them as to Zachary's net worth, cause them to wrongly believe that Zachary had assets that satisfied the Net Worth Requirement, and lead them, respectively, to recommend and approve assignment of the Lease to QB Wash and acceptance of a personal guaranty from Zachary in connection therewith.

262. Ethan and Bert reasonably relied on the Net Worth Misrepresentation.

263. As a direct and foreseeable result of Ethan and Bert's reasonable reliance on the Net Worth Misrepresentation, Plaintiff suffered actual pecuniary losses consisting of (1) unpaid rent and additional rent and the other losses resulting from the breaches of the Lease pled above, and (2) attorneys fees and costs incurred in recovering possession of the Premises through the

Eviction Action and the Bankruptcy Case, and (3) attorneys fees and costs incurred in collecting

damages resulting from breach of the Lease, and Scott is liable therefor.

**FOURTH CLAIM FOR RELIEF**
**For Aiding and Abetting Fraud**

264.     Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs 1 through 263 as if fully set forth herein.

265.     If the finder of fact at the trial of this matter concludes that Zachary was aware of

the Net Worth Misrepresentation, then by providing Ethan with the Inflated Account Statement

and his accompanying email, Zachary made a material false statement with knowledge of its falsity

and intent to defraud.

266.     Scott knew of the Net Worth Misrepresentation and provided substantial assistance

to Zachary in its commission by arranging for funds to be temporarily transferred into the Wells

Fargo Brokerage Account and providing Zachary with the Inflated Account Statement with the

expectation it would be provided to Ethan and Bert and would deceive them as to Zachary's net

worth, cause them to wrongly believe that Zachary had assets that satisfied the Net Worth

Requirement, and lead them, respectively, to recommend and approve assignment of the Lease to

QB Wash and acceptance of a personal guaranty from Zachary in connection therewith.

267.     Ethan and Bert reasonably relied on the Net Worth Misrepresentation.

268.     As a direct and foreseeable result of Ethan and Bert's reasonable reliance on the

Net Worth Misrepresentation, Plaintiff suffered actual pecuniary losses consisting of (1) unpaid

rent and additional rent and the other losses resulting from the breaches of the Lease pled above,

and (2) attorneys fees and costs incurred in recovering possession of the Premises through the

Eviction Action and the Bankruptcy Case, and (3) attorneys fees and costs incurred in collecting

damages resulting from breach of the Lease, and Scott is liable therefor.

**FIFTH CLAIM FOR RELIEF**
**For Conspiracy to Commit Fraud**

269.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 268 as if fully set forth herein.

270.    If the finder of fact at the trial of this matter concludes that Zachary was aware of the Net Worth Misrepresentation, then by providing Ethan with the Inflated Account Statement and his accompanying email, Zachary made a material false statement with knowledge of its falsity and intent to defraud, and Ethan and Bert reasonably relied thereon.

271.    If Zachary was aware of the Net Worth Misrepresentation, then his delivery of the Inflated Account Statement to Ethan, with Scott's participation and knowledge, establishes an agreement with Scott to deceive Ethan and Bert and constitutes an overt act pursuant to that agreement in furtherance of a common plan to deceive Ethan and Bert as to Zachary's net worth, cause them to wrongly believe that Zachary had assets that satisfied the Net Worth Requirement, and lead them, respectively, to recommend and approve assignment of the Lease to QB Wash and acceptance of a personal guaranty from Zachary in connection therewith.

272.    As a direct and foreseeable result of Ethan and Bert's reasonable reliance on the Net Worth Misrepresentation, Plaintiff suffered actual pecuniary losses consisting of (1) unpaid rent and additional rent and the other losses resulting from the breaches of the Lease pled above, and (2) attorneys fees and costs incurred in recovering possession of the Premises through the Eviction Action and the Bankruptcy Case, and (3) attorneys fees and costs incurred in collecting damages resulting from breach of the Lease, and Scott is liable therefor.

**JURY DEMAND**

273.    225. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.       On the First Claim for Relief, for the amount of the Rent Nonpayment Damages, the Water Charge Damages, the Oil Spill Damages, the Municipal Violation Damages, the Lease Termination Damages, and the Attorneys' Fee Damages;

B.        On the Second Claim for Relief, for the amount of the Rent Nonpayment Damages, the Water Charge Damages and the Attorneys' Fee Damages;

C.       On the Third, Fourth and Fifth Claims for Relief, Plaintiff's actual pecuniary losses directly resulting from the fraud, consisting of (1) unpaid rent and additional rent and the other losses resulting from the breaches of the Lease pled above, and (2) attorneys fees and costs incurred in recovering possession of the Premises through the Eviction Action and the Bankruptcy Case, and (3) attorneys fees and costs incurred in collecting damages resulting from breach of the Lease.

~~C~~D.       For punitive damages on the ~~First and~~ Second, Third, Fourth and Fifth Claims for Relief in the amount of not less than Two Million Dollars ($2,000,000); and

~~D~~E.       For such other and further relief as the Court deems just and proper, including, without limitation, costs and disbursements.

Dated:  New York, New York
                ~~August 30~~July ____, ~~2022~~2023                    **ROSENBERG & ESTIS, P.C.**


                                                                      By:_____
                                                                            Michael A. Pensabene, Esq.
                                                                      ~~Harris W. Davidson~~        Eric S. Askanase,
                                                                      Esq.
                                                                            733 Third Avenue
                                                                            New York, New York 10017
                                                                            (212) 867-6000

mpensabene@rosenbergestis.com
easkanase@rosenbergestis.com
*Attorneys for Plaintiff*